**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Chevelle & Holly Clements, as co- administrators of the estate of DECYNTHIA CLEMENTS, Deceased, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Case No.  1:18-CV-03935 |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF ELGIN, a municipal corporation, and ELGIN POLICE OFFICERS Christopher Jensen, individually and as agents of the CITY OF ELGIN | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS, CITY OF ELGIN AND ELGIN POLICE OFFICER CHRISTIAN JENSEN'S RULE 56.1(a) (3) STATEMENT OF MATERIAL FACTS**

NOW COME Defendants, CITY OF ELGIN and ELGIN POLICE OFFICER CHRISTIAN JENSEN, by and through their attorneys, DeANO & SCARRY, LLC and for their Rule 56.1 (a) (3) Statement of Undisputed Material Facts, set forth the following:

**Description of the parties**

The Plaintiff is the Estate of DeCynthia Clements, deceased, Defendant City of Elgin is a Illinois municipal corporation and Defendant Christian Jensen is a Lieutenant in the City of Elgin Police Department. Plaintiff brought this Wrongful Death and Survival Action under Section 1983 asserting claims of Excessive Force and Failure to Intervene, a Monell claim for Failure to Train and state claims of Battery and Willful and Wanton Conduct. (Exhibit A –Amended Complaint)

1

**Venue and Jurisdiction**

Jurisdiction in this court is founded in the federal questions under 28 U.S.C. §1331 and 28 U.S.C. §1343, and supplemental jurisdiction over state law claims is based on 28 U.S.C. §1367.

Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the Northern District of Illinois and all parties reside in this Judicial District.

**follows:**

### EXHIBITS

Exhibit A - Amended Complaint

Exhibit B - Deposition of Officer Joniak

Exhibit C - Affidavit of Officer Joniak

Exhibit D - Deposition of Lieutenant Jensen

Exhibit E - Affidavit of Lieutenant Jensen

Exhibit F - Deposition of Officer Hall

Exhibit G - Deposition of Officer Garcia

Exhibit H - Deposition of Dr. White

Exhibit I - Deposition of Sgt Hartman

Exhibit J - Deposition of Officer Williamson

Exhibit K - Deposition of Master Sergeant Surz

Exhibit L - Deposition of Paramedic Best

Exhibit M - Deposition of Paramedic Bava

Exhibit N - Deposition of Officer Duffy

Exhibit O - Deposition of Trooper Nelson

Exhibit P - Deposition of Officer Schuttrow

Exhibit Q - Deposition of Paramedic Needham

Exhibit R - Deposition of Chief Ana Lalley

Exhibit S - Elgin Police Department Policy 1.3

Exhibit T - Deposition of Sergeant Demierre

Exhibit U - Body Camera Video Recording of Officer Schuttrow

Exhibit V - Body Camera Video Recording of Officer Joniak

Exhibit W - Body Camera Video Recording of Lieutenant Jensen

Exhibit X - Dashboard Camera Video Recording of Lieutenant Jensen

1.     On March 11, 2018 at approximately 11:50pm Elgin Police Officer Matthew Joniak was on routine patrol in a marked squad when he performed a premises check of Trout Park, which was closed at that hour. At that time, Office Joniak's attention was drawn to a vehicle with its running lights on parked near a bike trail at Trout Park. Exhibit B p. 5, 44-46; Exhibit C.

2.     Officer Joniak proceeded with the premises check of Trout Park and approximately one-half hour after first observing the parked vehicle, Officer Joniak returned to the area where he had first seen it and noticed it was still parked at that location.   Exhibit B p. 47.

3.      Officer Joniak approached the parked vehicle and spoke with the driver who stated that

her name was DeCynthia Clements and she was there to meet with and obtain money from her

husband, a sheriff.  Exhibit B p. 48-49.

4.      While speaking with Ms. Clements, Officer Joniak observed a knife on the front

passenger seat of her car and noticed that the interior of the car was in disarray.  Exhibit B p. 49,

59.  Officer Joniak had been trained in advanced recognition of impaired driving (ARIDE) and

determined that Ms. Clements showed signs of impairment such as dilation of pupils and

bruxism, a grinding of the teeth and mashing of the gums, which are signs that a person is under

the influence of a central nervous system stimulant. Exhibit B p. 49-50, 53-54.

5.      Having observed signs of Ms. Clements's impairment, Officer Joniak made a decision to

call for a police dog to "sniff" Ms. Clements's vehicle, but as he returned to his squad car to

make the call, Ms. Clements drove away from the area. Exhibit B p. 50.

6.      Believing that Ms. Clements was driving while impaired, Officer Joniak followed Ms.

Clements in his squad and when she disregarded a stop sign, he activated his overhead lights and

siren to initiate a traffic stop. Exhibit B p. 51.  After Officer Joniak activated his overhead lights

and siren, the Clements vehicle accelerated farther ahead of Joniak's squad car.  Exhibit B p. 52.

Officer Joniak followed Ms. Clements as she continued northbound on Dundee and turned onto

the entrance ramp for eastbound Interstate 90. Exhibit B p. 52**.**

7.      After Officer Joniak drove onto the ramp to eastbound Interstate 90, he was instructed via radio by his shift commander, Lieutenant Jensen, to terminate the pursuit of Ms. Clements because the pursuit was being conducted for solely traffic violations. Exhibit B p. 52- 53. Exhibit D p. 30; Exhibit G p. 56.

8.      Officer Joniak then terminated the pursuit, shut down his overhead lights and dashboard camera and proceeded eastbound on Interstate 90 to the next exit, at Route 59, where he exited Interstate 90, then took Route 59 to the entrance to westbound Interstate 90, intending to return to the City of Elgin on westbound Interstate 90. Exhibit B p.  52-53.

9.      On March 12, 2018, Elgin Police Officer Christopher Hall was westbound on Interstate 90 when he observed a vehicle 200 yards ahead of him at the "turnaround to go into the westbound lanes" and Hall then saw the taillights of that vehicle rise four to six feet into the air and come down abruptly, which caused Officer Hall to conclude that the vehicle had collided with the guardrail. Exhibit F p. 34-35. Officer Hall wanted to make sure that that car was alright, so he then turned to enter the westbound lanes of Interstate 90. Exhibit F p. 34, 38.

10.     Officer Hall followed the vehicle, a dark colored SUV, which was being driven very slowly, very close to the median barrier and not within a demarcated traffic lane. Exhibit F p. 37-38. Officer Hall followed this vehicle for minute or two until the vehicle eventually stopped and then Officer Hall radioed Officer Joniak to ask if the vehicle Joniak had been pursuing was a dark colored SUV. Exhibit F p. 40. Officer Joniak responded in the affirmative and Hall then told Joniak that the vehicle was now in the westbound lanes of Interstate 90.  Exhibit B p 54; Exhibit F p. 40.

5

11.     As Officer Joniak continued westbound on Interstate 90 he observed the damaged car to which Officer Hall had referred and Joniak confirmed that it was the vehicle occupied by Ms. Clements which he had pursued earlier. Exhibit B p. 54. At that time, Officer Joniak believed he had probable cause to arrest Ms. Clements for disobeying a stop sign, fleeing and eluding and possibly DUI depending on the results of a field sobriety test he intended to perform. Exhibit B p. 55, 58.

12.     Ms. Clements had stopped her car on the shoulder of westbound Interstate 90; the driver's side of her car had two flat tires and there was body damage on the driver's side of the car. Exhibit B p. 59; Exhibit G p. 69. Officer Joniak stopped behind her and then attempted to communicate with Ms. Clements and as he did so he observed the knife in the front passenger seat of her car. Exhibit B p. 59.

13.     Officer Hall then arrived on the scene, walked to the passenger's side the Clements vehicle and saw Ms. Clements holding a Bic lighter in her left hand and a pipe in her right hand, she then put the pipe to her lips and lighted it. Exhibit B p. 57-58; Exhibit F p. 43. Officer Hall also saw a steak knife with a sharp serrated edge, under Ms. Clements's right hip. Exhibit F p. 45.

14.     Dr. Steven White was the Cook County Medical Examiner who performed the autopsy of Ms. Clements and obtained her toxicology results from NMS Laboratory, a facility with which he was familiar and had reviewed and relied on toxicology results from in the past. Exhibit H p. 50, 66-67. Dr. White reviewed and relied upon NMS Laboratory's toxicology report regarding

Ms. Clements and it showed that Ms. Clements's blood tested positive for cocaine and

Benzoylecgonine, which is the metabolite of cocaine. Exhibit H p. 50, 66-67.

15.    As Officers Joniak and Hall were attempting to speak with Ms. Clements, Elgin Police

Sergeant Robert Hartman arrived on the scene. Exhibit B p. 60. Upon learning of the incident on

Interstate 90 Sergeant Hartman went to the scene to provide support and assistance.  Exhibit I p.

60.

16.    Sergeant Hartman had been a member of the Elgin Police Department since 1996 and had

been a member of the crisis and hostage negotiation team since 2004.  Exhibit I p. 5, 12-13.  In

2004 Sergeant Hartman attended a crises intervention course at Northwestern University; the

course was certified by the State of Illinois and provided training on how to negotiate with

people in crisis. Exhibit I p. 13-14, 166-168.

17.    Prior to 2018, Sergeant Hartman also attended a crises training course at the Aurora

Police Department which featured actors role playing in crises situations. Exhibit I p. 14-16, 50-

51. That course included specific training on de-escalation and negotiating with people

experiencing a mental health crisis.  Exhibit I p. 14-16, 50-51. Prior to 2018 Sergeant Hartman

utilized his crises intervention skills on patrol and on SWAT calls, including situations where a

subject was armed, to attempt to ensure that incidents did not escalate and would end peacefully.

Exhibit I p. 45-46, 48.

18.     Officer Chad Schuttrow joined the Elgin Police Department in 2012, after spending six years as an Indiana State Trooper. Exhibit P p. 13-14. Officer Schuttrow responded to the call on Interstate 90 on March 12, 2018, because of the nature of the call, initially a pursuit, and because the two officers on scene, Hall and Joniak, were relatively new officers. Exhibit P p. 61-62.

19.     Elgin police Lieutenant Christian Jensen arrived on scene on Interstate 90 at approximately 12:30 a.m. on March 12, 2018 as the officer in charge. Exhibit D p. 8-9. Lt. Jensen was hired by the Elgin Police Department in 1999, became a sergeant in 2011, a Lieutenant in 2016 and was a member of the Elgin SWAT team from 2002 to 2018.  Exhibit D p. 7, 13-14.

20.     Lt Jensen tried to communicate with Ms. Clements by calling her name, but she would not acknowledge him or look in his direction. Exhibit D p. 23. Lt. Jensen thought that Ms. Clements was either emotionally disturbed or under the influence of alcohol or drugs, so he told Sergeant Hartman, a certified crises intervention officer, to engage in crises intervention negotiations with Ms. Clements. Exhibit D p. 24, 28; Exhibit I p. 86. A total of three Elgin officers present at the scene on interstate 90 were certified in crises intervention. Exhibit D p. 22; Exhibit J p. 43-44.

21.     Sgt. Hartman used the microphone in his squad car to speak to Ms. Clements and tried to develop a dialogue with her to de-escalate the situation and resolve it peacefully; he told her that no one was going to hurt her and asked her what police could do to help her. Exhibit I p. 91-93, 108-109; Exhibit J p. 86-87.

22.     Lt. Jensen told Sergeant Hartman to "keep on negotiating." Exhibit I p. 140.  Sgt. Hartman also called phone numbers of Ms. Clements and her family members, but was unable to reach them. Exhibit I p. 66, 84-86, 107, 159-160, 168-169; Exhibit J p. 73-74.

23.     When Sgt. Hartman learned that Ms. Clements was in possession of a knife he radioed a request for non-lethal weapons such as a 40 millimeter non-lethal munition to be brought to the scene because he wanted to ensure a peaceful resolution of the matter.   Exhibit I p 156, 160-161.

24.     Ms. Clements never responded to Sgt. Hartman's efforts to communicate with her and effective and successful crisis intervention depends upon cooperation from and communication with the subject. Exhibit I p. 170-172. Crises intervention requires at the very minimum that the subject acknowledge the presence of the crises intervention officer, which Ms. Clements did not do. Exhibit B p. 83; Exhibit D p. 23, Exhibit I p. 170-172.

25.     Master Sergeant Margaret Surz was the supervisor of the Illinois State Troopers at the scene on Interstate 90 on March 12, 2018 and she offered assistance to Elgin Police. Exhibit K p. 5, 32, 57. Master Sergeant Surz was told by Elgin Lieutenant Jensen that Elgin police would take charge of the scene and Jensen asked Surz for assistance in shutting down both eastbound and westbound lanes of Interstate 90 to protect against the possibility that Ms. Clements would exit her car and run across the road. Exhibit K p. 40-44; Exhibit P p.75-79. Lieutenant Jensen told Sgt Surz that he had a negotiator on scene. Exhibit K p. 94.

26.     During the incident Master Sergeant Surz called for an ambulance to be present on standby at the scene. Exhibit K p. 23. She had been trained to call for an ambulance when a matter involved a subject who was suicidal or had mental health issues. Exhibit K p. 23, 24. Master Sergeant Surz called for the ambulance because Elgin Police informed her that Ms. Clements had a knife and was possibly cutting herself and because Surz thought Ms. Clements "was in a disjointed mental state, possibly suicidal." Exhibit K p. 26.

27.     Hoffman Estates firefighter/paramedics were initially dispatched to the scene on Interstate 90 on March 12, 2018, for "a behavioral or a psychiatric-type call and possible suicide." Exhibit L p. 22-23, 51-53. On such calls, the firefighter/paramedics will "stage" in their ambulance near the scene but will not approach the subject until police inform them that it is safe to do so. Exhibit D p. 123-124; Exhibit L p. 51-53.

28.     While the Hoffman Estates paramedics were en route and getting close to Interstate 90 at Route 59 they received an update call stating that the vehicle on Interstate 90 was now was on fire. Exhibit L p. 23, 51-53. The Hoffman Estates paramedics staged in their ambulance on the bridge over Interstate 90 at Route 59. Exhibit M p. 23.

29.     During incident Master Sergeant Surz observed the Clements vehicle keep driving forward and backward toward several officers on foot behind her vehicle and the friction of the metal rims on the pavement caused sparks to emit as the wheels turned. Exhibit K p. 51, 53-55, 83-84; Exhibit N p. 41; Exhibit P p. 73. Ms. Clements drove her vehicle forward and backward

10

multiple times, for distances of fifteen, twenty or fifty feet and some of the police officers

climbed over the concrete median barrier to the eastbound lanes for safety. Exhibit C .p 60-61;

Exhibit J p. 79-81; Exhibit N p. 90-91; Exhibit P p. 73, 79. Lieutenant Jensen directed the Elgin

officers to move to the eastbound side of Interstate 90 to in case Ms. Clements drove in reverse

again. Exhibit I p. 125.

30.     Illinois State Trooper Brett Nelson approached the Clements vehicle when he arrived on

scene and Clements car drove forward "two plus times."  Exhibit O p. 40. Trooper Nelson saw

Elgin police officers approach the vehicle a couple of times and each time the Clements vehicle

would go in reverse and then start driving forward.  Exhibit O p. 44.  Trooper Nelson asked

Elgin officers why they were not taking Ms. Clements out of the vehicle and they told him that

they believed they were not permitted by law to do so.  Exhibit O P. 45

31.     One of the female Elgin police officers on the night shift will go to the scene of a police

call when there is a female subject involved.  Exhibit G p. 100-101. Female Elgin police officers

Cristina Garcia and Linda Williamson attended the Clements scene on March 12, 2018. Exhibit

G p. 93; Exhibit J p. 46-47.

32.     Ms. Clements drove her vehicle away when Officer Garcia was standing next to her

vehicle trying to communicate with her. Exhibit G p.109. At one point Ms. Clements backed up

her vehicle directly toward Officers Garcia and Hall who were standing possibly fifteen feet

from Clements's car and there was nothing between the car and the officers.  Ex G p. 109, 115.

When asked about the distance between the car and the officers, Officer Garcia testified, "I don't know. 15 feet." Exhibit G p. 115.

33.     Lieutenant Jensen told Sergeant Hartman that they would have to stop the Clements vehicle from moving forward. Exhibit I p. 65-66. Lieutenant Jensen told Sergeant Hartman to park his vehicle behind Ms. Clements's car, touching the back of her car to contain it, and Lieutenant Jensen parked his squad in front of the Clements car, facing it, to prevent the car from moving forward and backward and from exiting Interstate 90 and getting on to Dundee Road. Exhibit D p. 125-126; Exhibit I p. 65-67, 95. Ms. Clements's car was pinned between the squad cars for the safety of Ms. Clements and the police officers. Exhibit B p. 62-63.

34.     After the Clements vehicle was pinned, or blocked in place, Ms. Clements began to step on the gas pedal and place the car in forward and reverse, causing the engine to smoke and the rims and metal axles to grind into the concrete surface of the road making sparks shoot from the rims.  Exhibit B p. 63; Exhibit K p. 54, 59; Exhibit O p. 49-50; Exhibit P p. 89. The Clements vehicle was in physical contact with and was pushing against the Jensen squad car in front of it. Exhibit I p. 137-138.

35.     Ms. Clements was seen holding a knife to her throat and making a stabbing motion with the knife towards her chest. Exhibit B p. 67.  Sergeant Hartman had learned in crises training that "the line between a suicidal subject and a homicidal subject is very thin.  Someone who is ready to kill themselves won't have any problems killing you."  Exhibit I p. 101. Lt Jensen concluded

that Ms. Clements was exhibiting suicidal actions and was either emotionally disturbed, mentally ill or under the influence of alcohol or drugs or a combination of all of these. Exhibit D p. 66-67.

36.     During the course of the incident, Lt Jensen spoke by phone with Elgin police Commander Collin Fleury and Elgin Sergeant Jim Lalley about the process they were going to use, whether additional resources would be to be needed and whether they should employ a full SWAT response. Exhibit D p. 49-51.

37.     The Elgin officers discussed using less lethal devices in the event Ms. Clements came out of her vehicle holdings knives. Exhibit I p. 163. The Elgin officers discussed that if Ms. Clements came out of the vehicle with a knife less lethal options such as pepperball and Tasers and a 40 millimeter munition would be available to use. Exhibit I p. 131-132.

38.     Officer Williamson was called to the scene to bring a pepperball because nonlethal force was being considered. Exhibit J p. 44, 48. A pepperball is a nonlethal projectile which upon impact releases a powder irritant which is intended to bring subjects into compliance. Exhibit J p. 49. Officer Williamson was trained on the use of the pepperball and she brought the PepperBall to the scene. Exhibit J p. 45, 50. Exhibit G p. 108; Exhibit J p. 45, 50 and 55.

39.     Lt Jensen told Elgin officers "we'll be here for a while," (Exhibit J p. 76-77), and that they were going to "wait it out until [Ms. Clements] got out of the vehicle." Exhibit G p. 114-116. The plan was to continue talking to Ms. Clements and see if the circumstances changed for

her to come out of the car.  Exhibit G p. 116. The plan that was employed was to wait and gain her compliance through verbal communication and contact. Exhibit N p. 65-66.

40.     The Elgin officers on the scene "had many discussions of formulations of possible scenarios that could have happened." Exhibit N p. 66. One such scenario was "if she came out and was compliant, if she would come back to the officers, she would be taken into custody, given the medical and mental healthcare that she needed before anything else [was] to happen. Another scenario was, if she was going to be what we call resistive or, you know, run away from officers, if there was traffic and other pedestrians -- not pedestrians, but traffic in other -- like noninvolved individuals in the roadway, there is a discussion had about what we would do then and the tools and implements that we would use." Exhibit N p. 66.

41.     If Ms. Clements came out of the car with knives in her hands, the plan was to utilize the Taser, if she was not charging at the officers. Exhibit D p. 98, If she exited the vehicle and stood there, the plan was to back up and "hopefully be able to hop over the median," but that did not work because Ms. Clements charged the officers upon exiting of the vehicle.  Exhibit D p. 98. Lt Jensen had communicated that plan earlier, before the car was engulfed in flames. Exhibit D p. 99.

42.     The Elgin officers discussed using less lethal devices in the event Ms. Clements came out of her vehicle holdings knives. Exhibit I p. 163. Elgin officers also discussed "the same scenario where she was resistant and running away from officers but there was no traffic involved in the roadway or no other bystanders in the area. So there were many discussions of formulations of possible scenarios that could have happened." Exhibit N p. 66-67.

14

43.     The Elgin officers also discussed the possible use the 40 millimeter less lethal munition. Exhibit N p. 67. Elgin Officer Duffy stated, "I mean, we just like to have all our tools on scene. You never know what you are going to need because there's a million and one possibilities, and we can't predict them all…"   Exhibit N p. 67-68.

44.     After her car was pinned in place, Lieutenant Jensen sat in his squad car, facing into the front windshield of Ms. Clements's car and he observed Ms. Clements light a piece of paper on fire and toss it into the backseat of her car. Ex E pars. 6-7.  Lieutenant Jensen had activated the dashboard camera of his squad on March 12, 2018, reviewed the video recording depicting Ms. Clements lighting the piece of paper and tossing it into the backseat and concluded that the video recording truly and accurately depicts Ms. Clements doing this. Ex E Pars. 6-7.

45.     After the fire started, Elgin officers called to Ms. Clements, urging her to get out of the flaming car. Exhibit G p. 102. At that point, Lt Jensen decided not to use the 40 Millimeter impact weapon because he was concerned that breaking a car window could oxygenate the interior of the car and accelerate the fire; he was also concerned that if she was struck in the head by the 40 millimeter projectile she could become incapacitated inside the flaming vehicle. Exhibit B p. 64-65; Exhibit D p. 77. The 40 millimeter impact weapon can be lethal in a range closer than five feet. Exhibit D p. 79; Exhibit I p. 163-164.

46.     The incident escalated when the vehicle was set on fire. Exhibit I p. 102, 149. The fire inside her vehicle started near the middle of the vehicle and then spread to the point where the

15

car was nearly fully engulfed. Exhibit B p. 68. Once the fire had started Lieutenant Jensen told

Elgin Offices that "we were going to have to extract Decynthia out of the burning vehicle" and

he assigned officers Joniak and Schuttrow to the "hands" team. Exhibit B p. 68-69; Exhibit I p. 139.


47.     Lieutenant Jensen said over the radio, "we have a fire in the car, we have to get her out of

there." Exhibit F p. 75. Elgin officers were yelling to Ms. Clements, trying to get her to step

away from the flaming vehicle.  Exhibit G p. 102.


48.     The fire was spreading quickly, but Ms. Clements remained in the vehicle so Lt Jensen

determined that Elgin officers would have to approach the vehicle because there was not enough

time to wait due to the fire inside the vehicle. Exhibit D p. 92.


49.     When the fire started, Elgin police officers began to plan to rescue Ms. Clements from

the burning vehicle. Exhibit P p. 92-93. Four Elgin officers gathered next to Ms. Clements's

vehicle, Lieutenant Jensen and Officers Joniak, Hall, and Schuttrow, preparing to rescue Ms.

Clements and protect themselves from any harm Ms. Clements may attempt to inflict. Exhibit B

p. 72; Exhibit E.

50.     Lieutenant Jensen initially assigned the Taser to Officer Schuttrow, then Officer Hall was

assigned the Taser by Officer Schuttrow when Schuttrow was reassigned to the 'hands' team.

Exhibit P p. 96-97. Officer Hall had been trained and certified on the use of the Taser.  Exhibit F

p. 19-20.

51.     Lieutenant Jensen assigned two officers to a "hands" team, meaning they were to physically remove Ms. Clements from the burning vehicle when it was deemed appropriate to do so.  Exhibit B p. 68-69, 73; Exhibit P p. 98-99. Officers Schuttrow and Joniak were the "hands" team. Exhibit B p. 68-69, 73; Exhibit P p. 98-99.

52.     As the vehicle was becoming fully engulfed in flames, the driver's door opened and officers yelled to Ms. Clements to drop the knives, show her hands and exit the vehicle.  Exhibit B p. 71; Exhibit G p. 102; Exhibit P p. 112. Lieutenant Jensen held a ballistic shield, although a ballistic shield is not an effective defense against an attacker wielding a knife. Exhibit N p. 106-107.

53.     Lt Jensen was aware that Ms. Clements could come out of the car with a knife or knives in her hands. Exhibit D p. 75. Lieutenant Jensen's decision to resort to deadly force depended on the manner in which Ms. Clements exited the car. Exhibit D p. 140. If she came out aggressively but then stood there, the Taser could be utilized and if she ran away from police, deadly force would not have been an option. Exhibit D p. 140.

54.     Ms. Clements exited her car and then made an aggressive lunging motion toward the officers with a knife in her right hand and a knife in her left hand. Exhibit P p. 113, 95-96.  Once out of the car, Ms. Clements made a "harsh step" toward the officers with her body leaning in the direction of the officers. Exhibit P p. 113.  Officer Schuttrow believed that Ms. Clements's physical motions made it clear that she was "coming to attack officers." Exhibit P p. 150.

55.     Officer Joniak observed Ms. Clements exit the vehicle with the knife in her hand in a manner he described as aggressively toward the police officers.  Exhibit B p. 71. Officer Joniak perceived Ms. Clements as a threat as she exited her vehicle and believed she intended to inflict harm so he unholstered his firearm but before he could discharge his weapon, Lieutenant Jensen discharged his firearm. Exhibit B p. 71, 74-76.

56.     The parties have stipulated to the proper foundation for the body camera video recordings of the Elgin officers equipped with body cameras on March 12, 2018. Exhibit D p. 142-143.

57.     Officer Schuttrow had his body camera activated and recording throughout the event. Exhibit P p. 56-57.  Lieutenant Jensen reviewed the video recording of Officer Schuttrow's body camera and concluded that the video truly and accurately depicts the events of March 12, 2018, as they unfolded, in particular, the manner in which Ms. Clements exited her vehicle in possession of a knife in her left hand and moved swiftly toward Lieutenant Jensen and the other officers. Exhibit E par. 9. The still shots below, taken from Officer Schuttrow's body camera, depict Ms. Clements as she exited her car. Ex E.





58.     Lieutenant Jensen reviewed the video recording of Officer Joniak's body camera and

concluded that the video truly and accurately depicts the events of March 12, 2018, as they

unfolded, in particular, the manner in which Ms. Clements exited her vehicle in possession of a

19

knife in her right hand and moved swiftly toward Lieutenant Jensen and the other officers.
Exhibit E par. 10.

59.     As she exited her vehicle, Ms. Clements took approximately three steps toward
Lieutenant Jensen, holding a knife in each hand in a threatening fashion, and was approximately
three feet from him when he discharged his firearm at her. Exhibit B p. 71; Exhibit D. p. 89;
Exhibit E par. 11.  Lieutenant Jensen was within three to five feet from Ms. Clements as she
moved swiftly toward him and he fired his weapon.  Exhibit D p. 78-79. The knife Ms. Clements
held in her right hand is visible at 7:07:06 on the body camera video of Officer Joniak
immediately following the shooting, as shown in the still shot below. Ex E par. 9.



60.     Officer Hall fired his Taser at Ms. Clements when he saw her run at the officers with both
fists raised and knives in her hands. Exhibit F p. 81-83.  The Taser was discharged almost
simultaneously with the discharge of the firearm. Exhibit F p. 83.

61.     Elgin police officers who observed Ms. Clements's condition after the shooting concluded that she was deceased and that any medical aid they could offer would not save her life.  Exhibit G p. 96-97; Exhibit F p. 89; Exhibit N p. 78.

62.     Dr. Steven White was the pathologist at the Cook County Medical Examiners Office who performed the autopsy on Ms. Clements. Exhibit H p. 7, 12-13, 30. The gunshot wound to Ms. Clements's head "was lethal because it injured the brain, which is a lethal injury." Exhibit H p. 53. That gunshot wound also injured the midbrain, the pons, and the medulla which made it a lethal gunshot wound. Exhibit H p. 53.

63.     When Hoffman Estates paramedics observed Ms. Clements on Interstate 90, they observed brain matter on her and on the road pavement, which meets the "obvious sign of death criteria" for their paramedic protocol.  Exhibit M p. 47-48. As paramedics tended to Ms. Clements, she remained unresponsive, never breathed on her own and never responded to painful stimuli. Exhibit M p. 48-50; Exhibit Q p. 66-68.

64.     After the shooting, Ms. Clements's body lay motionless on the pavement within a few feet of her car, which by then was fully engulfed in flames and was emitting popping and snapping sounds, so Officer Schuttrow dragged Ms. Clements's by the wrists away from the smoke, heat and flames. Exhibit P p. 119-120.

65.     Hoffman Estates paramedic Charles Best testified that dragging a person away from a fire can be appropriate and "makes sense" from a risk/benefit analysis and that the paramedics would

have dragged Ms. Clements away from the flaming car to assess and treat her. Exhibit L p. 34-35, 53-55.

66.     City of Elgin police officers are trained on Elgin Police Department Standard Operating Procedure 1.3 entitled "Response to Resistance" which contains the department's use of force policy, including deadly force. Exhibit R p. 84, 109; Exhibit S. The policy states that officers shall use the level of force that is proportionate and objectively reasonable and deadly force may only be used when the subject presents a threat of death or great bodily harm to the officer or others and may be used only as a last resort. Exhibit R p. 85-87; Exhibit S.

67.     The Elgin Police Department use of force policy prohibits officers from employing deadly force against an individual who only poses a danger to themselves. Exhibit R p. 82-83. Lieutenant Jensen received use of force training at the Elgin Police Department, Exhibit D p. 112.

68.     Elgin Police Department Standard Operating Procedure 42.5, "Responding to Persons with Mental Illness" as revised on May 27, 2015, establishes guidelines for the recognition and handling of persons who are suspected to be mentally ill and/or in need of mental health treatment and provides procedures to be used when coming into contact with such individuals. Exhibit R p. 64-65; Exhibit T p. 40-41

69.     Elgin police officers are trained that they are required to render assistance to injured subjects when appropriate and to the extent possible and when the injuries exceed the officer's capabilities, the officer should request medical transport. Exhibit R p. 47-48.

70.    Prior to 2018, the Elgin Police Department began sending officers to a 40-hour crisis intervention training class.  Exhibit R p. 21. The Elgin Police Department provides training on crisis intervention including how to address individuals having a mental health crisis, building rapport with the individual and the use of verbal de-escalation tactics. Exhibit T p. 17-18, 20.

Respectfully submitted


DeANO & SCARRY, LLC


_____s/James L. DeAno_____
Attorney for Defendants
Christian Jensen and City of Elgin

James L. DeAno
DeAno & Scarry, LLC
53 W. Jackson Blvd.
Suite 1610
Chicago, IL 60604
(630) 690-2800
jdeano@deanoscarry.com