**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE NORTHERN DISTRICT OF ILLINOIS
 3               EASTERN DIVISION
 4
 5  CHEVELLE & HOLLY CLEMENTS, as    )
 6  Co-Administrators of the         )
 7  Estate of DECYNTHIA CLEMENTS,    )
 8  Deceased,                        )
 9           Plaintiffs,             ) No. 18 CV 3995
10        -v-                        )
11  CITY OF ELGIN, a municipal       )
12  corporation; et al.,             )
13           Defendants.             )
14
15     The video deposition of Christian Jensen,
16  called for examination pursuant to the Rules of
17  Civil Procedure for the United States District
18  Courts pertaining to the taking of depositions,
19  on the 24th day of November, 2020, at the hour of
20  11:00 a.m., via zoom, pursuant to notice.
21
22           (Proceedings concluded at 3:15 p.m.)
23  REPORTED BY ELVIRA M. MOLNAR
24  CERTIFIED SHORTHAND REPORTER LICENSE NO. 84-3309
```
1

**Page 2**

```
 1  APPEARANCES:
 2     ROMANUCCI & BLANDIN
 3     MR. ANTONIO M. ROMANUCCI
 4     MS. BHAVANI RAVEENDRAN
 5     321 North Clark Street, Suite 900
 6     Chicago, Illinois 60654
 7     312-458-1000
 8     aromanucci@rblaw.net
 9     braveendran@rblaw.net
10        appeared on behalf of the Plaintiffs;
11
12     DEANO & SCARRY, LLC
13     MR. JAMES L. DEANO
14     MR. RAYMOND BYRNE
15     53 West Jackson Boulevard, Suite 1610
16     Chicago, Illinois 60604
17     630-690-2800
18     jdeano@deanoscarry.com
19        appeared on behalf of the Defendants.
20
21  ALSO PRESENT:
22     Mr. Andrew Stroth
       Mr. Ian Fallon
23     Ms. Eva Dickey
       Mr. Holly Lucy
24     Mr. Tom Scheckel
```
2

**Page 3**

```
 1                    INDEX
 2  WITNESS                        EXAMINATION
 3  Christian Jensen
 4    By Mr. Romanucci                 4
 5
 6
 7
 8                  EXHIBITS
 9  NUMBER                       MARKED FOR ID
10  Jensen Deposition
11    Exhibit No. 1                  37
12    Exhibit No. 2                  56
13    Exhibit No. 3                  95
14    Exhibit No. 4                  95
15    Exhibit No. 5                 105
16    Exhibit No. 6                 110
17    Exhibit No. 7                 118
18    Exhibit No. 8                 118
19    Exhibit No. 9                 124
20    Exhibit No. 10                126
21    Exhibit No. 11                127
22    Exhibit No. 12                130
23    Exhibit No. 13                131
24    Exhibit No. 14                147
```
3

**Page 4**

```
 1      THE VIDEOGRAPHER:  We are now on the record.
 2  The time is 11:02 a.m.  Please proceed.
 3           (Whereupon, the witness was duly
 4            sworn.)
 5           Christian Jensen,
 6  called as a witness herein, having been first duly
 7  sworn, was examined and testified as follows:
 8                EXAMINATION
 9  BY MR. ROMANUCCI:
10     Q.  Good morning, Officer Jensen.  My name is
11  Tony Romanucci.  I am one of the attorneys
12  representing the Estate of DeCynthia Clements.
13        Can you state your full name, please.
14     A.  Yes.  It's Christian Jensen, spelled
15  J-E-N-S-E-N.
16     Q.  No middle initial?
17     A.  M.
18     Q.  I'm sorry, what was it?
19     A.  M.
20     Q.  Very well.  Officer Jensen, we are taking
21  this deposition, as you can see, by video
22  conference.  This is something that we didn't do
23  very often prior to the pandemic, but now has
24  become standard operating procedure in this world
```
4



1  with Covid.
2         So we have some hurdles that we are going
3  to have to get over today, and that's making sure
4  that you and I cooperate with each other.  Meaning
5  that as I ask the question, that you are to give
6  the answer.  And it's probably best to wait a
7  quarter to half second after you think I'm done to
8  make sure that I'm done with my question, that I'm
9  still not thinking about what else to ask.  And I
10  will do the same with you.  I will do my best to
11  wait for you to finish your answer before I begin
12  the next question.
13        Have you given a deposition before?
14  A.    Yes, I have.
15  Q.    Are you familiar with the rules or would
16  you like me to go over them with you?
17  A.    Why don't you go over them again.
18  Q.    So, I am here to ask you questions and
19  you're here to give answers as a result of the
20  lawsuit that was filed against the City of Elgin
21  and yourself for the death of Cynthia --
22  DeCynthia Clements on March 12, 2018.
23        As I told you, it's very important that we
24  don't speak over each other because despite the

5

1  fact that this is being recorded video-wise, the
2  court reporter still has to make a record of this.
3  So she is going to be required to write down
4  everything that you're saying, that I am saying,
5  that your attorney may be saying, or anybody else
6  who is participating.
7         Is that understood?
8  A.    Yes, sir.
9  Q.    The other thing is obviously I am looking
10  here to get information from you, and I am here to
11  also exhaust your memory about certain things.
12        Now, if you have no memory or you have no
13  information, that would be appropriate.  But if I
14  asked you, for example, to give me an example on
15  time or distance or speed, which may not be an
16  issue in this case, I want you to give me your best
17  estimate.  I want to give me your closest
18  estimate that you can.  I am not asking you to
19  guess, because nobody wants a guess, but I do want
20  you to give me your best answer to the question.
21        You're allowed to take breaks at any time.
22  The only time you're not allowed to take a break is
23  if there is a question pending.  We will take
24  periodic breaks as it is, anyway.  Typically, you

6

1  know, every one to two hours we will take a break.
2  We will certainly accommodate if you need to make a
3  phone call or comfort breaks.
4         And because we are going to be working
5  over the lunch hour, we will probably take maybe an
6  extra few minutes when we take our first break or
7  so if you want to get some nourishment and
8  something to drink, also, okay?
9  A.    Sounds good.
10  Q.    All right.  So you have already told me
11  your name.  I want you to tell me where are you
12  located right now?  Where are you giving this
13  deposition at?
14  A.    I am at the Elgin Police Department inside
15  my office.
16  Q.    And what is your current rank in the
17  Elgin Police Department?
18  A.    I'm a lieutenant.
19  Q.    And you have been a lieutenant for how
20  long?
21  A.    Since late 2016 early 2017.  I forget the
22  exact swear in.
23  Q.    And how many years have you been employed
24  by the Elgin Police Department as a sworn officer?

7

1  A.    21 years.
2  Q.    Prior -- or prior to your employment with
3  Elgin or at any time, have you ever been convicted
4  of a felony or a misdemeanor?
5  A.    No, sir.
6  Q.    And have you ever been disciplined in your
7  capacity in the Elgin Police Department for on duty
8  incidents?
9  A.    No, sir.
10  Q.    Do you agree that you were on duty the
11  night of March 11th and the morning of March 12th,
12  2018, as an Elgin Police Officer?
13  A.    Yes, sir.
14  Q.    And at that time you were sworn as an
15  Elgin Police Officer, also, is that correct, sir?
16  A.    Yes, sir.
17  Q.    You arrived on scene of an incident in
18  progress of a stalled vehicle on I-90 westbound at
19  approximately 12:30 a.m., true?
20  A.    Yes.
21  Q.    And you were a lieutenant at the time, is
22  that correct, sir?
23  A.    Yes, sir.
24  Q.    When you arrived on scene, you were the

8

1    officer in charge, true?
2        A.    That is true.
3        Q.    And you remained the officer in charge
4    until DeCynthia Clements was killed, true?
5        A.    True.
6        Q.    You were wearing your duty uniform, true?
7        A.    True.
8        Q.    You were also wearing your duty belt, is
9    that correct?
10       A.    Yes, sir.
11       Q.    We will cover what options you had on your
12   duty belt at a later time, but you were also
13   carrying your duty weapon, is that correct?
14       A.    Yes, sir.
15       Q.    And am I correct that your duty weapon was
16   loaded with Elgin Police Department issued bullets?
17       A.    Yes, sir.
18       Q.    Some time during the morning of March 12,
19   2018, you consciously and knowingly placed your
20   index finger on the trigger of your gun, is that
21   correct, sir?
22       A.    Yes, sir.
23       Q.    You aimed your gun at DeCynthia Clements,
24   is that correct?

9

1        A.    Yes, sir.
2        Q.    You pulled the trigger on that gun, true?
3        A.    That is true.
4        Q.    You pulled the trigger three times, is
5    that correct, sir?
6        A.    Yes, sir.
7        Q.    You shot three times in the direction of
8    DeCynthia Clements, is that correct?
9        A.    Yes, sir.
10       Q.    That was a conscious and knowing decision
11   on your part, is that true?
12       A.    That is true.
13       Q.    You shot and killed DeCynthia Clements
14   knowing that your actions were designed to take
15   human life, is that correct, sir?
16       A.    It was done -- no, that's kind of
17   incorrect, sir.  It was done to stop an immediate
18   threat.
19       Q.    So you do not agree that your duty weapon
20   is a mechanism, is a tool designed, to take human
21   life?
22       A.    It is, yes.
23       Q.    So let me reask the question.
24              You shot and killed DeCynthia Clements

10

1    knowing that your option of using your duty weapon
2    was designed to take human life, is that correct?
3        A.    Yes, it is.
4        Q.    You knowingly pulled the trigger causing
5    the bullet to discharge from your weapon, is that
6    correct, sir?
7        A.    Yes, sir.
8        Q.    Are you aware of any directive or order or
9    standing operating procedure within the
10   Elgin Police Department that talks about or directs
11   you with respect to the sanctity of life?
12       A.    Yes, sir.
13       Q.    What is your familiarity with respect to
14   what the Elgin Police Department trains its
15   officers with respect to the sanctity of life?
16       A.    We hold that in the highest regard.
17       Q.    Are you aware of any other directive
18   within the Elgin Police Department that talks about
19   human life that is any more important than the
20   sanctity of life?
21       A.    Human life is the most important, yes.
22       Q.    And you agree that DeCynthia Clements'
23   life was important on the morning of March 12,
24   2018?

11

1        A.    Yes, it was.
2        Q.    DeCynthia Clements deserved to live on
3    March 12, 2018, is that correct, sir?
4        MR. DEANO:  Object to the form of the question.
5              You can answer it, if you can.
6        THE WITNESS:  Should I answer the question?
7        MR. DEANO:  My objection is noted.
8    BY MR. ROMANUCCI:
9        Q.    If your attorney objects, and unless he
10   tells you not to, there are only two circumstances
11   under which you do not answer questions,
12   Mr. Jensen, or Officer Jensen, and your attorney
13   and I will have that discussion.  You will hear it.
14   So you can answer the question.
15       MR. DEANO:  And my objection is vagueness as to
16   time.
17       THE WITNESS:  DeCynthia Clements' life
18   absolutely was important and it mattered.  However,
19   her actions mitigated that.
20   BY MR. ROMANUCCI:
21       Q.    Officer Jensen, I would like to go
22   through, obviously we are going to spend some time
23   together today, so I would like to go through some
24   other matters, some other factors, that are

12

1  important for that day.
2      I would like to understand a little bit
3  more about your employment history. You told us
4  that as of today you have been employed with the
5  Elgin Police Department for 21 years, true?
6      A.  True.
7      Q.  So back in about 2018, that number would
8  have been about 18 or 19 years, is that correct?
9      A.  Yes, sir.
10     Q.  And lead me through when you were first
11  hired by the Elgin Police Officer what capacity you
12  were hired as.
13     A.  I was hired in June of '99. From June of
14  '99 to approximately October I was in the field
15  training program.
16         From the field training program I went to
17  the midnight shift patrol. And, then, at some
18  point in time I transferred to the afternoon shift
19  patrol.
20         In May of 2001 I went into the gang crimes
21  unit. I was in the gang crimes unit for
22  approximately ten years until I was promoted to the
23  rank of sergeant.
24         Would you like me to keep explaining, sir?

13

1  I didn't know if you were just writing notes or
2  what.
3      Q.  I am just writing notes. Yes, unless I
4  stop you, you can keep going.
5      A.  Okay. All right. After the gang crimes,
6  I became a sergeant in October of 2011. And from
7  2011 until early 2012 I was out on the fourth watch
8  as a sergeant, which is a split shift. It's 8:00
9  at night until 4:00 in the morning.
10         After that I went into the drug unit as
11  the supervisor as a sergeant in charge. I was in
12  the drug unit for approximately three years.
13         And, then, I went to supervise the gang
14  crimes division. And I was in there about a year
15  and a half, I would say. And, then, after that I
16  became a lieutenant of the midnight shift.
17         And I did have ancillary duties, if you
18  would like to hear those.
19     Q.  Go ahead.
20     A.  From 2002 until 2018 I was a member of the
21  Elgin Police Department SWAT team.
22     Q.  Can you give me those dates again, please?
23     A.  2002 to 2018. I was on the team for
24  16 years.

14

1      Q.  Were you a member of the SWAT unit in
2  March of 2018?
3      A.  Yes, sir.
4      Q.  Are you aware or do you know what the
5  statistical numbers are for the population makeup
6  in Elgin in terms of white demographic, black
7  demographic and brown?
8      A.  I do not have those exact numbers. I can
9  speculate, but I don't have exact.
10     Q.  Can you give me an approximation of what
11  your understanding of the population makeup is in
12  Elgin?
13     A.  As far as African American were 12 to
14  14 percent, I believe. Somewhere in that ballpark.
15  Hispanic is a little over 50 percent. And
16  Caucasian and Asian make up all the rest, whatever
17  percentage breakdown that would be.
18     Q.  What is your height and weight?
19     A.  I am 6 foot, 170.
20     Q.  And because we are remote and you're in a
21  different location, I cannot see your sleeves or
22  arms. Do you have any ink marks or tattoos
23  anywhere on your body?
24     A.  I do not, sir.

15

1      Q.  So, none, is that correct?
2      A.  None.
3      Q.  And can you tell me with respect to your
4  duty weapon, are you right handed or left handed?
5      A.  Right handed.
6      Q.  So strong side right, weak side left?
7      A.  Yes, sir.
8      Q.  On the night of March 12, 2018, I think
9  you already told me that you were wearing your duty
10  belt. Can you tell me what you were carrying on
11  your duty belt and any other equipment that you may
12  have been carrying on your vest or on your person?
13     A.  Yes. I carry, obviously, I have a
14  sidearm. I carry two extra magazines. I carry
15  pepper spray. I have on my radio. I have a glass
16  break tool. I have two pairs of handcuffs. I have
17  a door hook to keep open a door. That would go on
18  any type of door we would need to keep open. And I
19  have a flashlight. And I have a pen and a note
20  pad.
21     Q.  No taser for you?
22     A.  No, sir.
23     Q.  No baton?
24     A.  No, sir.

16



1    Q.   Any other impact weapons?
2    A.   No, sir.
3    Q.   Are you certified to use a taser?
4    A.   Yes, sir.
5    Q.   Is there a reason why you don't carry a
6  taser?
7    A.   I didn't have a taser issued at that time
8  because we didn't have the amount of tasers.  The
9  patrolmen were all getting them first, and I did
10 not have one.
11   Q.   During your training with the Elgin Police
12 Department, can you tell me specifically what
13 training you had in the academy, if any, dealing or
14 being subjected to persons with emotional
15 disturbances or mental illness?
16   A.   I don't recall in the academy because that
17 was quite a while ago, sir, what we had exactly, so
18 I don't want to speculate on the training.  I can
19 give you examples at the Elgin Police Department.
20   Q.   So let's just take one answer at a time.
21 As you sit here, you have no recollection whether
22 you had any or not of training with either
23 emotionally disturbed people or with mental
24 illness, is that correct?

17

1    A.   That is correct.  I am sure we had it, but
2  23 years ago I don't remember the exact training we
3  had or how in depth it was.
4    Q.   Would it be an accurate statement that
5  whatever training you had in the Elgin Police
6  Department while you were at the academy
7  did not play a role in your dealings with
8  DeCynthia Clements on March 12, 2018, since you
9  have no recollection of that training?
10   MR. DEANO:  I am going to object.  That
11 misstates his earlier testimony.  What he said is
12 he didn't recall the academy training on emotional
13 disturbance and mental illness.
14 BY MR. ROMANUCCI:
15   Q.   You can answer the question.
16   A.   I don't recall the academy training I had
17 23 years ago.  I don't recall that.
18   Q.   Are you able to tell me anything that you
19 learned at the academy with respect to mental
20 illness or emotionally disturbed persons as you sit
21 here today that you can apply in your -- that you
22 can apply in your work force on the street in
23 dealing with EDPs or mental illness?
24   A.   Most of my training on that has been

18

1  through the Elgin Police Department.  I can
2  speculate the things they taught me in the academy.
3  To give them space, to talk to them calmly, not to
4  lie to them, but that's as far as I can go with
5  that from the academy.
6    Q.   Anything else you'd be guessing, right?
7    A.   Yes, sir.
8    Q.   Now, after the academy, can you walk me
9  through the specific training you received with
10 regard to dealing with suspects or people on the
11 street who are mentally or emotionally disturbed?
12   A.   Yes, I have received CIT training at the
13 Elgin Police Department.  I am not a certified CIT
14 officer, but I have received in-service training in
15 the techniques of CIT.
16   Q.   Can you tell me what the difference is
17 between receiving training and being certified?
18   A.   The certification course for CIT is a
19 five-day course usually offered at the
20 Kane County State's Attorney's Office.  I have not
21 taken that course yet.  But we did have in-service
22 training here taught by certified CET instructor --
23 CIT instructor.  And I attended that in-service.
24   Q.   And how long is the training for CIT?

19

1    A.   If you add the actual week-long training,
2  it's a 5-day 40-hour class.
3    Q.   And the certification would be an
4  additional five days?
5    A.   No.  I believe it's just a five-day class,
6  sir.  It's just a 40-hour class.
7    Q.   So CI -- CIT training is a 40-hour class?
8    A.   Yes.
9    Q.   And you underwent that?
10   A.   I did not.
11   Q.   All right.  I think we have a little bit
12 of a disconnect.  You told me that you were CIT
13 trained.  Is that correct?
14   A.   I was CIT trained at the Elgin Police
15 Department in in-service training, which was an
16 eight-hour class.  I did not go to the certified
17 40-hour CIT training.
18   Q.   Okay.  So the training is eight hours.
19 Would that be over one day?  Is it spread out over
20 two days?  How many days?
21   A.   One day, sir.
22   Q.   What year did you obtain or did you go for
23 your CIT training?
24   A.   I don't recall that.  I would have to

20



1  review the training records for the Elgin Police
2  Department.
3        Q.  Was it in the 1990s or 2000s?
4        A.  It was in the 2000s.
5        Q.  But you don't know if it was between 2000
6  and 2010 or 2010 and 2018?
7        A.  It would have been between 2010 and 2018.
8        Q.  But you don't know the year as you sit
9  there today?
10       A.  No, sir, I don't.
11       Q.  As you sit here, tell me what you recall
12  about that eight-hour one-day class that you took.
13       A.  You're supposed to speak calmly to the
14  individual.  Do everything you can not to make them
15  agitated.  You are supposed to try to build
16  somewhat of a rapport and determine if you can
17  calmly resolve the situation and get them to an
18  area where -- where they can receive other help
19  that they need.
20       Q.  When you say another area where they can
21  receive help, does that include a mental help
22  hospital?
23       A.  Yes, a mental help hospital or our
24  Elgin hospitals have what's called -- it's an

                                              21

1  Ecker Center, and that is a mental health area
2  where they go -- where you take an individual and
3  at the hospital they have a counselor do an
4  evaluation.
5        Q.  Is an ambulance an area of help?
6        A.  I would not say an ambulance is an area of
7  mental health help.  It's just a transport.
8        Q.  Are you a trained negotiator?
9        A.  I am not.
10       Q.  As you sit here today, can you tell me who
11  was CIT certified that was on scene at the
12  DeCynthia Clements event?
13       A.  Sergeant Hartman, Officer Williamson.
14       Q.  Is that --
15       A.  I believe Officer Hall, as well.
16       Q.  So you recall having three certified CIT
17  officers on scene that night, is that correct?
18       A.  Yes, sir.
19       Q.  Well, let's talk about your role as a CIT
20  trained officer that night.  Can you tell me what
21  conversation that you had with DeCynthia Clements?
22  What words did you speak to her, and what words did
23  she speak to you?
24       A.  I approached her vehicle.  I was on the

                                              22

1  eastbound side of I-90 with the barrier as
2  protection.  I tried to obtain some type of verbal
3  contact with her.  She would not roll down the
4  window.  She would not look -- she would not look
5  at my direction or acknowledge me, and I could not
6  make any contact with her.
7        Q.  Did you speak to her?  My question was did
8  you speak any words to her?
9        A.  I did.
10       Q.  What words did you speak to her?
11       A.  I called out her name, and I don't recall
12  exactly the words I spoke with her.  Obviously,
13  it's all on the body camera, but I tried to get her
14  attention, and I tried to engage in conversation.
15       Q.  Did you engage the assistance of any of
16  the certified CIT officers on scene to talk to
17  DeCynthia?
18       A.  I did.
19       Q.  Which one?
20       A.  Sergeant Hartman.
21       Q.  Would he have been the only one?
22       A.  He was the only one I put in charge there,
23  because he was -- he was previously in charge of
24  the crisis negotiating team, and he is a certified

                                              23

1  CIT officer.
2        Q.  Would I be correct that Officers
3  Williamson and Hall did not play a role in the
4  negotiations with DeCynthia Clements?
5        A.  If they did, I did not observe that or I
6  do not recall observing that.
7        Q.  Well, let's just kind of tie this up a
8  little bit.  There were three CIT certified
9  officers on scene; Hartman, Williamson and Hall.
10  Your recollection is that only Officer Hartman was
11  engaged in the discussions and negotiations with
12  DeCynthia Clements, true?
13       A.  True.
14       Q.  Was it your order to Hartman to negotiate
15  with DeCynthia?
16       A.  Wasn't a direct order.  I just advised
17  him.
18       Q.  So it was you who asked him to negotiate
19  with DeCynthia, correct?
20       A.  Yes, sir.
21       Q.  And were you on scene when that occurred,
22  or were you still at the station or en route?
23       A.  I was on scene.
24       Q.  Were you on scene, then, when Hartman

                                              24

1   began his negotiations with DeCynthia?
2       A.   Yes, I was.
3       Q.   Tell me everything that you saw and heard
4   with respect to the negotiations between Hartman
5   and Clements.
6       A.   He was on the PA trying to speak with her.
7   And I also know he attempted to call her.  And he
8   was unable to make contact.
9       Q.   So when you're saying he was on the PA, is
10  he on the portable PA, or is he talking through the
11  PA from his vehicle aimed at her?
12      A.   From the squad car aimed at her.
13      Q.   And when you say he called her, he made an
14  attempt to call her from cell phone to cell phone?
15      A.   Yes, sir.
16      Q.   Do you know how he obtained her cell phone
17  number?
18      A.   No.  I can only assume he contacted
19  dispatch that did a computer check and obtained a
20  cell phone number.
21      Q.   Do you know whether or not there was any
22  contact that was made between Hartman and Clements
23  via cell phone?
24      A.   I do not believe there was any contact.

25

1       Q.   Do you know whether or not Officer Hartman
2   made any attempts to approach DeCynthia at the
3   vehicle and make -- and attempt to negotiate with
4   her?
5       A.   I don't recall, sir.
6       Q.   Do you recall Officer Hartman ever
7   approaching the Buick that was westbound on
8   I-90 in an attempt to negotiate with her?
9       A.   I did not observe that.  And if I did, I
10  don't recall at this time.
11      Q.   Did Hartman ever tell you that he
12  approached a vehicle in an attempt to negotiate
13  with her?
14      A.   He could have.  As I said, I don't recall
15  that, though, sir.
16      Q.   Pardon me?
17      A.   He could have, but I do not recall that.
18      Q.   Who is it that you're aware of that first
19  noticed that DeCynthia had some objects in the
20  vehicle that either at that time were or resembled
21  a steak knife?
22      A.   Officer Joniak.
23      Q.   And how did he make that identification?
24      A.   He advised me that he had observed it

26

1   through the window.
2       Q.   Well, how close was he when he made that
3   observation?
4       A.   He was at her driver's side window at that
5   point.
6       Q.   And was the window up or down?
7       A.   I don't recall.  I wasn't -- at that time
8   I was not on scene.
9       Q.   Did you ever see DeCynthia Clements with
10  her windows rolled down?
11      A.   I did not.
12      Q.   Is Officer Joniak certified as a CIT -- in
13  crisis intervention?
14      A.   I do not know, sir.
15      Q.   Who is it that approached
16  DeCynthia Clements while she was in the
17  vehicle prior to it starting on fire while
18  you were on scene?
19      A.   I approached it, and I don't recall
20  which other officers approached it besides
21  Officer Joniak.
22      Q.   Did you see any sharp objects in the car
23  when you approached it?
24      A.   Not the first time, no, sir.

27

1       Q.   When you approached it the first time, was
2   her window rolled up or down?
3       A.   It was rolled up.
4       Q.   Did you hear any music playing inside?
5       A.   I don't recall if I did or not.
6       Q.   Did you approach the vehicle a second
7   time?
8       A.   The second time I approached was when the
9   vehicle was on fire.
10      Q.   So as you sit here today, is it a correct
11  statement that you personally never saw any sharp
12  objects in the vehicle?
13      A.   Not the first time.  Only the second time.
14  I should correct that.  I did see her hold a knife
15  to her throat when I was in the front of the
16  vehicle pinning it in.
17      Q.   Up until that point where you saw her hold
18  a knife to her throat, would you agree that
19  DeCynthia Clements met the definition as the
20  Elgin Police Department defines it as an
21  emotionally disturbed person?
22      A.   She was either emotionally disturbed
23  person or under the influence of alcohol or drugs
24  or a combination thereof.  I believe it's hard to

28



1  specifically diagnose what she was under or if it
2  was -- if she was mentally impaired or just under
3  the influence.
4      Q.  Well, you would agree that -- that either
5  temporary alcohol abuse or -- or -- or -- or
6  transient drug use falls under the definition
7  emotionally disturbed person, isn't that correct?
8      A.  No, I don't believe -- that's incorrect.
9  I don't -- if you're under the influence of alcohol
10 or you're under the influence of drugs, I don't
11 know if that falls into a medical category of an
12 emotionally disturbed person.  I don't want to
13 split hairs here, sir, but I don't know -- I just
14 don't know if that's the case.
15     Q.  Do you know whether or not
16 DeCynthia Clements suffered from mental illness
17 prior to her exiting the vehicle?
18     A.  I contacted Elgin dispatch and they had
19 said that she had had some issues at a counselor's
20 office and that we had had a call there that there
21 was a suicidal call in the past.
22     Q.  So you agree that when you arrived on
23 scene on March 12, 2018, that you were put on
24 notice and that you had knowledge that

29

1  personally with harm or violence?
2      A.  No, sir.
3      Q.  Had she threatened any other officer on
4  scene with harm or violence?
5      A.  No.  The only thing I can say is that by
6  ramming the vehicles when we had her pinned in, I
7  guess that is to be construed I guess as a violent
8  act.  I mean, it's not something that I would use
9  force on at that point, but she was trying to break
10 out of the pin by ramming on my vehicle.
11     Q.  When she was ramming your vehicle, were
12 you inside of it?
13     A.  Yes, sir.
14     Q.  So you knowingly put yourself in a
15 position where she could ram the vehicle while you
16 were inside, true?
17     A.  Yes, that is true, sir.
18     Q.  When she was ramming your vehicle, do you
19 know whether or not she was suffering from mental
20 illness?
21     A.  I did not.  I can only speculate that.
22     Q.  Do you know whether mentally ill people
23 have the capacity -- the mental capacity to commit
24 a crime?

31

1  DeCynthia Clements could or might be either an
2  emotionally disturbed person or suffering from
3  mental illness, true?
4      A.  True.
5      Q.  And that was your knowledge up until the
6  time that she exited the vehicle, true?
7      A.  That is true, sir.
8      Q.  Up until DeCynthia Clements had exited
9  the vehicle, can you state for me every single
10 crime that she had committed before that?
11     A.  The crime she committed was fleeing and
12 alluding and possibly reckless driving and failure
13 to pull over.
14     Q.  When did she flee and allude?
15     A.  When she drove away from Officer Joniak.
16     Q.  Was that before or after you told Joniak
17 to terminate?
18     A.  That was before, because once I had heard
19 that the only reason he was pursuing her was for
20 traffic and for being a suspicious vehicle.
21 Through the Elgin policies, that's not a reason to
22 pursue.
23     Q.  Up until the time that DeCynthia Clements
24 had exited the vehicle, had she threatened you

30

1      A.  I believe --
2      MR. DEANO:  I am just going to object to asking
3  for a legal conclusion, but go ahead.
4      THE WITNESS:  Yes, I believe a mentally ill
5  person can commit a crime.  Yes.
6  BY MR. ROMANUCCI:
7      Q.  I didn't ask you if they can commit a
8  crime.  I asked do they have the mental
9  capacity to commit a crime.
10     A.  I guess it would depend on the mental
11 capacity.  I believe every person's mental capacity
12 is different and so, yes, I believe certain people
13 with a diminished mental capacity can commit a
14 crime.
15     Q.  And do you know whether or not
16 DeCynthia Clements' mental capacity was diminished
17 to the point where she didn't have the capacity to
18 commit a crime?
19     A.  I can't make that determination, sir.
20     Q.  Do you know whether or not Officer Hartman
21 was able to make that determination through his
22 negotiations with DeCynthia Clements that she had
23 the capacity to commit a crime?
24     A.  I can't speculate what Officer Hartman had

32

1  in his mind at that time.
2      Q.   Well, did he tell you that he didn't think
3  that she had the capacity to commit a crime?
4      A.   Never told me that.
5      Q.   Was it ever raised as a subject while you
6  were on scene as officer in charge that her
7  capacity was diminished that she could not commit a
8  crime?
9      A.   I don't recall that, sir.
10     Q.   Do you agree that DeCynthia Clements
11 showed behavior that she wanted to harm herself?
12     A.   Yes.
13     Q.   You testified that you saw her hold a
14 knife to her throat, is that correct?
15     A.   Yes.
16     Q.   Did any other officer see behavior that
17 exhibited or that would have exhibited indication
18 that DeCynthia was attempting to harm herself?
19     A.   I heard over the radio that Officer Joniak
20 said that she may have been stabbing herself at one
21 point.
22     Q.   Based upon your training as an
23 Elgin Police Officer, would those two behaviors
24 give you indication that DeCynthia Clements was an
                                                    33

1  emotionally disturbed person and/or mentally ill?
2      A.   Yes, I can conclude that that -- that she
3  was either emotionally disturbed, mentally ill or
4  under the influence of alcohol or drugs or a
5  combination of everything, sir.
6      Q.   Could you go as far as to say that
7  DeCynthia Clements was suicidal that night?
8      A.   She was exhibiting suicidal actions by
9  holding a knife to her throat, yes.
10     Q.   And your job as an Elgin Police Officer
11 when you encounter someone who exhibits suicidal
12 tendencies is to preserve that life and not end it,
13 true?
14     A.   Yes, it's to preserve that life.  However,
15 if they are --
16     Q.   I didn't ask you -- I didn't ask -- if
17 there is an explanation, your attorney can follow
18 up with that.
19     A.   That's fine.  I apologize.
20     Q.   That's okay.
21          Do you agree that emotionally disturbed
22 people and mentally ill people do not follow
23 commands as well as those who do not have emotional
24 disturbance or mental illness?
                                                    34

1      A.   Yes, I agree with that.
2      Q.   Are you aware that a command that you may
3  give to an emotionally disturbed person may not
4  result in the desired outcome because of that
5  mental illness?  You agree with that?
6      A.   Yes, sir.
7      Q.   And are you aware that repetitive commands
8  are also poor form when negotiating with an
9  emotionally disturbed or mentally ill person?
10          MR. DEANO:  I am just going to object to the
11 form of the question.
12          You can answer, Chris.
13          THE WITNESS:  I don't agree with that, sir.
14 BY MR. ROMANUCCI:
15     Q.   Were you trained that repetitive commands
16 were poor form -- are poor form with respect to
17 EDPs and mentally ill people?
18     A.   It depends all on the situation.
19 Sometimes it is, sometimes it is not.
20     Q.   Have you ever issued repetitive commands
21 to a mentally ill or emotionally disturbed person
22 prior to DeCynthia Clements in March of 2018?
23     A.   Yes, I have.
24     Q.   Give me an example of what a repetitive
                                                    35

1  command is.
2      A.   Ordering someone to drop a weapon.
3      Q.   Do you agree that you never told
4  DeCynthia weapon -- DeCynthia Clements to drop her
5  weapon when she exited her vehicle?
6      A.   No, I did.  I did tell her to drop the
7  knives.
8      Q.   Let's do that again, since we talked over
9  each other.
10          Do you agree that you failed to tell
11 DeCynthia Clements to drop her weapons after she
12 exited the vehicle?
13     A.   I did not fail to do that.  I told her to
14 drop the weapons.
15     Q.   Did you give her a command of hands?
16     A.   I'd have to refresh my memory on the
17 video.  I remember someone yelling hands.  It could
18 have been me.
19     Q.   Do you agree that emotionally disturbed
20 people and mentally ill people do not act normal in
21 response to commands?
22     A.   I agree with that.
23     Q.   And you were aware of that before she
24 exited her vehicle, is that correct?
                                                    36



1    A.    Yes.
2    Q.    So you were aware that any commands that
3  you might give to DeCynthia Clements after she
4  exited her vehicle might not be responded to, is
5  that correct?
6    A.    That is correct.
7    Q.    I will show you what we are marking right
8  now as Jensen Exhibit No. 1.
9              (whereupon, Jensen Deposition
10             Exhibit No. 1 was marked for
11             identification as of 11/24/20.)
12  BY MR. ROMANUCCI:
13    Q.    Officer Jensen, you can see the screen?
14    A.    Yes, sir, I can.
15    Q.    You can see the first line that says fair
16  and impartial policing.  A science-based
17  perspective.
18          You see that?
19    A.    Yes, sir.
20    Q.    Do you recall when you took or when you
21  first saw this PowerPoint presentation?
22    A.    Let me see here.  This would have been at
23  an Elgin in-service.  I am not sure of the date of
24  it, though.

37

1    Q.    Do you remember approximately how many
2  years ago you might have seen this PowerPoint?
3    A.    Well, judging by the date of the 17th,
4  some time from the 17th on or from 2017 on, but I
5  don't recall exactly on the date, sir.
6    Q.    And before I show you the rest of the
7  presentation, can you tell me what your
8  recollection of what this presentation was about?
9    A.    I am just reading it here.  I have had a
10  lot of in-service training over the years, so I
11  guess we'll just get into it, and I will tell you
12  exactly what I remember about it.
13    Q.    Well, in looking at the first three
14  slides, does anything jog your memory as to what
15  this in-service training was about?
16    A.    Well, it's actually a fair and impartial
17  policing.  A science-based perspective.
18    Q.    And do you remember any details about it?
19    A.    No, not yet.
20    Q.    So I have just put up the second page.
21  The first line is a graph chart.  But if you look
22  at the second slide, you see the one where it
23  starts off visual perception study?
24          Do you see that?

38

1    A.    Yes, sir.
2    Q.    And it talks about affirms a black crime
3  blink response.
4          Do you see that?
5    A.    Yes.
6    Q.    What can you tell me about that slide?
7    A.    All right.  Visual perception study.
8  Affirms a black crime blink response.  Exposure to
9  black male faces facilitated the identification of
10  a crime relevant objects.  Exposure to white male
11  faces inhibited the identification of crime
12  relevant objects.  Okay.
13    Q.    Right.  So what does that mean to you?
14    A.    I don't know what it means to me here.
15  Black male faces facilitated.  I don't know if it's
16  trying to allude to stereotyping or what it's
17  getting at here.
18    Q.    Do you know why Elgin thought it was
19  necessary to train you on black crime blink
20  response?
21    A.    Probably for fair and impartial policing,
22  but this slide here, given the time frame it was
23  instructed, I am not -- I am not sure on the blink
24  response or what that refers to.

39

1    Q.    Do you see the third slide?
2    A.    Yes.
3    Q.    Can you read it out loud?
4    A.    I sure can.
5          Is there some fact at the root of
6  stereotypes including the black crime association.
7    Q.    Okay.  There is a question mark at the
8  there.  Do you see that?
9    A.    I do, sir.
10    Q.    Do you know what the answer is?
11    A.    No, I do not.
12    Q.    Earlier you told me that your
13  understanding of the black population in Elgin is
14  about 12 to 14 percent, is that correct?
15    A.    Yes.
16    Q.    And that the brown population in Elgin was
17  50 percent, which is about three to four times that
18  of the black population, is that correct?
19    A.    Yes.
20    Q.    Were you ever given a slide presentation
21  with respect to the crime association rate with
22  Hispanics, to your recollection?
23    A.    I probably was, sir.  I don't recall it.
24    Q.    Well, if you were, would that be something

40

1  that would be an in-service training module or
2  PowerPoint?
3      A.   It could have, sir.  We use several
4  in-service trainings over all the year, and it's
5  hard to remember each of the slides and each of the
6  steps that we are shown.
7      Q.   Well, I am asking you as you sit here
8  today do you specifically recall a PowerPoint slide
9  that talked about the association of brown people
10  and crime?
11     A.   No, I don't recall a specific slide unless
12  I saw it.
13     Q.   Do you specifically recall any PowerPoint
14  presentation or in-service training that talked
15  about the white blink response or the crime rate
16  associated with white people?
17     A.   No, I don't remember the slide or the
18  stats involved with that.
19     Q.   What about with Asians, do you recall
20  that?
21     A.   I don't recall any of that, sir.
22     Q.   So getting back to the third slide there,
23  the question whether or not there is some fact at
24  the root of stereotypes including the black crime

41

1  association, you said you don't recall the answer
2  to that, is that correct?
3      A.   That is correct.
4      MR. ROMANUCCI:  And can you show the next
5  slide, please.
6  BY MR. ROMANUCCI:
7      Q.   What is the answer Mr. -- Officer Jensen?
8      A.   It says, A = Lower income people are --
9      Q.   No, Mr. Jensen.  What is the answer to the
10  question?  You can read that out loud.
11          You see yes there?  You see where it says
12  yes?
13     A.   Yes, and I was going to read all of the A,
14  B and A plus B and C, so...
15     Q.   Do you see where it says yes with three
16  exclamation points?
17     A.   Yes.
18     Q.   Do you know why there are three
19  exclamation points after yes?
20     A.   Because it's the affirmative response.
21     Q.   So what Elgin Police Department is
22  training you on is that there is a black crime
23  association, is that correct?
24     A.   I am still not following this at all, sir,

42

1  about black crime association.
2      Q.   What is it that you don't follow?  The
3  presentation is telling you that there exists a
4  black crime association stereotype; yes or no?
5      A.   That's what the presentation is inferring,
6  yes.
7      Q.   Okay.  I want to confirm that you and I
8  are understanding the same issue here.  The
9  Elgin Police Department is telling you and training
10  you that there exists a black association crime
11  stereotype.
12          Do you agree with that; yes or no?
13     A.   I can't give you an accurate answer now
14  because I'd have to read the whole PowerPoint
15  presentation to accurately gauge what they are
16  explaining here.
17     Q.   Okay.  Let me ask you the question once
18  again.  The Elgin Police Department is showing you
19  a PowerPoint presentation slide in which they are
20  telling you that there exists a black association
21  crime stereotype.  True?
22     A.   I would have to read this here, sir.  I
23  can't just look at it, glance at it, and give you
24  an accurate answer.

43

1      Q.   Well, what is the Elgin Police
2  Department's answer to the question?  Is it a yes
3  or a no?
4      A.   It says yes.
5      Q.   Thank you.  Do you agree that lower income
6  people are disproportionately represented among the
7  people who commit street crimes?
8      A.   I don't know if I agree with that, sir.
9  That's what this PowerPoint can say.  I don't know
10  if things have changed in the last three almost
11  four years.  So I can't agree with that.
12     Q.   Well, George Floyd wasn't killed until
13  May of 2020.  So within the year that this
14  presentation was given to you and that you were
15  trained on it, what changes are you aware of that
16  occurred between April, 2017, and March, 2018, to
17  disqualify the stereotype that black people are
18  associated with crimes?
19     A.   I think all people are associated with
20  crime, sir.
21     Q.   So what you're doing is you are
22  representing a different opinion than what Elgin
23  trains its officers on, is that correct?
24     A.   I am not saying that.  I say we have a

44



1  PowerPoint from 2017, and I am only allowed to see
2  certain parts of it.  I'd have to read over the
3  PowerPoint.  I'd have to go over the PowerPoint.
4  And I'd have to refresh my memory on all of this.
5      Q.    Well, you were a member of the gang crimes
6  unit, is that correct?
7      A.    Yes, sir.
8      Q.    And why don't you tell me the makeup of
9  the gangs in Elgin.  Were they white gangs?
10     A.    Yes, there was.
11     Q.    Were there Asian gangs?
12     A.    Yes, there was.
13     Q.    Were there black gangs?
14     A.    Yes, there was.
15     Q.    Were there brown ones?
16     A.    Yes, there was.
17     Q.    Tell me what the proportions of each were.
18     A.    I don't have those exact numbers right
19  now, but we had biker gangs.  There was a sizeable
20  amount.  Those were predominantly Caucasian.  We
21  had a small amount of Asian gangs that were on the
22  decline.  We had Hispanic, and we had black.
23           I don't know the exact breakdown of each
24  gang.  The Outlaws in Elgin, which is a motorcycle

45

1      Q.    And what's your understanding of when you
2  are to activate your body cam?
3      A.    Whenever you are engaged in a police
4  function.
5      Q.    And do you know approximately how much
6  time your body cam allows you to record?
7      A.    I don't know the exact time frame if it's
8  recording continuously.  I don't know the battery
9  life on it.
10     Q.    Is it more than 30 minutes?
11     A.    Yes, sir.
12     Q.    Is it more than 60 minutes?
13     A.    Yes, sir.
14     Q.    Is it more than two hours?
15     A.    Yes, sir.
16     Q.    Do you know approximately when you
17  activated your body camera on March 12, 2018?
18     A.    When I arrived on scene.
19     Q.    Do you know what time that was?
20     A.    Not exactly.  But if you have all the
21  timelines there, I could give you an answer on
22  that.
23     Q.    I am just asking you right now your
24  recollection is that you activated it when you

47

1  gang, had a significant membership, so I don't know
2  the exact breakdowns of how that would work.
3      Q.    Do you police on stereotypes?
4      A.    I do not, sir.
5      Q.    So let's review something here.  On the
6  night of March 12, 2018, you were -- one of the
7  pieces of equipment that you didn't talk to me
8  about that you were wearing was a body cam, is that
9  correct?
10     A.    Yes, sir.
11     Q.    So you were wearing a body cam that night,
12  were you not?
13     A.    Yes, sir.
14     Q.    And tell me how your body cam is
15  activated.
16     A.    Just you push a button and the body cam
17  activates.
18     Q.    And do you know whether it starts
19  recording audio and video immediately, or is there
20  a lag between either one of the two?
21     A.    As soon as you hit the button, it
22  automatically activates immediately, and there is a
23  30 second time that it prerecords, and that's
24  called a buffer time.

46

1  arrived on scene, true?
2      A.    True.
3      Q.    And you are to keep it on during all
4  police functions and activities, is that correct?
5      A.    Except when having officer-to-officer
6  contact, or if you are in a squad car that has the
7  camera going and the -- and the audio working in
8  the vehicle, also.
9      Q.    What directive are you working off of to
10  instruct me or tell me that you are allowed to turn
11  your body camera off?
12     A.    Those were the directives under the policy
13  at that time on March 11th into March 12, 2018.
14     Q.    So those are the directives on body cam
15  usage, is that what you're saying?
16     A.    Yes, sir.
17     Q.    So any time that you're talking to an
18  officer your body camera is supposed to be turned
19  off, is that what you're saying?
20     A.    You can.  It's your choice.
21     Q.    You did turn your body camera off
22  consciously that night before DeCynthia Clements
23  was killed, true?
24     A.    Yes, sir, that is true.

48

1    Q.    You turned it off for approximately
2  30 minutes, did you not?
3    A.    I did.
4    Q.    And you were in your squad car when that
5  conversation or when you turned it off, isn't that
6  true?
7    A.    Yes, sir.
8    Q.    Your dash cam was in the car, right?
9    A.    Yes, sir.
10   Q.    Did your dash cam record that
11 conversation?
12   A.    Yes, sir.
13   Q.    Who were you talking to that night?
14   A.    I talked to several individuals
15 throughout the course of the evening.  At that time
16 it was Commander Collin Flurry (phonetic),
17 Sergeant Jim Lalley, and I could have spoke with
18 Sergeant Rob Hartman, also, inside of a vehicle.
19   Q.    Did you ever refer to DeCynthia Clements
20 with any derogatory or racially charged words while
21 your body camera was off?
22   A.    No, sir.
23   Q.    Did you ever refer to her in any racially
24 charged -- strike that.

49

1    Q.    Tell me about it.
2    A.    We were talking about plans about how long
3  this could go, about the process we were going to
4  use, and if additional resources were going to be
5  needed to call in.
6    Q.    And what resources did you decide needed
7  to be called in?
8    A.    We were debating as the hours started to
9  pass, rush hour was going to start, if we were
10 going to have to have a full SWAT team mode
11 response, and how far we would allow her to drive
12 on I-90.
13   Q.    So whose decision was it to not call SWAT
14 in that night?
15   A.    That was a discussion between myself,
16 Commander Flurry and Sergeant Lalley.
17   Q.    So maybe I misunderstood.  Is that a
18 decision that the three of you made together or one
19 of the three of you made?
20   A.    All three.
21   Q.    Have you ever used any derogatory
22 language to call -- have you ever used any
23 derogatory language against anyone else, not
24 DeCynthia Clements?

51

1         Did you ever refer to her in any
2  derogatory manner as a result of her mental
3  condition while your body camera was off?
4    A.    No, sir.
5    Q.    Have you ever used the N word before in
6  reference to any black people?
7    A.    I had used it in court.  There is a gang
8  in town that they use that term as the first part
9  of a gang name.  So, yes, I have testified against
10 that in court.
11   Q.    Is it your testimony that the only time
12 that you have used the N word with respect to
13 identifying a black person or referring to one has
14 been in your time in a courtroom testifying either
15 before a judge or a jury under sworn testimony?
16   A.    A judge, a jury, in sworn testimony, or
17 when I have to give the actual account of words
18 spoken on a case.
19   Q.    Do you recall during the 30 minutes that
20 your body camera was turned off what -- and I want
21 to know the full extent of the conversation that
22 you had with captain Flurry?
23   A.    All of that was recorded on the in-car
24 squad camera.

50

1    A.    Derogatory language?  As far as what type
2  of derogatory?
3    Q.    Well, have you ever called -- have you
4  ever called or used a name against someone that
5  would be considered derogatory?
6    MR. DEANO:  I object to the form of the
7  question and also the relevance.
8         Go ahead.  You can answer, Chris.
9    THE WITNESS:  Over my life I am sure I have
10 said bad words to people, called people names, but
11 I have never used racially charged words against
12 individuals.
13 BY MR. ROMANUCCI:
14   Q.    What about ethnically charged words, have
15 you ever used an ethnically charged word against
16 someone?
17   A.    No, I have not.
18   Q.    Have you ever called someone a Nazi
19 before?
20   A.    No.
21   Q.    No?  Never?
22   A.    That's not a word I would use on a person.
23   Q.    Do you see this letter of
24 non-appreciation?

52

1    A.  I do.
2    Q.  You authored that letter, didn't you?
3    A.  I did.
4    Q.  You see the last sentence there?
5    A.  Yes.  I called him the word Nazi, yes.
6    Q.  So you called somebody a Nazi before,
7  haven't you?
8    A.  I have.  I didn't recall this one.  This
9  was --
10    Q.  You forgot about this one?
11    A.  Yes.  This was in reference to the
12  Seinfeld episode of the Soup Nazi.  So I called
13  Sergeant Olson the word Nazi.  So, yes, that was on
14  there.  I forgot about this.
15    Q.  But you hid who you were when you sent
16  this letter, did you not?
17    A.  I did not hide who I was.
18    Q.  Pardon me?
19    A.  I did not hide who I was.  I told him I
20  wrote it.  I told the deputy chief at the time, who
21  was Bob Beeder (phonetic), I wrote it.  I told the
22  chief I wrote it.
23    Q.  So this -- but that was after you were
24  confronted whether or not it was you, true?

53

1    A.  I don't recall if it was before I was
2  confronted.  I told everyone I was putting this on
3  his desk.  This wasn't a -- I didn't sneak this in.
4    Q.  What's by order of MID and SID?  Can you
5  tell us what that is?
6    A.  That's the Major Investigations Division
7  and Special Investigations Division.
8    Q.  So you wrote that on behalf of more than
9  one person then, true?
10    A.  Yes.  Yes, sir.
11    Q.  So you were authorized by both of those
12  divisions to write this letter and call someone a
13  Nazi?
14    A.  Those were my words.
15    Q.  Well, aren't all the words on that letter
16  your words?
17    A.  Yes.
18    Q.  What I am asking you is were you given the
19  authority by both of those divisions to call
20  someone a Nazi?
21    A.  Probably not every member, no.
22    Q.  Do you often hide your identity when you
23  say things to other people?
24    A.  No.

54

1    Q.  Have you called someone a Nazi other than
2  Sergeant Olson?
3    A.  Not to my recollection.
4    Q.  So that was the first and only time you
5  used that word to describe somebody, is that your
6  testimony?
7    A.  It's my testimony I don't recall any other
8  times.
9    Q.  And do you recall any other times that you
10  used the N word to describe black people?
11    A.  I don't use that word, sir.
12  MR. DEANO:  I object to the form of the
13  question.  Other times.
14  Go ahead, Chris.
15  THE WITNESS:  I already explained that, sir.  I
16  used that in courtroom testimony and to explain
17  when things were said in cases.
18  MR. ROMANUCCI:  Let's take a short break.  We
19  have been going about an hour and 15 minutes.
20  THE WITNESS:  All right.  Sounds good.
21  THE VIDEOGRAPHER:  Off the record.  The time is
22  12:14 p.m.
23          (Whereupon, there
24          was a short break.)

55

1          (Whereupon, Jensen Deposition
2          Exhibit No. 2 was marked for
3          identification as of were.)
4  THE VIDEOGRAPHER:  Okay.  We are back on the
5  record.  The time is 12:26 p.m.
6  BY MR. ROMANUCCI:
7    Q.  Can you tell me who you met with in
8  preparation for your deposition today?
9    A.  I met with my counsel.
10    Q.  Which one?
11    A.  James Deano.
12    Q.  Anyone else?
13    A.  I met with a representative from the
14  Travelers Insurance Agency, also.
15    Q.  Do you know that person's name?
16    A.  I forget his name, sir.
17    Q.  So it was -- was that a non-attorney, as
18  far as you know?
19    A.  That was someone that spoke to me about
20  trial prep.
21    Q.  Did you meet with that person separately
22  from your attorney?
23    A.  No, sir.
24    Q.  That person was present in the room with

56

1  your attorney at the time?
2      A.  It was on a zoom, sir.
3      Q.  I should have figured that.
4      A.  Yeah.
5      Q.  So you met with -- let me rephrase that.
6          You met on a zoom preparation call with
7  yourself, your attorney, James Deano, and an
8  insurance representative, is that correct?
9      A.  Yes, sir.
10     Q.  And was this representative a male or
11 female?
12     A.  He's a male.
13     Q.  And you don't know this man's name?
14     A.  I will be able to provide that I am sure.
15 I just don't have that now.
16     Q.  When did you meet with the three of them?
17     A.  A few weeks ago.
18     Q.  And for how long?
19     A.  An hour and a half.
20     Q.  And have you met with anybody else since
21 that time in preparation for your deposition?
22     A.  I have not, sir.
23     Q.  You didn't speak to your attorney?
24     A.  Yes.  I spoke with my counsel, absolutely.

57

1  Yes.  I spoke with him on and off since then or for
2  quite a while now.
3      Q.  During those conversations that you had
4  with your attorney, was anyone else present?
5      A.  No.
6      Q.  Can you tell me what records or documents
7  or electronic media that you have reviewed in
8  preparation for this deposition?
9      A.  I went over the state police report.  I
10 went over the Hillard Heintze report.  I went over
11 Chief Lalley's file or report.  And I reviewed the
12 videos.
13     Q.  And who provided you all these documents?
14     A.  All of them are Online through the
15 City of Elgin.
16     Q.  So did anybody direct you that that's what
17 you should be reviewing, or is that what you just
18 took upon yourself to review?
19     A.  I took it upon myself.
20     MR. DEANO:  You know not to reveal anything
21 that we have discussed, but other than that, you
22 certainly can testify to what you have done.
23     THE WITNESS:  I took that upon myself to
24 review, and my attorney advises me to also -- also

58

1  review --
2      MR. DEANO:  You don't have to.
3      THE WITNESS:  -- the reports involved, but,
4  yeah.
5  BY MR. ROMANUCCI:
6      Q.  Did your attorney specifically give you
7  any documents to review?
8      A.  No.  Everything is Online.
9      Q.  Are you married, Officer Jensen?
10     A.  I am.
11     Q.  When were you married?
12     A.  2013.
13     Q.  So you were married at the time of this
14 incident?
15     A.  Yes.
16     Q.  Did you discuss this incident with your
17 wife?
18     A.  I have.
19     Q.  What have you told her?
20     MR. DEANO:  I am going to object.  He has a
21 privilege with his spouse.
22         You can answer if you -- well, if you want
23 to waive that privilege, but you don't have to
24 waive that privilege, Chris.

59

1      THE WITNESS:  I spoke to my wife, and I am
2  going to keep those conversations private.
3      MR. ROMANUCCI:  We are going to go off the
4  record for a second.  Just mute for a moment.
5          (Whereupon, a discussion
6          was had off the record.)
7  BY MR. ROMANUCCI:
8      Q.  Are you maintaining a privilege, then,
9  with any discussions you have had with your wife as
10 to what you told her about the event?
11     A.  Yes, sir.
12     Q.  Who else have you discussed this matter to
13 that's not your attorney?
14     A.  Well, I have spoken with several people,
15 but not about the particulars of the case.
16     Q.  I know you gave a statement to
17 Hillard Heintze, right?  You gave that statement,
18 correct?
19     A.  Yes.
20     Q.  That was transcribed.  So we know that you
21 gave one statement.  You gave a statement to
22 Illinois State Police, isn't that true?
23     A.  Yes.
24     Q.  Did you give a statement to your insurance

60

1  company, Travelers?
2      A.  I don't believe I gave a certified
3  statement on that.  I had spoken with Travelers and
4  my counsel, but I don't recall if that was a
5  certified transcript on that.
6      Q.  Did you give a statement to Travelers when
7  your attorney was not present?
8      A.  No, sir.
9      Q.  Your attorney was always present when you
10 gave statements to Travelers?
11     A.  Yes.  I have never spoken to Travelers.
12     Q.  What do you mean you have never spoken to
13 Travelers?
14     A.  Me personally to my best recollection I
15 have never spoken to a person from Travelers and
16 given them a statement about what occurred on
17 scene.
18     Q.  Have you talked to any of your friends
19 about the event of DeCynthia Clements?
20     A.  People have asked me.  I have talked to my
21 friends.  But I have not divulged everything about
22 this case.  Just everything that people saw, you
23 know, online, and everyone has watched the video
24 over and over it seems like.

61

1      Q.  What are some of the names of the friends
2  that you have spoken to?
3      A.  I'd have to go over that all and figure
4  out which people I have.  Off the top of my head, I
5  can't recall.  There is a lot of people at the
6  Elgin -- at the Elgin Police Department here,
7  officers.
8      Q.  So you can't give me one name of one
9  person that you have spoken to that's not your
10 attorney or your wife with regard to what you have
11 said about the event?
12     A.  I have spoken to Chief Lalley.  I have
13 spoken to Deputy Chief Flurry.
14     Q.  I have asked about your friends.
15     A.  They are my friends.  I have spoken to
16 members of the SWAT team.
17     Q.  Who have you talked to outside of
18 Elgin Police Department about this occurrence?
19     A.  I can't come up with exact names right
20 now.
21     Q.  So you don't recall any as you sit there,
22 right?
23     A.  No, not non-police related individuals.
24     Q.  Were you bothered by the fact that you

62

1  shot and killed DeCynthia Clements?
2      MR. DEANO:  Object to the form of the question.
3          Go ahead and answer, Chris.
4      THE WITNESS:  I am not happy I had to, no.
5  And, yes, it does affect me, absolutely.
6  BY MR. ROMANUCCI:
7      Q.  This is the first time that you used your
8  duty weapon and discharged it against someone and
9  killed someone, right?
10     A.  Yes, sir.
11     Q.  And is it your testimony that you don't
12 remember anybody that you talked to about this
13 event that's bothering you outside of the police
14 department?
15     A.  I spoke with a counselor.  Per Elgin rules
16 and regulations, I had to go speak with a
17 psychologist.
18     Q.  That's still within the Elgin Police
19 Department.  I am talking about outside.
20     A.  I can't recall each name of the person or
21 people I spoke with.  I know hundreds of people.
22 People have asked me about it.  I didn't give them
23 any information about it.  Just, yeah, it was me
24 that was involved, and it's something I have to

63

1  deal with.
2      Q.  You gave a statement to the Illinois State
3  Police, I believe, on March 19th of 2018.
4          Do you recall that?
5      A.  I do.
6      Q.  Did you review that statement before
7  today's deposition?
8      A.  I did.
9      Q.  Do you recall telling the Illinois State
10 Police that Elgin Police Department Officers
11 approached the vehicle and that she refused to exit
12 her vehicle and that she brandished knives?
13          Do you recall saying that?
14     A.  Yes.
15     Q.  What does the word brandish mean to you?
16     A.  It means to hold -- hold them just -- hold
17 up of the knives.  Showing up that you have them.
18     Q.  Which police officer approached the
19 vehicle and which officer did DeCynthia Clements
20 brandish a knife to?
21     A.  Which part?  Is this the second time that
22 I approached her or would this be the first time
23 when Officer Joniak approached?
24     Q.  I don't know.  I am reading from the

64



1   Illinois State Police statement. It says the EPD
2   Officers approached the vehicle. Clements refused
3   to exit her vehicle and brandished knives.
4          Which officer did she brandish knives to
5   A.   It was me when I approached the vehicle
6   the second time.
7   Q.   So is it your testimony now that she held
8   up the knife and pointed them at you?
9   A.   I am still trying to figure out which part
10  it was, sir, because there was officers who
11  approached the vehicle a few times. If you're
12  asking about the time when the vehicle was on fire,
13  then, yes, she was brandishing them at me.
14  Q.   She never brandished a knife while she was
15  inside the vehicle to any officer, is that correct?
16  A.   I don't recall. I know that
17  Officer Joniak had said she had a knife inside of
18  the vehicle. I don't recall if she brandished it
19  towards him when he approached her the first time.
20  Q.   Can we agree that DeCynthia Clements never
21  brandished a knife to any Elgin Police Officer
22  while she was inside the vehicle?
23  MR. DEANO:  I object to foundation.
24          Go ahead and answer if you can, Chris.

65

1   THE WITNESS:  She brandished it when we
2   approached when the car was engulfed in flames.
3   BY MR. ROMANUCCI:
4   Q.   Who did she brandish it to?
5   A.   Me.
6   Q.   Is this when she was inside the car or
7   outside the car?
8   A.   This was after the car door was opened.
9   Q.   All right. So listen to my question.
10  While she was inside the vehicle with the door
11  closed, is it true that she did not brandish a
12  knife toward any Elgin Police Officer that you're
13  aware of?
14  A.   That I am aware of? No, I do not believe
15  she brandished a knife toward any Elgin Police
16  Officer when her door was closed.
17  Q.   If anything, DeCynthia Clements brandished
18  a knife on herself to her neck, is that correct?
19  A.   Yes, sir.
20  Q.   She never made any verbal or physical
21  threat to any Elgin Police Officer while she was
22  inside the vehicle, true?
23  A.   That is true.
24  Q.   While she was inside the vehicle, you knew

66

1   that she was suicidal, true?
2   A.   I guess I'd have to speculate into her
3   mindset at that point.
4   Q.   You had an understanding that she could or
5   might be suicidal, true?
6   A.   Yes, sir.
7   Q.   Do you agree that the Illinois State
8   Police Report when they indicate that Joniak
9   approached a female driver who refused to exit her
10  vehicle and brandished a knife is a false
11  statement?
12  MR. DEANO:  I am going to object to the
13  foundation and also asking to speculate about what
14  somebody meant when they recorded what somebody
15  else said.
16          Go ahead and answer, Chris, if you can.
17  THE WITNESS:  I can't answer what
18  Officer Joniak saw, and I can't speculate to what
19  he put in his police report or what the Illinois
20  State Police wrote down. So, I did not observe
21  that. That would be you would have to ask
22  Officer Joniak.
23  BY MR. ROMANUCCI:
24  Q.   Is it true that you advised the Elgin

67

1   Police Department Officers who were on scene that
2   Clements was a suicidal subject; yes or no?
3   A.   Yes.
4   Q.   Is it true that your observations of
5   DeCynthia Clements were that she was chewing her
6   gum, bobbing her head back and forth, talking to
7   herself, and displaying irrational behavior?
8   A.   Yes.
9   Q.   She did not threaten you while she was in
10  the car, true?
11  A.   True.
12  Q.   She did not pose a threat of bodily injury
13  or death to you while she was in the car, true?
14  A.   False.
15  Q.   When did she pose a threat of bodily
16  injury or harm to you while she was inside the
17  vehicle?
18  A.   When I first approached the vehicle to
19  speak with her, she began to speed off causing
20  brake pads and other debris off of the vehicle to
21  fly in the direction of officers. So that would
22  have been a threat of harm.
23  Q.   Did you use force on her at that point?
24  A.   I did not.

68



1    Q.  Were you concerned about
2 DeCynthia Clements' safety while she was
3 in the car?
4    A.  Yes, I was.
5    Q.  Were you concerned about preserving her
6 life?
7    A.  Yes, I was.
8    Q.  Can you list for me the non-lethal options
9 that were available to you that night and that you
10 did make available on scene in order to preserve
11 her life?
12    A.  We had out the 40, which is an impact
13 weapon.  It's a 40-millimeter impact weapon.  We
14 had a taser.  And we had a pepper ball launcher.
15    Q.  What's the difference between the pepper
16 ball launcher and the impact?
17    A.  The 40-millimeter impact is for a basic
18 explanation is an impact round that is like a hard
19 almost like a Nerf project -- a Nerf projectile
20 that is shot at a pretty high -- pretty high of
21 velocity almost like a fast pitch from a major
22 leaguer.  It's designed to hit into the major
23 muscle areas, lower stomach area, to incapacitate a
24 person.

69

1    You have the pepper ball, which is like a
2 paint ball filled with pepper, and it's used to
3 irritate on the person and cause pain compliance.
4    You also have the taser, which is an
5 electronic device, which when shot and if it takes
6 effect properly was -- is designed to incapacitate
7 a person through an electrical shock.
8    Q.  Which one of those were used, if any, on
9 DeCynthia Clements that night?
10    A.  The taser was -- the taser was utilized,
11 but it did not make contact.
12    Q.  Which was deployed first, the taser or did
13 you fire your weapon?
14    A.  I believe it was simultaneous, sir.
15    Q.  So the taser would have been ineffective,
16 anyway, true?
17    A.  It was lodged in her hair, so, yes, that
18 would have rendered it ineffective.
19    Q.  I am not concerned about where the taser
20 barb landed.  My suggestion is that since you shot
21 and the taser was deployed simultaneously that the
22 taser would have been rendered ineffective by the
23 gunshots, is that correct?
24    A.  Yes.  The gunshots are what incapacitated

70

1 her.
2    Q.  You did not allow the taser -- strike
3 that.
4    You shot at the same time that the taser
5 was deployed, correct?
6    A.  Yes, sir.
7    Q.  At the time that you shot
8 DeCynthia Clements, where was the 40-millimeter
9 weapon?
10    A.  I believe it was on the median at that
11 time, or I don't know if another officer had
12 grabbed it.
13    Q.  How many feet away was the 40-millimeter
14 from you when you shot DeCynthia Clements?
15    A.  I do not know that, sir.
16    Q.  Who placed it on the median; you or
17 another officer?
18    A.  I did, sir.
19    Q.  Did you make a conscious choice to leave
20 the 40-millimeter weapon behind and use your
21 sidearm as a weapon against DeCynthia Clements
22 coming out of the vehicle?
23    A.  Yes, sir.
24    Q.  And where was the pepper -- where was the

71

1 pepper ball gun?
2    A.  I don't recall at that time.
3    Q.  Who did you put in charge of operating the
4 pepper ball gun?
5    A.  I do not know who had it at that point.  I
6 do not know.
7    Q.  Did you put anybody in charge of aiming
8 either the 40-millimeter or the pepper ball gun at
9 DeCynthia Clements so as she came out of the car it
10 could be deployed on her as non-lethal force?
11    A.  No, sir.
12    Q.  You did not give that order, true?
13    A.  I did not, that is true.
14    Q.  The only order that you gave was to halt
15 to have the taser ready, is that correct?
16    A.  Yes, sir, that's correct.
17    Q.  And you had two other officers who were
18 supposed to be hands on, correct?
19    A.  Yes, sir, that's correct.
20    Q.  And you were covering all with your
21 sidearm and a shield, true?
22    A.  True.
23    Q.  What is the shield made of?
24    A.  It's made up of Kevlar material.

72

1    Q.   Is that Kevlar material able to withstand
2  the stabbing of a knife?
3    A.   I am unsure.  It says it is not rated for
4  stabbing for sharp objects.  I myself had never
5  tested it with an edged weapon.
6    Q.   Why did you use a shield if you didn't
7  know whether or not it could protect you?
8    A.   It was the best option I had at that
9  point.  It was better than nothing.
10   Q.   You also had the option of a median, did
11 you not, of a concrete median?
12   A.   I did.
13   Q.   You didn't use that option, did you?
14   A.   It would have been an ineffective option
15 when you're going to attempt to rescue a person out
16 of a vehicle.
17   Q.   Let me ask the question again.  You did
18 not use the median as an option, is that correct,
19 sir?
20   A.   That is correct.
21   MR. DEANO:  Let me object to the form of the
22 question.  Use is vague.
23       Go ahead, Chris.
24 BY MR. ROMANUCCI:

73

1    Q.   You understand I meant you didn't use the
2  eastbound side of the median as an option to
3  protect yourself against someone that you knew had
4  a knife in the car, correct?
5    A.   That's incorrect depending on the time
6  frame, sir.  We used it up until the vehicle was
7  engulfed in flames.
8    Q.   So what you're saying is that your goal
9  was to save DeCynthia Clements when she came out of
10 the car, true?
11   A.   Yes, true.
12   Q.   And you armed yourself with a sidearm,
13 correct?
14   A.   Yes, sir.
15   Q.   On the westbound side of the median,
16 correct?
17   A.   Yes, sir.
18   Q.   And you held a shield in one hand,
19 correct?
20   A.   Yes, sir.
21   Q.   A gun in the other, correct?
22   A.   Yes, sir.
23   Q.   And you designated yourself as cover, is
24 that correct?

74

1    A.   Yes, sir.
2    Q.   But you were not primary then, is that
3  correct?
4    A.   Primary in -- I don't understand primary
5  as far as --
6    Q.   Well, primary in terms of saving life.
7  How were you going to save her life with a gun in
8  one hand and a shield in the other?
9    A.   I was the cover officer.  Hall was the
10 taser officer.  We had two people on hands to
11 extricate her from the vehicle, so --
12   Q.   Go ahead.
13   A.   So I don't know what primary -- if I was
14 -- I don't understand primary life saver at that
15 point.  I could have holstered at any time if I
16 would have had to to drag her out of the vehicle,
17 as well.
18   Q.   You were aware that that car door could
19 open and she come out of it, is that correct?
20   A.   Yes, that was a possibility.
21   Q.   And you were also aware that she could
22 come out of the car with knife or knives in her
23 hands, true?
24   A.   Yes, sir.

75

1    Q.   Both those possibilities -- both those
2  scenarios were made aware to you, is that correct?
3    A.   Yes, sir.
4    Q.   Both those scenarios were in your head as
5  possible outcomes once you saw the flames in the
6  car, true?
7    A.   True.
8    Q.   Illinois State Police Report indicates
9  that Lieutenant Jensen said it had been
10 approximately one and a half hours of negotiation.
11       Do you recall saying that?
12   A.   Yes, sir.
13   Q.   Was that entire one and a half hours spent
14 in negotiation, or was it spent walking around and
15 talking and watching her, or was the whole time in
16 negotiation?
17   A.   I'd say the whole time was a negotiation,
18 but there was interruptions.  I had to speak with
19 officers.  I had to speak with the supervisors.  So
20 there wasn't constant talking the whole time.
21   Q.   You were not negotiating with
22 DeCynthia Clements for one and a half hours, is
23 that correct?
24   A.   No.

76

1    Q.   Before you saw the flames inside of
2 DeCynthia Clements vehicle, you were on the
3 eastbound of the median, true?
4    A.   NO.  I was on the westbound pinning the
5 vehicle at that time.
6    Q.   Did you ever jump over from the east side
7 to the west side when you saw the vehicle on fire?
8    A.   Yes.  Well, I dropped -- well, I was on
9 the west side and, then, I climbed the median to
10 the eastbound lanes.
11    Q.   At what point did you have -- were you
12 physically holding the impact weapon in your hand?
13    A.   Right as I hopped over the median, I was
14 -- I picked up the impact weapon, and I started to
15 debate if I should shoot one of the windows out.
16 But I determined that that could oxygenate the
17 fire.  Or if I had to shoot out the driver's side,
18 the amount of smoke starting to build up within the
19 vehicle, I did not want to hit her in the head with
20 the impact, thus incapacitating her stuck inside
21 the vehicle.
22    Q.   But you had a window breaker on your
23 person at that time, also?
24    A.   Yes, sir.

77

1    Q.   Did you ever remove it and use it to break
2 a window on DeCynthia's vehicle?
3    A.   I did not.
4    Q.   And at a certain point you saw that the
5 car was filling up with smoke, right?
6    A.   Yes, sir.
7    Q.   And you made the decision that it was
8 better for the car to continue to fill with smoke
9 than to break a window, correct?
10    A.   Yes.
11    Q.   You also made a conscious decision not to
12 bring the impact weapon with you as DeCynthia was
13 getting out the vehicle, true?
14    A.   True.
15    Q.   That impact weapon is designed as a
16 non-lethal weapon of force, correct?
17    A.   Yes, sir.
18    Q.   You were within six feet of DeCynthia when
19 you shot her with your gun, true?
20    A.   That's incorrect.  I don't know what the
21 Hillard Heintze Report exactly found, but it was
22 within three to six feet.  So I don't know where I
23 was at at that point.  It was very close.
24    Q.   Well, Hillard Heintze said six to

78

1 eight feet.  Is that accurate or not?
2    A.   That's not accurate, sir.  If you look at
3 the report, it's -- I believe it's three to
4 eight feet, actually.
5    Q.   So you tell me how close were you to her.
6 Three feet, eight feet, or somewhere in-between?
7    A.   I would say three to five because I was --
8    Q.   Had you had the impact weapon in your
9 hand, you would have been the same distance away,
10 true?
11    A.   Three to five feet, yes, which would
12 render that as a -- well, from three to five feet
13 the impact weapon is considered a lethal weapon.
14    Q.   So by design, when DeCynthia Clements
15 exited the vehicle, she was dead, right?  She would
16 have been dead either by your gun or the impact
17 weapon?
18    MR. DEANO:  Object to the form of the question.
19        You can answer, Chris.
20    THE WITNESS:  She would not have been -- no, if
21 she would have exited out the vehicle without the
22 knives and did not charge at us, she would be here
23 right now.
24 BY MR. ROMANUCCI:

79

1    Q.   Officer Jensen, you told us just minutes
2 ago that you were aware that she could come out of
3 the vehicle with knives in her hands, yes or no?
4    A.   Yes.
5    Q.   Had you had the impact weapon at the
6 distance that you were at, you just told us there
7 would have been lethal force, correct?
8    A.   Yes.
9    Q.   And you use -- you chose to use your gun
10 instead, correct?
11    A.   Yes, sir.
12    Q.   At the distance that you were standing
13 when you shot at DeCynthia Clements, whether it had
14 been your impact weapon or your gun, you would have
15 used lethal force on her, true?
16    A.   Yes.
17    Q.   DeCynthia Clements was dead the moment she
18 stepped out of her car as a result of the distance
19 that you placed between her and your choice of
20 weapons, true?
21    MR. DEANO:  I object to the form of the
22 question.  Also speculation and argumentative.
23        You can answer, Chris.
24    THE WITNESS:  Can you repeat that again, sir?

80



1    MR. ROMANUCCI: Can I ask the reporter to read
2  it back, please.
3              (whereupon, the record was read by
4              the reporter as requested.)
5    THE WITNESS: She was dead when she charged at
6  me with the two weapons in hand in close proximity,
7  yes, and I chose to use the firearm, yes, sir.
8  BY MR. ROMANUCCI:
9    Q.   As had you had the impact weapon in your
10  hand and she charged you, nonetheless she would
11  have been dead, correct?
12    MR. DEANO: Object, speculation.
13        Go ahead and answer, Chris.
14    THE WITNESS: I can't speculate on the effect
15  of the impact weapon at that range. Could she have
16  been dead? Absolutely.
17  BY MR. ROMANUCCI:
18    Q.   So that's my point. Either way your
19  choice of both weapons was designed to kill her
20  when she stepped out of the vehicle with the knives
21  in her hands, yes or no?
22    A.   Yes.
23    MR. DEANO: Object to the form of the question
24  and assumes facts --

81

1    MR. ROMANUCCI: He already answered.
2        Did you get the answer, Ms. Court
3  Reporter?
4    THE REPORTER: I got an answer of yes.
5    MR. ROMANUCCI: Thank you.
6  BY MR. ROMANUCCI:
7    Q.   It's true that when DeCynthia Clements
8  came out of the vehicle that you were backed up so
9  that you had nowhere to go and retreat, is that
10  correct?
11    A.   Yes.
12    Q.   Do you agree that you placed -- you
13  consciously placed yourself in the position where
14  you had nowhere to go when DeCynthia came out of
15  the car knowing that she may be holding knives?
16    A.   Yes.
17    Q.   That means that you had no choice based
18  upon what you just said to use your sidearm to stop
19  her from coming toward you from a burning vehicle,
20  true?
21    A.   False.
22    Q.   We are going to pull up some video for you
23  right now.
24    A.   Okay.

82

1    Q.   While we are waiting for the video to come
2  up, you agree that you did not call for an
3  ambulance until after she was shot, is that
4  correct?
5    A.   I did not, no.
6    Q.   Did you call for an ambulance before she
7  was shot?
8    A.   I did not, no.
9    Q.   During the entire time that you were on
10  the scene, did you ever call for an ambulance?
11    A.   I did not, no.
12    Q.   By the time you arrived on scene, you were
13  aware that she could be a mentally ill or an
14  emotionally disturbed person, true?
15    A.   True.
16    MS. RAVEENDRAN: For the record, this is
17  Axon_body_ 2_video_2018-03-012_0055. And I have
18  added Schuttrow, because it's Officer Schuttrow's
19  body cam, for the record.
20    MR. ROMANUCCI: All right. Can we play it and,
21  then, we can go back and stop it?
22    MS. RAVEENDRAN: I believe so.
23    MR. ROMANUCCI: I don't know, can they hear
24  sound, if you play sound?

83

1    MS. RAVEENDRAN: I have to mute. Yes. Hold
2  on. I can do this.
3    MR. ROMANUCCI: We are going to try and play it
4  with sound for you.
5    THE WITNESS: Okay.
6              (whereupon, there was a
7              short interruption.)
8    MS. RAVEENDRAN: I am pressing play for one
9  hour ten minutes and five seconds.
10              (whereupon, the video was played.)
11  BY MR. ROMANUCCI:
12    Q.   You were able to see that video,
13  Officer Jensen?
14    A.   Yes, I was, sir.
15    Q.   You're able to see it from the time that
16  you were on the eastbound side where you jumped
17  over to the westbound side up until a few seconds
18  after she was shot, correct?
19    A.   Yes, sir.
20    Q.   Whose voice said, If she jumps out with a
21  knife, I'll be ready to stand back?
22        Who said that?
23    A.   That was Officer Schuttrow.
24    Q.   Is he with the Elgin Police Department or

84



1    Illinois State Police?
2        A.   He is with the Elgin Police Department.
3        Q.   Was Schuttrow one of the officers with
4    hands on?
5        A.   Yes.
6        Q.   And so you heard that same statement that
7    he made that if she jumps out with a knife, he is
8    going to stand back, right?
9        A.   Yes.  I was the one who ordered him to
10   jump back over.
11       Q.   You were aware that she could jump out of
12   the car with a knife, is that correct?
13       A.   Yes, sir.
14       Q.   And do you and I agree on the word jump,
15   what that means, kind of acting aggressively,
16   moving quickly or swiftly?  Can we agree on that
17   definition of jump?
18       A.   Yes, sir, we can.
19       Q.   So we can agree that you were aware that
20   DeCynthia Clements was going to quickly, swiftly,
21   jump out of the car with a knife in her hand, is
22   that correct?
23       MR. DEANO:  I object to the form of the
24   question.  It misstates his earlier testimony.  The

85

1    word vague -- the word was is vague.  It's not what
2    he said.
3            You can answer, Chris.
4        THE WITNESS:  There was a possibility.  Yes,
5    that's always a possibility.
6    BY MR. ROMANUCCI:
7        Q.   So you were aware of that possibility,
8    correct?
9        A.   Yes, sir.
10       Q.   You were also aware of the possibility
11   that she could be jumping out of a car with a
12   knife, but your goal was to preserve the sanctity
13   of life at the same time, true?
14       A.   True.
15       Q.   However, while you were trying to preserve
16   the sanctity of life, you placed yourself within a
17   distance of DeCynthia Clements where you could only
18   use your sidearm or an impact weapon, which would
19   have had the same effect as lethal force, is that
20   correct?
21       A.   No, that's not, sir.
22       Q.   You knew that you were standing within
23   five feet of DeCynthia Clements when you shot her,
24   is that correct?

86

1        A.   Yes, sir.
2        Q.   And had you had the impact weapon in your
3    hand, that -- from that distance that impact weapon
4    can be lethal force, is that correct?
5        A.   Yes, sir.
6        Q.   And you knew that she was going to
7    possibly jump out of the vehicle, is that correct?
8        A.   Yes, sir.
9        Q.   And that you were pinned up against the
10   median with nowhere to go, is that correct?
11       A.   Yes, sir.
12       Q.   When she was screaming, she was screaming
13   inside the vehicle, not outside the vehicle, is
14   that correct?
15       A.   Yes, sir.
16       Q.   Was that a yes?
17       A.   Yes.
18       Q.   So the war cry that you state that she
19   made was made inside the vehicle as a scream
20   probably as a result of smoke inhalation, true?
21       A.   False.
22       Q.   Did she threaten you while she was inside
23   the vehicle?
24       A.   Yes.

87

1        Q.   What did she say to you when she was
2    inside the vehicle that was a threat to you?
3        A.   She was slashing all the knives out at me.
4        Q.   I asked what verbal statements that she
5    made to you that were a threat to you.
6        A.   No verbal statements were a threat.
7        Q.   So her war cry was not a verbal threat to
8    you, was it?
9        A.   No.
10       Q.   But your testimony is that when she was
11   inside the vehicle with the door open that she was
12   slashing at you?
13       A.   Yes, sir.
14       Q.   While she was still inside the vehicle?
15       A.   Yes, sir.
16       Q.   Is that something that we can see on the
17   video that she was slashing at you while she was
18   sitting inside the vehicle?
19       A.   Yes, sir.
20       Q.   Whose body cam can we see there?
21       A.   You'd have to play it back.  It could be
22   on Schuttrow's, Hall's, and Jomiak.
23       Q.   Schuttrow, Hall and Jomiak?
24       A.   Yes.

88

1    Q.   Do you know whether or not she was trying
2  to wave the smoke away from her nose so that she
3  didn't have to breath it?
4    A.   I can't speculate on that, sir.
5    Q.   How many steps did DeCynthia Clements take
6  at you once she exited the vehicle; none, one, two,
7  three or four?
8    A.   I believe it was three.
9    Q.   Do you know which foot hit the ground
10  first; left or right?
11    A.   I would have to watch the video again to
12  analyze it.  It was very quick, sir.
13    Q.   But your testimony is that you saw three
14  steps come at you before you shot, is that correct?
15    A.   I said approximately three.
16    Q.   So how much did she close the gap when you
17  were five feet away; one foot, two foot, three foot
18  or four foot?
19    A.   I can only estimate that she was
20  approximately three feet away.
21    Q.   I mean, I am just spit balling this, but
22  typically one step equals about two to three feet,
23  is that correct, sir?
24    A.   Yes.

89

1    Q.   So within three steps she closed the gap
2  six to nine feet on you, is that correct?
3    A.   Yes.
4    Q.   Do you agree that you told the Illinois
5  State Police that you were backed up against the
6  median wall and as a result you could not retreat
7  any further and had no choice but to use deadly
8  force?
9    A.   Yes.
10    Q.   Did you ever make any attempt to open the
11  door while DeCynthia Clements was in it before the
12  fire started?
13    A.   I did not.
14    Q.   Did your negotiator make an attempt to
15  open the door before the fire started?
16    A.   No, sir.
17    Q.   Did anybody ask DeCynthia Clements
18  permission to open the door at any time before the
19  fire started in an attempt to get her out to come
20  out of the car?
21    A.   No, sir.
22    Q.   Did you ask her permission if you could
23  open the door so that you could assist her out of
24  the car and preserve the sanctity of life?

90

1    A.   I did not, sir.
2    Q.   Do you know -- strike that.
3        Do you agree that at one point right
4  before DeCynthia Clements opened up the car door
5  that you agreed that you were not going to end this
6  for her?
7    A.   I don't understand the question, sir.
8    Q.   Sure.  Let me rephrase it.
9        Prior to the door opening, do you agree
10  that the plan was that if she has got a knife and
11  she comes out of the car that at that point we are
12  not going to end it for her?
13    A.   Depending on the distance involved, of
14  course not, we wouldn't have shot her, or I
15  wouldn't have shot her.
16    Q.   Did you ever place yourself in a distance
17  before you pointed your gun at her of greater than
18  five feet away?
19    A.   Yes.
20    Q.   How far were you?
21    A.   From -- so is this -- so I am correct on
22  the answer, is this after the car was engulfed in
23  flames and we hopped over the median?
24    Q.   Yes, sir.

91

1    A.   Okay.  Yes, I was back at the -- at the
2  back of the squad car, but that was only for a few
3  seconds because of the fire was building so
4  quickly.  She had not exited yet.  So that's when
5  we determined we have to approach the vehicle.
6  There wasn't enough time to wait at that point in
7  my opinion with the amount of flames inside the
8  vehicle.
9    Q.   When you saw her step out of the car, were
10  you able to retreat backwards and place more
11  distance between you and DeCynthia as she was
12  exiting the vehicle?
13    A.   I was not, sir.
14    Q.   Because you were cornered up against the
15  median, true?
16    A.   And other officers.
17    Q.   So you agree that at that moment in time
18  before DeCynthia Clements placed one foot on the
19  ground that you were incapable of moving to your
20  right or your left or backwards in order to retreat
21  away from her had she come out of the car with a
22  knife in her hand, true?
23    A.   True.
24    Q.   And because you only had your sidearm in

92



1  your hand, your gun, you only were able to use that
2  in order to stop what you perceived as a threat,
3  true?
4      A.   True.
5      Q.   You shot and killed DeCynthia Clements
6  because you had nowhere to go other than forward
7  toward her, true?
8      MR. DEANO:  I object to the form of the
9  question.
10      You can answer, Chris.
11      THE WITNESS:  I had no other area to retreat to
12  at that time.
13  BY MR. ROMANUCCI:
14      Q.   You agree that you said that if she does
15  end up brandishing the knife running at us, we will
16  go with the 40, correct?
17      A.   Yes, but that was when we were in a
18  tactical advantage position on the other side of
19  the barricade.
20      Q.   Can you answer my question?  Did you or
21  did you not say that if she ends up brandishing a
22  knife running at us, we will go with the 40, is
23  that correct?
24      A.   Yes.

93

1      MR. DEANO:  Object to the form of the question.
2  It's vague.  At what time?
3  BY MR. ROMANUCCI:
4      Q.   Did you say that?
5      A.   I did when we were on the other side of
6  the median, yes.
7      Q.   When you jumped over to the other side of
8  the median, you left the 40 behind, did you not?
9      A.   Yes, sir.
10      Q.   Did you also state that you don't know how
11  well her direction following skills are going to
12  be?  Did you say that?
13      A.   Yes, sir.
14      Q.   Meaning that you understand that somebody
15  who is in distress whether as a result of emotional
16  disturbance or mental illness or drug or alcohol
17  use does not understand direction following well,
18  is that correct?
19      A.   That is correct, sir.
20      Q.   Officer Jensen, do you recall completing a
21  set of forms or a document known as your
22  interrogatory answers?
23      A.   I do, sir.
24      Q.   And we can go to the end of the page, and

94

1  your signature is affixed at the end of the page.
2  There it is.  Is that your signature?
3      A.   Yes.
4      MS. RAVEENDRAN:  So we are going to mark
5  Jensen's -- the file labeled 125222.Jensen's
6  Answers to Plaintiff's First Interrogs as
7  Exhibit 3, and Exhibit 4 will be the signature
8  page.
9          (whereupon, Jensen Deposition
10          Exhibit Nos. 3-4 were marked for
11          identification as of were.)
12  BY MR. ROMANUCCI:
13      Q.   Do you see the page where it talks about
14  Christian Jensen's Answers to Interrogatories?
15          You see that, right?
16      A.   Yes, sir.
17      MR. ROMANUCCI:  All right.  Can you go to
18  Page 6, please.
19  BY MR. ROMANUCCI:
20      Q.   And, then, Question 11, do you see
21  Question 11 there?  Can you read that?
22      A.   Yes.
23      Q.   And that states that please state each and
24  every option considered by Defendant Officer Jensen

95

1  on the scene other than their chosen actions in
2  regard to DeCynthia Clements.  Please describe each
3  and every step taken to evaluate and consider each
4  and every such option.
5          Do you see that?
6      A.   Yes, I do.
7      Q.   All right.  And, then, you start off your
8  answer by, without waiving 5th amendment rights.
9          Do you see that?
10      A.   I do, sir.
11      Q.   You're not exercising any of those rights
12  today, are you?
13      A.   No, sir.
14      Q.   And, then, if you go to the second
15  sentence, it states that it was known that she
16  possessed a knife.
17          Is that correct?
18      A.   Yes, sir.
19      Q.   And the objective was to have her exit the
20  vehicle on her own volition.
21          Do you see that?
22      A.   I am reading it now, so...
23      Q.   Do you see that?
24      A.   I am just reading, sir.  It's going to

96

1    take me a second to check out the paragraph here.
2        Q.   You want to read the whole paragraph?
3        A.   Well, if you want to highlight it.  If you
4    already did, I apologize.  I didn't see that part.
5        Yes, I see it.  Sorry about that.
6        Q.   What option did you exercise if she was
7    going to come out of the vehicle with a knife in
8    her hand?  Where is that on here?
9        A.   I had officers on the other side of the
10   barricade.  We had the 40.  We had the pepper ball.
11   And if she would have exited at that time when we
12   had the tactical advantage, we would have been able
13   to utilize the impact weapon or the pepper ball gun
14   or the taser even.
15       Q.   Did anyone discharge the pepper ball gun?
16       A.   No, sir.
17       Q.   Did anyone discharge the impact weapon?
18       A.   No, sir.
19       Q.   So my question is what option did you
20   delineate or did you have planned if she exited the
21   car with the knife when you were on the westbound
22   side of the median?
23       A.   We had the taser at that point.
24       Q.   Is that it?

97

1        Q.   So where did you talk about this plan of
2    retreating backwards and hopping over the median?
3        A.   I would have given the order.
4        Q.   So you didn't talk about it before, right?
5    It wasn't a plan that was communicated.  Do you
6    agree with that?
7        A.   I had communicated that plan earlier
8    before the car was engulfed in flames.
9        Q.   So, Officer Jensen, what's your plan?  I
10   want to know the detailed plan of her coming out of
11   the car with knives in her hand out of a smoking
12   car where she was going to jump out and you're on
13   the westbound side of the median.
14       A.   If she did not charge at us and she stood
15   there, we would have retreated.  I would have given
16   the order to retreat, to back up, and climb over
17   the median.
18       Q.   And my question is, when did you
19   communicate that plan and to whom?
20       A.   I did not communicate that plan because
21   there was not time to communicate that plan.
22       Q.   That's exactly it.  You had an hour and a
23   half to think of all the scenarios, but you didn't
24   think of the plan if she was going to come out,

99

1        A.   Yes, sir.
2        Q.   And your gun, right?
3        A.   Yes, sir.
4        Q.   And the gun was discharged simultaneously
5    with the taser, so the taser was rendered
6    ineffective, true?
7        A.   Yes, sir.
8        Q.   So there was no real plan to preserve her
9    life if she came out of the car when you were on
10   the westbound side of the median, true?
11       MR. DEANO:  Object to the form of the question.
12   Also misstates his earlier testimony.
13       THE WITNESS:  That is false, sir.
14   BY MR. ROMANUCCI:
15       Q.   What was your plan?  Give me the detailed
16   plan with her coming out of the car with knives in
17   her hand with you on the westbound side of the
18   median.
19       A.   If she was not charging at us, we would
20   have utilized the taser.  If she exited the vehicle
21   and stood there, we would just -- we would just
22   start to back up to retreat, hopefully be able to
23   hop over the median.  But that did not work because
24   she charged at us upon exiting out of the vehicle.

98

1    knowing that she had knives in the car, is that
2    correct?
3        MR. DEANO:  Objection, argumentative.
4        Go ahead and answer again, Chris.
5        THE WITNESS:  That's incorrect, sir.
6    Throughout the evolution of this call, there were
7    several times I gave orders and instructions to
8    stay on the other side of the median and if she had
9    exited with the knives how we would handle that.
10   BY MR. ROMANUCCI:
11       Q.   So what was your expectation of how she
12   was going to hold these knives when she jumped out
13   of the vehicle?
14       Did you expect her to have the knives
15   behind her back, so that you couldn't see them?
16       A.   I was hoping that she did not exit with
17   the knives in her hand.  That she would exit
18   without the knives, exited unarmed.
19       Q.   Now, you state that Hartman and Garcia
20   stood by as cover.  Were they on the eastbound or
21   westbound side?
22       A.   Garcia was on the -- she was on the
23   westbound -- no, she was on the eastbound side.
24   Hartman was on the westbound side.  But I do not

100



1  recall exactly where they were at that time.
2      Q.   Were there any other sidearms or hand guns
3  or long guns pointed at DeCynthia Clements when she
4  exited the vehicle besides your gun?
5      A.   Not to my knowledge, sir.
6      Q.   Did you have any snipers on the ground and
7  at the scene?
8      A.   No, sir.
9      Q.   Do you see in the middle toward the
10 bottom, do you see where it says the sentence that
11 starts with, The attempt to remove?
12     A.   Yes.
13     Q.   We just highlighted for you.  Do you see
14 that?
15     A.   I see that, sir.
16     Q.   In looking at the video that we showed you
17 earlier, did you ever make any attempt before she
18 stepped out of the car to move any closer than five
19 feet?
20     A.   On the initial approach of the vehicle
21 before the door was open, I am not sure exactly how
22 close we got, but I believe I got to the -- about
23 the beginning of the passenger -- the rear
24 passenger door on the driver's side.

101

1      Q.   I am talking about after the door was
2  open, did you make it any closer than five feet to
3  make an attempt to remove her from the car and
4  extract her?
5      A.   I did a technique called slicing of the
6  pie to get a better view into the vehicle.  And I
7  can expound on that if you would like.
8      Q.   Okay.  Can you just answer my question
9  first and, then, you can tell me about slicing the
10 pie.
11          After the door was open, did you make it
12 any closer than five feet before she stepped out of
13 the car?
14     A.   I do not recall if it was five feet,
15 six feet, seven feet.  I don't know.
16     Q.   So Question No. 15 discusses whether or
17 not you have been sued in the past.  And it's been
18 disclosed that you were sued five times and that
19 one of them settled.
20          Bosque versus Elgin, what was that case
21 about?
22     A.   In that case there was a search warrant.
23     Q.   And?
24     A.   And I am not sure exactly what they were

102

1  contending.  I believe it was a broken garage door
2  from the breach and that their house was left in
3  disarray after the search warrant.
4      Q.   Do you know how many times you have used
5  force while you have been on the Elgin Police
6  Department?
7      A.   I do not have an exact number, sir.
8      Q.   Was it more than five?
9      A.   Yes.
10     Q.   More than ten?
11     A.   Yes.
12     Q.   More than 20?
13     A.   Yes, but depending on force, I mean, there
14 is force by grab a person's arm to hold them to
15 handcuff them.  It depends on the force that we are
16 talking about.
17     Q.   Well, we are just talking about force
18 right now.  Do you know -- if I told you that you
19 had used force 29 times while you were on the Elgin
20 Police Department, does that sound right to you?
21     A.   Yes, that could be accurate.
22     Q.   So that's about at least once a year for
23 every year of service that you have, correct?
24     A.   Yes.

103

1      Q.   And that would involve physical force,
2  taser force, impact force or sidearm deadly force,
3  correct?
4      A.   Yes.  It could also be --
5      MR. DEANO:  Objection.
6      THE WITNESS:  I'm sorry, Jim.
7      MR. DEANO:  Go ahead and answer.  I'll explain.
8      THE WITNESS:  It could also be OC spray, it
9  could be empty hand control, it could be hard empty
10 hand control, it could be pointing a weapon, but
11 not discharging of the weapon.  There is many
12 things it could be.
13 BY MR. ROMANUCCI:
14     Q.   Do you remember an incident with
15 Mandy Seitz?
16     A.   No, I do not.
17     Q.   Do you remember this incident from
18 March 18, 2011, where you responded to a suicidal
19 call of a female white 51 years old at 90 Poplar
20 Creek Drive?
21     A.   I do.  I believe -- yes, if you can
22 expound on it, it will start to jog my memory.
23     Q.   We are pulling it up right now.
24     MS. RAVEENDRAN:  Can we mark as Exhibit 5 the

104



1  Use of Force Incident Spreadsheet. We are looking
2  at Page 5.
3             (Whereupon, Jensen Deposition
4             Exhibit No. 5 was marked for
5             identification as of were.)
6  BY MR. ROMANUCCI:
7      Q.   You want to take a look at that and see if
8  that refreshes your memory?
9      A.   Yes, it does, sir.
10     Q.   Do you recall being on scene that night?
11     A.   I do, sir.
12     Q.   And you recall that this was a woman who
13  had barricaded herself in the northeast corner
14  behind a couch in her basement?
15     A.   Yes, sir.
16     Q.   And that she had potentially taken a drug
17  overdose and was suicidal and needed help?
18     A.   Yes, sir.
19     Q.   Similar circumstances to
20  DeCynthia Clements, right?
21     A.   Completely different.
22     Q.   Was DeCynthia suicidal?
23     A.   I don't know if she was, because we never
24  spoke with her.

105

1      Q.   Was she potentially suicidal?
2      A.   Potentially I would agree with.
3      Q.   Was Mandy suicidal?
4      A.   Yes.
5      Q.   Was DeCynthia, possibly, you said she
6  could have taken a drug overdose, right?
7      A.   Yes.
8      Q.   And Mandy had taken a drug overdose, too,
9  right?
10     A.   I don't recall what she took a drug
11  overdose of. I am kind of unclear on that. I'd
12  have to read this to jog my memory here.
13     Q.   Well, the report indicates that she took
14  an overdose of Clonazepam, Ciprofloxic (phonetic)
15  and Trazodone.
16     A.   Okay.
17     Q.   Do you know what those are?
18     A.   I do not, sir.
19     Q.   Does it matter?
20     A.   I don't know if it matters. I don't know.
21  I don't know what those drugs are. I don't know
22  what they do. I don't know the effect of the
23  drugs, but...
24     Q.   Well, do you know what the effect of

106

1  DeCynthia's drugs were, if any?
2      A.   I do not.
3      Q.   Do you know the effect of Mandy's drugs,
4  if any?
5      A.   No, sir.
6      Q.   Mandy had steak knives with her, didn't
7  she?
8      A.   Yes.
9      Q.   So did DeCynthia, right?
10     A.   Yes.
11     Q.   So far we are even-steven, right? Same
12  circumstances, right, so far? Right?
13     A.   Not really, sir. No.
14     Q.   Okay. Do you agree that Mandy was defined
15  as either mentally ill or emotionally disturbed
16  because of her drug overdose?
17     A.   Yes.
18     Q.   Do you agree that DeCynthia was defined as
19  emotionally disturbed or mentally ill as a result
20  of her potential drug or alcohol overdose?
21     A.   Yes.
22     Q.   Do you agree that Mandy was not responding
23  to Officer Jensen's commands?
24

107

1      Q.   DeCynthia was not responding to your
2  commands?
3      A.   Yes.
4      Q.   Mandy said that she would stab herself
5  with the knife if you approached her.
6             Do you remember that?
7      A.   Yes.
8      Q.   DeCynthia actually did hold a knife up to
9  her throat attempting to stab herself, right?
10     A.   Yes.
11     Q.   Do you remember whether or not a taser was
12  used on Mandy?
13     A.   Two tasers were used, I believe.
14     Q.   Was there any -- was there anyone
15  positioned on the east side of the median with a
16  taser trained at DeCynthia Clements' door so that
17  when it would open, someone would have a shot at
18  her?
19     A.   No.
20     Q.   Was there anything that prevented you from
21  putting somebody on the east side of the median
22  with the taser trained on her door so that if it
23  opened it could be deployed on her?
24     A.   Yes, that would have actually been a

108

1  tactical error as far as the taser and not a wise
2  deployment.
3      Q.   What about using an impact weapon on the
4  other side of the median?
5      A.   Again, that would not have been a smart
6  idea.
7      Q.   Well, it being smart and it being
8  available as an option are two different things,
9  right?
10     A.   Yes, but I would not use poor tactics and
11  a poor decision to validate the use of a tool.
12     Q.   Do you agree that Mandy began to walk
13  toward you with the knives in her hand?
14     A.   Yes.
15     Q.   So did DeCynthia, right?
16     A.   No.
17     Q.   Oh, DeCynthia didn't come at you with a
18  knife now?
19     A.   Mandy was walking slowly, and DeCynthia
20  was charging out with the knives pointed at us.
21  Mandy had the knife pointed at her stomach.
22     Q.   The knives were a deadly weapon whether
23  they were in the hands of Mandy or in the hands of
24  DeCynthia, right?

109

1      A.   Absolutely.
2      Q.   Did you have your sidearm drawn when Mandy
3  was walking towards you with the knives?
4      A.   I did.
5      Q.   You did?
6      A.   Yes.
7      Q.   You did not discharge your sidearm, did
8  you?
9      A.   I did not.
10     Q.   Were you also the cover officer for Mandy?
11     A.   I was.
12     Q.   You let the tasers discharge before you
13  were able to use your sidearm with Mandy, correct?
14     A.   Yes, sir.
15     MR. ROMANUCCI:  Let's take a ten-minute break,
16  reconvene at 2 o'clock.  Is that good with
17  everyone?
18     THE WITNESS:  That's good, sir.
19     MR. DEANO:  That's fine.
20     THE VIDEOGRAPHER:  Off the record at 1:49 p.m.
21          (Whereupon, there
22          was a short break.)
23          (Whereupon, Jensen Deposition
24          Exhibit No. 6 was marked for

110

1          identification as of 11/24/20.)
2      THE VIDEOGRAPHER:  Okay.  We are back on the
3  record.  The time is 2:03 p.m.
4  BY MR. ROMANUCCI:
5      Q.   So, Officer Jensen, I am showing you
6  what's marked as Defense Exhibit No. 6.  Do you
7  recall being trained on this presentation on police
8  use of force?
9      A.   Yes, sir.
10     Q.   Do you remember the last time that you
11  would had been trained on this?
12     A.   I do not, sir.  I don't recall when this
13  PowerPoint was issued.
14     Q.   Do you recall seeing it, though?
15     A.   Yes, sir.
16     Q.   Let me go to Page 5.  Sir, do you see the
17  slide that we put up, Officer Jensen, what is
18  controlling the decisions of an officer when it
19  comes to use of force?
20          Do you see that?
21     A.   Yes.
22     Q.   There are a number a bullet points there;
23  state law, Illinois compiled statutes?
24     A.   Yes.

111

1      Q.   You see that, right?
2      A.   Yes.
3      Q.   And Tennessee versus Garner, do you know
4  what that is?
5      A.   Yes, sir.
6      Q.   What is it?
7      A.   That's the case law outlining the use of
8  force.  That the force has to be -- the force has
9  to be equal to what the crime is and basically,
10  like, in a nutshell.
11     Q.   And, then, you see Elgin Police Department
12  SOP, is that correct?
13     A.   Yes, sir.
14     Q.   The SOPs are what govern your
15  decisionmaking, not only with use of force, but how
16  you conduct yourself as an Elgin Police Officer,
17  true?
18     A.   That is true.
19     Q.   And, then, the use of force continuum, you
20  know what that is, correct?
21     A.   Yes, I do, sir.
22     Q.   And, then, force options available.  We
23  talked about that, and we may talk about that
24  again.  And, then, your, experience.

112



1        Do you see that?
2        A.   Yes, sir, I do.
3        Q.   And, then, you see at the bottom it says
4   discretion, right?
5        A.   Yes, sir.
6        Q.   And, then, we talked about what force
7   options are available to our officers.  And here
8   again it refers to Elgin Police Officers, and we
9   see that they list six of them, is that correct?
10       A.   Yes.
11       Q.   And do you agree that all of those were
12  available either to you personally or on scene the
13  night of March 12, 2018?
14       A.   The only one I am unsure of is the baton
15  or the ASP.  I don't know which officers carry
16  those on their person, sir.  All the other ones,
17  absolutely.
18       Q.   And there you see the conducted electrical
19  weapon, which is known as the taser.  Talks about
20  what a taser does.  And, then, it talks about its
21  cartridge range and operational range.
22       Do you see that?
23       A.   I do, sir.
24       Q.   Do you agree that you were or that

113

1   Officer Hall was within operational range of the
2   taser that night?
3        A.   Yes, sir.
4        Q.   When he deployed it, correct?
5        A.   Yes, sir.
6        Q.   And you see at the bottom where it says
7   it's highly effective, correct?
8        A.   I do.
9        Q.   And, then, why don't we move ahead to the
10  slide that talks about less lethal impact munitions
11  right there.  And, then, we talked about those
12  earlier.  And it talks about the middle section
13  there, employed against violently resisting and
14  aggressive individuals.
15       Do you see that?
16       A.   Yes.
17       Q.   And that is for the defense of officers
18  and others, correct?
19       A.   Yes, sir.
20       Q.   And it's employed against suspects with
21  deadly weapons.
22       You see that?
23       A.   Yes.
24       Q.   And you have been trained on all this, is

114

1   that correct?
2        A.   Yes, sir.
3        Q.   Do you recall this scenario that they gave
4   you in the PowerPoint presentation?
5        A.   I was out there on this call actually.
6   Yes, sir.
7        Q.   Oh, so you know this.  You might be in the
8   picture possibly?
9        A.   I probably am.
10       Q.   All right.  So you remember this incident,
11  then, not only by PowerPoint, but personally, is
12  that correct?
13       A.   Yes.
14       Q.   So if I tell you that there were reports
15  of subject with a gun, you would agree with that?
16       A.   Yes.
17       Q.   That it was a rapidly changing
18  circumstance, right?
19       A.   Yes.
20       Q.   That the subject eventually took a hostage
21  while he was with a gun, is that correct?
22       A.   Yes.
23       Q.   And that this was confirmed when the
24  officers were on scene, is that right?

115

1        A.   Yes.
2        Q.   And that a SWAT team was called in, is
3   that correct?
4        A.   Yes.
5        Q.   And they subdued the subject with the
6   40-millimeter less lethal impact munition, is that
7   correct?
8        A.   Yes.
9        Q.   Did you fire that weapon or was it someone
10  else?
11       A.   I did not.  That was another officer.
12       Q.   So this was another successful resolution
13  of somebody who was holding a deadly weapon in
14  their hand, but with the additional exigent
15  circumstance of a hostage, is that correct?
16       A.   That's incorrect.  It wasn't a deadly
17  weapon.  It ended up being a starter pistol.  It
18  was not a real firearm.
19       Q.   And to a police officer does it matter if
20  someone is brandishing a starter pistol or a real
21  gun when it comes to the return of force?
22       A.   Depending on the situation.
23       Q.   Wow!  You're the first one who has ever
24  said that.  That's interesting.

116

1    A.   Well, sir, if you know it's a starter
2  pistol, and you know it doesn't have the ability to
3  harm an individual, then you would not use lethal
4  force.
5    Q.   Interesting.
6         Was this subject white or black or brown?
7    A.   I believe he was white, sir.
8    Q.   All right.  Done with that done.
9         Can you answer for me whether
10 DeCynthia Clements was under arrest that
11 night at any point before she opened up her
12 door?
13   A.   Yes, she would have been placed under
14 arrest for her actions of fleeing and alluding.
15   Q.   No.  That's not my question.
16        Was she placed under arrest before she
17 opened up her door?
18   A.   No, sir.
19   Q.   Was she told that she was under arrest
20 before she opened up the door?
21   A.   I believe they early on on the PA they
22 advised her that she was under arrest, yes.
23   Q.   Was she told that she could not leave the
24 scene?

117

1    A.   I don't recall that, sir.
2         (whereupon, Jensen Deposition
3          Exhibit No. 7 was marked for
4          identification as of 11/24/20.)
5  BY MR. ROMANUCCI:
6    Q.   So we are putting up Exhibit No. 7 now.
7         Can you see it?
8    A.   Yes, sir.
9    Q.   All right.  I just want to identify
10 that this is the standard operating procedure for
11 the response to resistance dated 12/29/16 and that
12 this would have been the SOP in effect in March of
13 2018.
14   A.   Yes, sir.
15        (whereupon, Jensen Deposition
16         Exhibit No. 8 was marked for
17         identification as of 11/24/20.)
18 BY MR. ROMANUCCI:
19   Q.   So Exhibit 8 is responding to persons with
20 mental illness effective 5/27/15.  If you can
21 identify this as being the SOP that was effective
22 in March of 2018, please.
23   A.   Yes.  Yes, that was in effect at that
24 time.

118

1    Q.   And would you agree that this would
2  have been the SOP that would have applied to
3  DeCynthia Clements in March of 2018 based upon
4  mental illness?
5    A.   Yes, sir.
6    Q.   So the definitions that are on Page 1, if
7  one of those definitions applies, they would have
8  applied to DeCynthia -- strike that.  That was a
9  bad question.
10        The definitions that are contained on that
11 page, if they are applicable to her, would define
12 her on that night, is that correct?
13   A.   I am not sure if there is more of the
14 definitions on the other page, but --
15   Q.   Go to Page 2.
16   A.   Mental illness, mental impairment, yes.
17   Q.   Let's go back to Page 1.  Can you read out
18 loud the purpose of the standard operating
19 procedure?
20   A.   It is to give you guidance on dealing with
21 individuals with mental health issues.
22   Q.   No, no.  Can you read the purpose?
23   A.   Oh, I'm sorry.  The purpose of this policy
24 is to establish guidelines for employees on the

119

1  recognition and handling of persons who are
2  suspected to be mentally ill and/or in need of
3  mental health treatment and to provide procedures
4  to be used when coming into contact with such
5  individuals.
6    Q.   So I think the operative language there,
7  Persons who are suspected to be mentally ill or in
8  need of mental health treatment.
9         Meaning that you don't need a diagnosis
10 for this operating procedure to be effective, is
11 that correct?
12   A.   I would agree, sir.
13   Q.   Are you familiar with the Americans with
14 Disabilities Act?
15   A.   I am, sir.
16   Q.   Do you know what accommodations were made
17 for DeCynthia Clements on the night of March 12,
18 2018, to accommodate for her disability or
19 impairment?
20   A.   I don't know what accommodations we could
21 have made for her impairment or disability besides
22 having trained CIT officers there and the
23 negotiators or and a negotiator.
24   Q.   Let me go to Page 2, please, toward the

120

1  bottom.
2  Do you see Section 42.5.1, recognition of
3  persons suspected to be suffering from mental
4  illness?
5  A.  I do, sir.
6  Q.  And, once again, we don't need a diagnosis
7  of mental illness.  It's just if you're suspected
8  of suffering from one, is that correct?
9  A.  Yes, sir.
10  Q.  And do you see where it says, Mental
11  illness is quite often difficult to define in a
12  given individual?
13  Do you see that?
14  A.  Yes, sir.
15  Q.  And it's told to officers that they should
16  be recognizing behavior that is potentially
17  destructive and/or dangerous to self or others.
18  Do you see that?
19  A.  Yes, sir.
20  Q.  So far that defines DeCynthia Clements,
21  right?
22  A.  Yes.
23  Q.  And that you should not rule out potential
24  causes of this mental illness, such as reactions to
121

1  narcotics or alcohol or temporary emotional
2  disturbances that are situationally motivated.
3  Do you see that?
4  A.  Yes, sir.
5  Q.  And do you agree that applies to
6  DeCynthia Clements, is that correct?
7  A.  Yes.
8  Q.  And, then, it tells you that employees,
9  meaning you, Elgin Police Officers, should be
10  looking at the reactions of that mentally ill
11  person.
12  Do you see it?
13  A.  Yes.
14  Q.  Do you agree that DeCynthia showed fear
15  that night?
16  A.  No.
17  Q.  She showed no fear?
18  A.  No.
19  Q.  Do you believe that she was inappropriate
20  in her behavior?
21  A.  Yes.
22  Q.  It talks about extreme rigidity or
23  inflexibility, and that doesn't pertain to
24  physical, but to mental.
122

1  Do you agree that she was rigid and
2  inflexible in her decision making?
3  A.  Yes, sir.
4  Q.  Turn to Page 7.  Right there, B.
5  You see where it talks about the following
6  steps shall be taken?
7  What does it mean when you hear the
8  command shall?
9  Is that discretionary?
10  A.  That's an order.
11  Q.  So you take that to be an order, correct?
12  A.  Yes.
13  Q.  So the following steps shall be taken when
14  encountering a person suspected of excited delirium
15  or a serious mental episode.  When safe and
16  practical, request an ambulance.
17  Correct?
18  A.  Yes.
19  Q.  You did not request an ambulance prior to
20  her being shot, is that correct?
21  A.  I did not.
22  Q.  Did anybody else on scene request one
23  before she was shot?
24  A.  It was the Illinois State Police had
123

1  requested one to stand by.
2  Q.  But it wasn't on scene?
3  A.  Define on scene.  Ambulances will not
4  stage on scene.  They will stage in a safe area.
5  And that safe area could be up to a half mile to,
6  like, a mile away.
7  Q.  Where was this ambulance staged?
8  A.  I don't recall.  The Illinois State Police
9  was handling that.
10  (whereupon, Jensen Deposition
11  Exhibit No. 9 was marked for
12  identification as of 11/24/20.)
13  BY MR. ROMANUCCI:
14  Q.  Showing you what's marked as Deposition
15  Exhibit No. 9, Officer Jensen.  This picture was
16  taken in the daylight.
17  This incident occurred when it was night,
18  correct?
19  A.  Yes, sir.
20  Q.  Do you agree that this photograph depicts
21  the car as it was when DeCynthia Clements exited
22  the vehicle as she was shot?
23  A.  Yes, sir.
24  Q.  And we are looking at an orientation where
124

1   we are looking westbound, is that correct?
2       A.   That is correct, sir.
3       Q.   There is a tripod set up to the right of
4   the vehicle.  And, again, we are looking at that
5   tripod, we are standing on the east, and we are
6   looking west, correct?
7       A.   That is correct, sir.
8       MR. DEANO:  I'm sorry.  Is that Exhibit 9 or 8?
9       MR. ROMANUCCI:  We have it as nine.
10      MR. DEANO:  Okay.  Thank you.
11      MS. RAVEENDRAN:  And, Jim, after this is done,
12  I will send you and the court reporter a list with
13  everything attached exactly as it was shown.
14      MR. DEANO:  Okay.  Thanks, Bhavani.
15      MS. RAVEENDRAN:  No problem.
16  BY MR. ROMANUCCI:
17      Q.   And looking at this photograph, although
18  there are no other vehicles depicted in it, can you
19  tell us where your vehicle was when it was pinned
20  up against DeCynthia's vehicle?
21      A.   It would have been in the front, sir.
22      Q.   And would that have been facing eastbound?
23      A.   Yes, sir.
24      Q.   And was there any vehicle that was pinned
                                                    125

1   from behind east to west?
2       A.   Yes.  That would have been
3   Sergeant Hartman's.
4       MS. RAVEENDRAN:  This will be Exhibit 10.
5           (whereupon, Jensen Deposition
6           Exhibit No. 10 was marked for
7           identification as of 11/24/20.)
8   BY MR. ROMANUCCI:
9       Q.   And, again, I am showing you a photograph
10  marked as Exhibit No. 10.
11          Would this be the condition of DeCynthia's
12  vehicle as it was after she exited the car and
13  clearly had burned?
14      A.   Yes.
15      Q.   And this photograph is looking from west
16  to east, is that correct?
17      A.   Yes, sir.  Yes.
18      Q.   So that the police vehicles behind
19  DeCynthia's are to the east of this vehicle, true?
20      A.   Yes, sir.
21      Q.   And, then, to the -- let's see.
22          To the south of the vehicle is the median,
23  is that correct?
24      A.   Yes.
                                                    126

1       Q.   That's a concrete median, true?
2       A.   True.
3       Q.   Approximately how high is it?
4       A.   I would say about four feet.
5       Q.   And you would have been at some point on
6   the other side of the median in the eastbound
7   traffic lane, is that correct?
8       A.   Yes.
9       Q.   And that would have been immediately
10  before the car -- well, that would have been after
11  the car -- you saw flames in the car and before she
12  was shot?
13      A.   Yes.
14          (whereupon, Jensen Deposition
15          Exhibit No. 11 was marked for
16          identification as of 11/24/20.)
17  BY MR. ROMANUCCI:
18      Q.   Exhibit No. 11 is coming up next.
19          You see this to be the standard operating
20  procedure of the Elgin Police Department dated
21  1/12/16 with regard to Special Weapons and Tactics
22  Team, also known as SWAT, is that correct?
23      A.   Yes, sir.
24      Q.   And is this the one that would have been
                                                    127

1   in effect in March of 2018?
2       A.   Yes, sir.
3       Q.   And the purpose of this policy is to
4   establish procedures for SWAT, is that correct?
5       A.   Yes, sir.
6       Q.   And this is the policy that is tasked with
7   resolving critical incidents that exceed the
8   capabilities of first responders and/or
9   investigative units, is that correct?
10      A.   Yes, sir.
11      Q.   Do you see the definition of barricaded
12  subject?
13      A.   Yes.
14      Q.   Can you read that out loud?
15      A.   A barricaded subject.  A person who is
16  known or believed to be armed and uses any shelter,
17  conveyance, structure or building as a barrier
18  against law enforcement and refuses to exit and
19  submit to custody or arrest.
20      Q.   Is DeCynthia Clements defined as a
21  barricaded subject pursuant to this definition?
22      A.   Yes.
23      Q.   Do you agree that SWAT could or might have
24  been called to this scene to extricate a barricaded
                                                    128

1   subject?
2       A.   Yes.
3       Q.   Do you agree that SWAT was not called?
4       A.   SWAT was called.  Sergeant Lalley was
5   actually responding to the scene to assess before
6   the SWAT team was called out.  So, yes, SWAT -- the
7   SWAT commander was responding.
8       Q.   Let's make that a little clearer.  There
9   were no SWAT officers on scene when she was shot?
10      A.   There was SWAT officers on scene.
11      Q.   You?
12      A.   Myself, Officer Joniak was on SWAT, and
13  Officer Duffy had just arrived on scene --
14      Q.   You did not respond as a SWAT unit,
15  though, correct?
16      A.   No, sir.
17      Q.   You responded as a lieutenant and officer
18  in charge, correct?
19      A.   That is correct.
20      Q.   You did not mobilize a SWAT team that
21  night, is that correct, on scene?
22      A.   That is correct.
23      Q.   SWAT did not complete an operations plan,
24  correct?

                                                    129

1       A.   Yes, sir.
2       Q.   They did or not?
3       A.   They did not.
4       Q.   Okay.
5                (whereupon, Jensen Deposition
6                Exhibit No. 12 was marked for
7                identification as of 11/24/20.)
8   BY MR. ROMANUCCI:
9       Q.   Exhibit No. 12 is the tactical
10  negotiations team standard operating procedure
11  effective January 12, 2016.
12           This would have been the one in effect in
13  March of 2018, correct?
14      A.   Yes.
15      Q.   You're familiar with this document?
16      A.   I am, sir.
17      Q.   And can you read what this policy is?
18      A.   It is the policy of the Elgin Police
19  Department to provide a group of specifically
20  trained officers to respond to and effectively deal
21  with situations such as hostage takers, hostages
22  and/or barricaded subjects.  The team aims for a
23  peaceful resolution to each crisis situation.
24      Q.   And who was the tactical negotiator on

                                                    130

1   scene that night?
2       A.   Sergeant Hartman.
3       Q.   And, then, you see the definition of
4   barricaded subject the same as the SWAT definition,
5   correct?
6       A.   Yes, sir.
7                (whereupon, Jensen Deposition
8                Exhibit No. 13 was marked for
9                identification as of 11/24/20.)
10  BY MR. ROMANUCCI:
11      Q.   Are you familiar with this PowerPoint
12  training module?
13      A.   Yes.
14      Q.   Can you define for me what de-escalation
15  means in your own words?
16      A.   De-escalation is to resolve a situation by
17  using techniques to calm the situation down, to
18  take your time and use all available tools and
19  tactics at your disposal for peaceful resolution.
20      Q.   Do you agree that it also is used to teach
21  officers how to address the needs of a person in a
22  time of crisis?
23      A.   Yes, sir.
24      Q.   And DeCynthia was in crisis that night on

                                                    131

1   March 12, 2018, true?
2       A.   Yes, sir.
3       Q.   Remember we talked about repetitive
4   commands earlier?
5       A.   Yes, we did.
6       Q.   So hands, hands, show hands, show hands,
7   hands, hands, hands, that's a repetitive command,
8   isn't it?
9       A.   Yes, it is.
10      Q.   What does the cartoon in the top left
11  corner talk about with respect to repetitive
12  commands?
13      A.   Repetitive commands getting locked into a
14  rigid response.
15      Q.   Meaning that you get no response, is that
16  correct?
17      A.   Yes, that can happen.
18      Q.   Meaning that a person in crisis who is
19  given repetitive commands will give you a
20  non-response, is that correct?
21      A.   Yes.
22      Q.   Yes.  A rigid response means no response,
23  true?
24      A.   Yes.

                                                    132

1    Q.   And that repetitive commands can actually
2 serve to escalate a crisis, correct?
3    A.   They can.
4    Q.   And that you would agree that this
5 situation that DeCynthia was in was a high stress
6 situation?
7    A.   Yes.
8    Q.   Inside a burning vehicle?
9    A.   Yes.
10    Q.   And that repetitive commands can actually
11 boomerang and do the opposite of what you want it
12 to do, correct?
13    A.   They could.
14    Q.   So rather than esc -- rather than
15 de-escalate, repetitive commands can actually
16 escalate, true?
17    A.   They can.
18    Q.   We talked about you being in a position
19 where you were up against the median at the time
20 that DeCynthia set foot on the ground and came out
21 with a knife in her hand.
22         Do you remember that?
23    A.   Yes, sir.
24    Q.   Was there anything that prevented you from
                                                      133

1 jumping back over the median to the eastbound side
2 when you were on the westbound side?
3    A.   Yes.
4    Q.   What?
5    A.   I would have had the time, I would have
6 had to put down -- I would have had to put down the
7 shield, I would have had to somehow hop over a
8 four-foot concrete barrier, while a person is
9 aggressing on you.
10    Q.   Is it your testimony that you were
11 incapable of jumping over the four-foot median
12 prior to DeCynthia Clements coming out of the car
13 with her feet on the ground?
14    A.   Prior to her exiting out of the vehicle
15 when the door was already opened, sir?
16    Q.   Yes.
17    A.   Yes.  I wouldn't -- I wouldn't have been
18 able to turn on my back, hop over the median and
19 safely cross that.  No, I couldn't.  No, sir.
20    Q.   I am confused.  Did you say yes you could
21 or no you -- I'm --
22    A.   No, I could not.  It would have put me at
23 a tactical disadvantage.  So, no, sir, I would not
24 have.
                                                      134

1    Q.   So when DeCynthia's door was open, you
2 could not have jumped back over the median to the
3 eastbound side to place yourself in a safer
4 position?
5    A.   Not with the time frame involved, no, sir.
6    Q.   What time frame?
7    A.   To be able to open up the door -- for her
8 to open up the door and assess as she was trapped
9 in the vehicle, no.
10    Q.   After the door was open and before she
11 came out, were you able to jump over to the
12 eastbound side -- on the other side of the median
13 to the eastbound traffic side?
14    A.   Physically I could have, but that would
15 have been poor tactics.
16    Q.   My question earlier was there was nothing
17 that prevented you from jumping over to the
18 eastbound side of the median after the door was
19 open and before she came out, correct?
20    A.   Incorrect.
21    Q.   What was there to stop you from jumping
22 over the median?
23    A.   Poor tactics.  It would have put me --
24    Q.   Forget tactics.  I am not talking about
                                                      135

1 tactics.  I am talking about physically.
2         Was there anything physically that
3 prevented you from jumping over the median before
4 she came out of the car while the door was open?
5    A.   No, there is nothing physically preventing
6 me, sir.  No, I could have hopped over, yes.
7    Q.   Now, there was discussion that night of
8 bringing over a vehicle known as BATT, is that
9 correct?
10    A.   Yes.
11    Q.   What is the BATT?
12    A.   That is an armored vehicle used by the
13 Elgin SWAT team.
14    Q.   Was the armored vehicle on scene before
15 she came out of the car?
16    A.   I believe it had just arrived on the
17 scene.
18    Q.   Do you agree that the BATT was not
19 employed as a mechanism to help assist get her out
20 of the vehicle, that it was there too late?
21    A.   Yes, it was there too late.  Yes.
22    Q.   While any individual police officer was
23 not inside one of their vehicles, did DeCynthia
24 ever make any attempt to drive at any officer?
                                                      136



1    A.  She put it in reverse, so she was driving
2  at us in our -- yes.  So she was going in the
3  direction of the officers when she put it in
4  reverse.
5    Q.  So her car was being used as a deadly
6  weapon is what you're saying?
7    A.  She did not drive far in reverse.  She
8  drove in the direction of the officers.  So that is
9  a threatening gesture.  But it did not need a
10 response at that time of any force, no, because she
11 put it back into drive.
12   Q.  How many feet were between you and the
13 other officer when the car was moving in reverse?
14   A.  There was enough area to make a decision
15 if we had to go behind a car, a squat car to block
16 ourselves, or to hop over the median.
17   Q.  So you do agree that a car can be used as
18 deadly force, is that correct?
19   A.  Yes, sir.
20   Q.  And so what you did there was employ the
21 tactic of distance in order to ensure that the car
22 was not deadly force because of your tactic of
23 space, correct?
24   A.  Yes, sir?

137

1    Q.  Did you ever tell anybody that when
2  somebody comes at you with a knife and you're
3  standing within six to eight feet of them that
4  that's a lethal encounter where deadly force is
5  necessary?
6    A.  Yes.
7    Q.  And your testimony today is that you were
8  within five feet of her when she came out of the
9  car with a knife, is that correct?
10   A.  Yes, sir.
11   Q.  And after she was shot, you made a
12 statement that, She is shot in the head, bro.
13 There is nothing we can do, right?
14   A.  Yes, sir.
15   Q.  Did you tell me today that it was
16 acceptable protocol to turn your body camera off
17 when you're involved in a police incident?
18   A.  No, I did not say in a police incident.  A
19 police incident is a pretty vague term because you
20 can turn your camera off occasionally when in
21 contact with the public.  It depends on the
22 situation.  You can turn your camera off inside of
23 a squad car when it has the audio and the video
24 recording.  And at the time under the draft policy

138

1  you could turn it off when having officer to
2  officer contact off of the scene.
3    Q.  Did you clearly communicate all
4  of your plans and the possible scenarios of
5  DeCynthia Clements coming out of the car to your
6  fellow officers before she stepped foot onto the
7  ground and you shot her?
8    A.  Yes, I did.
9    Q.  Do you agree that people who are under the
10 influence of drugs and alcohol are not going to
11 cooperate as easily and have diminished mental
12 capacity?
13   A.  Yes, sir.
14   Q.  Did you want squad on scene?
15   A.  Yes, I did.  I requested Sergeant
16 Jim Lalley to respond out there so he could assess
17 and make the final determination.
18   Q.  Do you agree that there was never a plan
19 for extraction for DeCynthia Clements from the
20 vehicle?
21   A.  I disagree.
22   Q.  Did anybody in command ever tell you to
23 take out the passenger window and pepper spray her
24 or do whatever you had to do to extricate her from

139

1  the car?
2    A.  No, sir.
3    Q.  Do you agree that your plan was to
4  peacefully resolve this encounter with
5  DeCynthia Clements?
6    A.  Yes.
7    Q.  What was your plan for the 360 if it could
8  not end peacefully?
9    A.  The 360?  What does that mean, sir?
10   Q.  Well, it means the opposite of peaceful.
11 Had she come out aggressively, what was the plan if
12 she was going to come out of the vehicle
13 aggressively with the knives?
14   A.  It depended on how she was acting.  If she
15 came out aggressively but stood there and we had
16 the time and we had the distance, we were able to
17 back off, we were able to utilize the taser, or if
18 she ran the opposite way and she was just running
19 on I-90, then we wouldn't have had to use the
20 deadly force option.
21   Q.  Well, this instance was not an option
22 because you had none and you couldn't go anywhere,
23 correct?
24   A.  That is correct, sir.

140



1    Q.   You didn't leave yourself enough distance,
2  correct?
3    A.   No, sir.
4    Q.   Was there a canine on site that night?
5    A.   Yes.  Officer Schuttrow had his canine.
6    Q.   The canine was never taken out of the car
7  or deployed, correct?
8    A.   That is correct, sir.  That would be
9  against our SOP.
10    Q.   Did you ever have a plan for extraction or
11  not?
12    A.   Yes, I did.
13    Q.   So extraction means either opening the
14  door or breaking the window, is that correct?
15    A.   That is correct, sir.
16    Q.   Which one did you do?
17    A.   Which one would I have done?
18    Q.   No.  Did you open the door?
19    A.   No.  She opened the door.
20    Q.   Did you break the window?
21    A.   No, sir.
22    Q.   So you never did extract her before she
23  stepped out of the car and you shot her, correct?
24    A.   No.  There was no attempt on an extraction
                                                    141

1  because she opened up the door.
2    MR. ROMANUCCI:  All right.  We are going to
3  take another break.  I am going to see where I am
4  at and, then, let you know what we have left.
5    THE WITNESS:  Okay.  Sounds good, sir.
6    MR. ROMANUCCI:  It's 2:53.  Why don't we
7  reconvene at about 3 o'clock.  All right.
8    THE WITNESS:  3 o'clock.  All right.
9    THE VIDEOGRAPHER:  Off the record.  The time is
10  2:54 p.m.
11          (Whereupon, there
12          was a short break.)
13    THE VIDEOGRAPHER:  Okay.  We are back on the
14  record.  The time is 3:05.
15    MR. ROMANUCCI:  So counsel and I had an
16  off-the-record discussion about the foundation of
17  the body cam warn videos of the officers from the
18  night of March 12, 2018.
19          I had asked counsel whether or not there
20  would be a stipulation as to the foundation for
21  those videos.  And the response was that there will
22  be a stipulation as to who wore which body cams and
23  that we would not need to individually authenticate
24  each one.
                                                    142

1    MR. DEANO:  Correct.  The defense will
2  stipulate that the -- the foundation for the
3  videos.  What is shown on the video was what was
4  seen that night and captured by the video by the
5  cameras.
6    MR. ROMANUCCI:  Very well.
7    MR. DEANO:  I am not trying to be tricky with
8  that language.  Those videos are stipulated to
9  foundation.
10    MR. ROMANUCCI:  I get it.  Understood.  Thank
11  you.
12  BY MR. ROMANUCCI:
13    Q.   All right.  Officer Jensen, final round of
14  questioning here.  I don't know if it's going to
15  take 5 minutes or 20 minutes, but whatever it does.
16    A.   Whatever you want.
17    Q.   Yeah.  Do you know any members of
18  DeCynthia's family?
19    A.   I know Chevelle Clements.  And I have met
20  Holly Lucy, I believe, one time.
21    Q.   And had you ever met DeCynthia before?
22    A.   No, sir.  And if I have, I do not recall
23  it at all.  I have been a police officer now at
24  Elgin for, you know, at that time, 18 to 19 years.
                                                    143

1  Do you come into contact with people on the street,
2  and you don't remember them?  Sure.  But I do not
3  recall.
4    Q.   And what race is Chevelle?
5    A.   He is black.
6    Q.   And what race is Holly?
7    A.   I believe she is white.
8    Q.   These are some questions that I may have
9  asked you before, but I am just trying to go
10  through a list here.
11          Do you agree that prior at any time that
12  night that she never verbally threatened anyone
13  where you felt that the use of force was necessary?
14    A.   That is correct.  She never threatened
15  anyone verbally from anything I heard, sir.
16    Q.   Do you agree that you stated that there is
17  a knife on her hip.  She doesn't have it out.  And
18  that she has a history of suicidal incidents?
19    A.   I don't recall saying she had a knife on
20  her hip.  I could have, though, with the
21  Illinois State Police Report.  I am not sure.  I
22  would have to refresh my memory on the police
23  report, sir.
24    Q.   Did DeCynthia Clements at some point show
                                                    144

1  you the middle finger?
2      A.  She gave me a salute and not like the
3  slang for the middle finger salute, but actually
4  like army salute when I was pinning her in.
5      Q.  Did you ever say on your own body worn
6  camera that this is getting messy now?
7      A.  I probably did at some point, especially
8  when the vehicle was becoming engulfed in flames.
9      Q.  Garcia's first name is Christine, is that
10  correct?
11      A.  Christina.
12      Q.  Christina?
13      A.  Yes, sir.
14      Q.  And who is Linda?
15      A.  Linda?  Oh, that's Officer Williamson.
16      Q.  Do you agree that Christina Garcia had a
17  rifle and that Linda had a pepper ball?
18      A.  I agree with that, sir.
19      Q.  Did you give them orders or instruction on
20  tactical position and use if she came out of the
21  car with knives in her hand?
22      A.  Yes, I did.
23      Q.  Well, that would be on your body cam then,
24  is that correct?

145

1      A.  Yes, it would.
2      Q.  Earlier you said that when I asked you if
3  she gave you the middle finger, you said you
4  remember a salute.
5          Do you recall saying that, She is giving
6  us the middle finger and, yeah, this is going to
7  get messy here?
8      A.  If it's on the body cam, it happened, sir.
9  I just don't recall it at this time.
10      Q.  Were you offended by her when she gave you
11  the middle finger?
12      A.  No.
13      Q.  So why would it get messy if a black woman
14  gave you the middle finger?
15      A.  I think because of the actions if the
16  vehicle was starting on fire, that was the part
17  that it's starting to get a little messy.
18      Q.  Well, what if this happened before the
19  fire started?
20      A.  It just shows her obstinance, but that's
21  not being offensive.  Over the course of my career
22  many people have said hurtful words to me and given
23  me the finger.  This is nothing new.
24      Q.  But you said it's going to get messy after

146

1  she gave you the finger, nonetheless, right?
2      A.  Yes.  If I said it, I don't recall.  If
3  it's on the body cam, I did.  I am not disputing
4  it.
5      MR. ROMANUCCI:  All right.  We are not going
6  off the record.  We are just going to mute you for
7  a second.  We are going to stick to video.
8      THE WITNESS:  Sure.
9              (Whereupon, a discussion
10              was had off the record.)
11  BY MR. ROMANUCCI:
12      Q.  All right.  We are going to show you one
13  last document that you can identify for us, please.
14      A.  Sure.
15      MS. RAVEENDRAN:  So exhibit -- this will be
16  Exhibit 14.  The Hillard Heintze interview.
17              (Whereupon, Jensen Deposition
18              Exhibit No. 14 was marked for
19              identification as of 14.)
20  BY MR. ROMANUCCI:
21      Q.  Is this the document that you reviewed
22  prior to today's deposition?
23      A.  Yes, sir.
24      Q.  And it is -- it shows at the top 91 pages

147

1  in length.  Does that sound right to you?
2      A.  Yes, sir.
3      Q.  And this is the estimate that you gave to
4  Hillard Heintze with your attorney present May 29,
5  2019?
6      A.  Yes, sir.
7      MR. ROMANUCCI:  That's all I have.
8      MR. DEANO:  I have no questions.  And we will
9  reserve only because my -- my internet faded in and
10  out a few times, and I missed a few things, but so
11  we will reserve.  I know it's on video, but the
12  witness will read it.
13      MR. ROMANUCCI:  Fair.
14      MR. DEANO:  Thank you.  Enjoy the holiday.
15      MR. ROMANUCCI:  You, too, everybody.  Happy
16  Thanksgiving.
17      MR. DEANO:  Thank you.
18      THE VIDEOGRAPHER:  Off the record at 3:15.
19              (FURTHER DEPONENT SAITH NOT.)
20
21
22
23
24

148



IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CHEVELLE & HOLLY CLEMENTS, as    )

Co-Administrators of the         )

Estate of DECYNTHIA CLEMENTS,    )

Deceased,                        )

                Plaintiffs,      ) No. 18 CV 3995

        -v-                      )

CITY OF ELGIN, a municipal       )

corporation; et al.,             )

        Defendants.              )

        This is to certify that I have read

the transcript of my deposition taken in the

above-entitled cause by Elvira M. Molnar,

Certified Shorthand Reporter, on November 24, 2020,

and that the foregoing transcript accurately states

the questions asked of me and the answers given by

me as they now appear.


                        Christian Jensen

SUBSCRIBED AND SWORN TO

before me this        day

of            , A.D. 20 .

        Notary public

149

---

STATE OF ILLINOIS )

                  ) SS:

COUNTY OF L A K E )

        I, Elvira M. Molnar, a Certified Shorthand

Reporter of the State of Illinois, do hereby

certify:

        That previous to the commencement of the

examination of the witness, the witness was duly

sworn to testify the whole truth concerning the

matters herein;

        That the foregoing deposition transcript

was reported stenographically by me, was thereafter

reduced to typewriting under my personal direction

and constitutes a true record of the testimony

given and the proceedings had;

        That the said deposition was taken before

me at the time and place specified;

        That the reading and signing by the

witness of the deposition transcript was agreed

upon as stated herein;

        That I am not a relative or employee or

attorney or counsel, nor a relative or employee of

such attorney or counsel for any of the parties

hereto, nor interested directly or indirectly in

150

---

the outcome of this action.

        IN WITNESS WHEREOF, I do hereunto set my

hand and affix my seal of office at Chicago,

Illinois, this 7th day of December, 2020.


C.S.R. Certificate No. 84-3309.

151

---

MCCORKLE LITIGATION SERVICES, INC.
200 North LaSalle Street, Suite 2900
Chicago, Illinois  60601-1014
(312) 263-0052

December 7, 2020

DEANO & SCARRY, LLC
MR. JAMES L. DEANO
53 West Jackson Boulevard, Suite 1610
Chicago, Illinois 60604
IN RE:  Clements -v- City of Elgin
COURT NUMBER:  18 CV 395
DATE TAKEN:  11/24/20
DEPONENT:  Lieutenant Christian Jensen

Dear Mr. Deano:

Enclosed is the deposition transcript for the
aforementioned deponent in the above-entitled
cause.  Also enclosed are additional signature
pages, if applicable, and errata sheets.
Per your agreement to secure signature, please
submit the transcript to the deponent for review
and signature.  All changes or corrections must be
made on the errata sheets, not on the transcript
itself.  All errata sheets should be signed and all
signature pages need to be signed and notarized.

After the deponent has completed the above, please
return all signature pages and errata sheets to me
at the above address, and I will handle
distribution to the respective parties.
If you have any questions, please call me at the
above telephone number.

Sincerely,

Ms. Cindy Alicea          Ms. Elvira M. Molnar
Signature Department      Court Reporter

cc:  All counsel of record

152

---



Christian Jensen 11/24/2020

**1**

**1**
37:8,10 119:6,17
**1/12/16**
127:21
**10**
126:4,6,10
**11**
95:20,21 127:15,18
**11/24/20**
37:11 111:1 118:4,
17 124:12 126:7
127:16 130:7 131:9
**11:02**
4:2
**11th**
8:11 48:13
**12**
5:22 9:18 11:23 12:3
15:13 16:8 18:8
29:23 40:14 46:6
47:17 48:13 113:13
120:17 130:6,9,11
132:1 142:18
**12/29/16**
118:11
**125222.jensen's**
95:5
**12:14**
55:22
**12:26**
56:5
**12:30**
8:19
**12th**
8:11
**13**
131:8
**14**
15:14 40:14 147:16,
18,19
**15**
55:19 102:16
**16**
14:24
**170**
15:19
**17th**
38:3,4
**18**
13:8 104:18 143:24
**19**
3:18 143:24
**1990s**
21:3
**19th**
64:3
**1:49**
110:20

**2**

**2**
56:2 110:16 119:15
120:24
**20**
103:12 143:15
**2000**
21:5
**2000s**
21:3,4
**2001**
13:20
**2002**
14:20,23
**2010**
21:6,7

**2011**
14:6,7 104:18
**2012**
14:7
**2013**
59:12
**2016**
7:21 130:11
**2017**
7:21 38:4 44:16 45:1
**2018**
5:22 8:12 9:19 11:24
12:23 13:7 14:20,23
15:2 16:8 18:8 21:6,
7 29:23 35:22 44:16
46:6 47:17 48:13
64:3 113:13 118:13,
22 119:3 120:18
128:1 130:13 132:1
142:18
**2019**
148:5
**2020**
44:13
**21**
8:1 13:5
**23**
18:2,17
**29**
103:19 148:4
**2:03**
111:3
**2:53**
142:6
**2:54**
142:10
**2_video_2018-03-012_0055**
83:17

**3**

**3**
95:7 142:7,8
**3-4**
95:10
**30**
46:23 47:10 49:2
50:19
**360**
140:7,9
**3:05**
142:14
**3:15**
148:18

**4**

**4**
95:7
**40**
69:12 93:16,22 94:8
97:10
**40-hour**
20:2,6,7,17
**40-millimeter**
69:13,17 71:8,13,20
72:8 116:6
**42.5.1**
121:2
**4:00**
14:9

**5**

**5**
104:24 105:2,4
111:16 143:15
**5-day**
20:2

**5/27/15**
118:20
**50**
15:15 40:17
**51**
104:19
**5th**
96:8

**6**

**6**
15:19 95:18 110:24
111:6
**60**
47:12

**7**

**7**
118:3,6 123:4

**8**

**8**
118:16,19 125:8
**8:00**
14:8

**9**

**9**
124:11,15 125:8
**90**
104:19
**91**
147:24
**99**
13:13,14

**A**

**a.m.**
4:2 8:19
**ability**
117:2
**absolutely**
12:18 57:24 63:5
81:16 110:1 113:17
**abuse**
29:5
**academy**
17:13,16 18:6,12,16,
19 19:2,5,8
**acceptable**
138:16
**accommodate**
7:2 120:18
**accommodations**
120:16,20
**account**
50:17
**accurate**
13:4 43:13,24 79:1,2
103:21
**accurately**
43:15
**acknowledge**
23:5
**act**
31:8 36:20 120:14
**acting**
85:15 140:14
**actions**
10:14 12:19 34:8
96:1 117:14 146:15
**activate**
47:2

**activated**
46:15 47:17,24
**activates**
46:17,22
**activities**
48:4
**actual**
20:1 50:17
**add**
20:1
**added**
83:18
**additional**
20:4 51:4 116:14
**address**
131:21
**advantage**
93:18 97:12
**advised**
24:16 26:24 67:24
117:22
**advises**
58:24
**affect**
63:5
**affirmative**
42:20
**affirms**
39:2,8
**affixed**
95:1
**African**
15:13
**afternoon**
13:18
**Agency**
56:14
**aggressing**
134:9
**aggressive**
114:14
**aggressively**
85:15 140:11,13,15
**agitated**
21:15
**agree**
8:10 10:19 11:22
28:18 29:4,22 33:10
34:21 35:1,5,13
36:3,10,19,22 43:12
44:5,8,11 65:20 67:7
82:12 83:2 85:14,16,
19 90:4 91:3,9 92:17
93:14 99:6 106:2
107:14,18,22 109:12
113:11,24 115:15
119:1 120:12 122:5,
14 123:1 124:20
128:23 129:3 131:20
133:4 136:18 137:17
139:9,18 140:3
144:11,16 145:16,18
**agreed**
91:5
**ahead**
14:19 32:3 52:8
55:14 63:3 65:24
67:16 73:23 75:12
81:13 100:4 104:7
114:9
**aimed**
9:23 25:11,12
**aiming**
72:7
**aims**
130:22
**alcohol**
28:23 29:5,9 34:4
94:16 107:20 122:1
139:10

**allowed**
6:21,22 45:1 48:10
**allude**
30:14 39:16
**alluding**
30:12 117:14
**ambulance**
22:5,6 83:3,6,10
123:16,19 124:7
**Ambulances**
124:3
**amendment**
96:8
**American**
15:13
**Americans**
120:13
**amount**
17:8 45:20,21 77:18
92:7
**analyze**
89:12
**ancillary**
14:17
**and/or**
34:1 120:2 121:17
128:8 130:22
**answers**
5:19 94:22 95:6,14
**apologize**
34:19 97:4
**applicable**
119:11
**applied**
119:2,8
**applies**
119:7 122:5
**apply**
18:21,22
**approach**
26:2 28:6 92:5
101:20
**approached**
22:24 26:12 27:15,
19,20,23 28:1,8
64:11,18,22,23 65:2,
5,11,19 66:2 67:9
68:18 108:5
**approaching**
26:7
**approximately**
8:19 13:14,22 14:12
38:1 47:5,16 49:1
76:10 89:15,20
127:3
**approximation**
15:10
**April**
44:16
**area**
21:18,20 22:1,5,6
69:23 93:11 124:4,5
137:14
**areas**
69:23
**argumentative**
80:22 100:3
**arm**
103:14
**armed**
74:12 128:16
**armored**
136:12,14
**arms**
15:22
**army**
145:4
**arrest**
117:10,14,16,19,22
128:19

**arrived**
8:17,24 29:22 47:18
48:1 83:12 129:13
136:16
**Asian**
15:16 45:11,21
**Asians**
41:19
**ASP**
113:15
**assess**
129:5 135:8 139:16
**assist**
90:23 136:19
**assistance**
23:15
**association**
40:6,21 41:9 42:1,23
43:1,4,10,20
**assume**
25:18
**assumes**
81:24
**attached**
125:13
**attempt**
25:14 26:3,8,12
73:15 90:10,14,19
101:11,17 102:3
136:24 141:24
**attempted**
25:7
**attempting**
33:18 108:9
**attempts**
26:2
**attended**
19:23
**attention**
23:14
**attorney**
6:5 12:9,12 34:17
56:22 57:1,7,23
58:4,24 59:6 60:13
61:7,9 62:10 148:4
**Attorney's**
19:20
**attorneys**
4:11
**audio**
46:19 48:7 138:23
**authenticate**
142:23
**authored**
53:2
**authority**
54:19
**authorized**
54:11
**automatically**
46:22
**aware**
11:8,17 15:4 26:18
35:2,7 36:23 37:2
44:15 66:13,14
75:18,21 76:2 80:2
83:13 85:11,19 86:7,
10
**Axon_body**
83:17

**B**

**back**
13:7 41:22 56:4 68:6
81:2 83:21 84:21
85:8,10 88:21 92:1,2
98:22 99:16 100:15
111:2 119:17 134:1,
18 135:2 137:11
140:17 142:13



backed
82:8 90:5
backwards
92:10,20 99:2
bad
52:10 119:9
ball
69:14,16 70:1,2
72:1,4,8 97:10,13,15
145:17
balling
89:21
ballpark
15:14
barb
70:20
barricade
93:19 97:10
barricaded
105:13 128:11,15,
21,24 130:22 131:4
barrier
23:1 128:17 134:8
based
33:22 82:17 119:3
basement
105:14
basic
69:17
basically
112:9
baton
16:23 113:14
BATT
136:8,11,18
battery
47:8
Beeder
53:21
began
25:1 68:19 109:12
begin
5:11
beginning
101:23
behalf
54:8
behavior
33:11,16 68:7
121:16 122:20
behaviors
33:23
believed
128:16
belt
9:8,12 16:10,11
Bhavani
125:14
biker
45:19
bit
13:2 20:11 24:8
black
15:6 39:2,8,9,15,19
40:6,13,18 41:24
42:22 43:1,4,10,20
44:17 45:13,22 50:6,
13 55:10 117:6
144:5 146:13
blink
39:3,8,19,23 41:15
block
137:15
Bob
53:21
bobbing
68:6
bodily
68:12,15

body
15:23 23:13 46:8,11,
14,16 47:2,6,17
48:11,14,18,21
49:21 50:3,20 83:19
88:20 138:16
142:17,22 145:5,23
146:8 147:3
boomerang
133:11
Bosque
102:20
bothered
62:24
bothering
63:13
bottom
101:10 113:3 114:6
121:1
brake
68:20
brandish
64:15,20 65:4 66:4,
11
brandished
64:12 65:3,14,18,21
66:1,15,17 67:10
brandishing
65:13 93:15,21
116:20
breach
103:2
break
6:22 7:1,6 16:16
31:9 55:18,24 78:1,9
110:15,22 141:20
142:3,12
breakdown
15:17 45:23
breakdowns
46:2
breaker
77:22
breaking
141:14
breaks
6:21,24 7:3
breath
89:3
bring
78:12
bringing
136:8
bro
138:12
broken
103:1
brown
15:7 40:16 41:9
45:15 117:6
buffer
46:24
Buick
26:7
build
21:15 77:18
building
92:3 128:17
bullet
11:5 111:22
bullets
9:16
burned
126:13
burning
82:19 133:8
button
46:16,21

C

call
7:3 25:7,14 29:20,21
51:5,13,22 54:12,19
57:6 83:2,6,10 100:6
104:19 115:5
called
4:6 21:24 23:11
25:13 46:24 51:7
52:3,4,10,18 53:5,6,
12 55:1 102:5 116:2
128:24 129:3,4,6
calm
131:17
calmly
19:3 21:13,17
cam
46:8,11,14,16 47:2,6
48:14 49:8,10 83:19
88:20 142:17 145:23
146:8 147:3
camera
23:13 47:17 48:7,11,
18,21 49:21 50:3,20,
24 138:16,20,22
145:6
cameras
143:5
cams
142:22
canine
141:4,5,6
capabilities
128:8
capacity
8:7 13:11 31:23
32:9,11,13,16,17,23
33:3,7 139:12
captain
50:22
captured
143:4
car
25:12 27:22 48:6
49:4,8 66:2,6,7,8
68:10,13 69:3 72:9
74:9,10 75:18,22
76:6 78:5,8 80:18
82:15 85:12,21
86:11 90:20,24 91:4,
11,22 92:2,9,21
97:21 98:9,16 99:8,
11,12 100:1 101:18
102:3,13 124:21
126:12 127:10,11
134:12 136:4,15
137:5,13,15,17,21
138:9,23 139:5
140:1 141:6,23
145:21
career
146:21
carry
16:13,14 17:5
113:15
carrying
9:13 16:10,12
cartoon
132:10
cartridge
113:21
case
6:16 29:14 50:18
60:15 61:22 102:20,
22 112:7
cases
55:17
category
29:11

Caucasian
15:16 45:20
cause
70:3
causing
11:4 68:19
cell
25:14,16,20,23
Center
22:1
certification
19:18 20:3
certified
17:3 19:13,17,22
20:16 22:11,16
23:16,24 24:8 27:12
61:2,5
CET
19:22
changed
44:10
changing
115:17
charge
9:1,3 14:11 23:22,23
33:6 72:3,7 79:22
99:14 129:18
charged
49:20,24 52:11,14,
15 81:5,10 98:24
charging
98:19 109:20
chart
38:21
check
25:19 97:1
Chevelle
143:19 144:4
chewing
68:5
chief
53:20,22 58:11
62:12,13
choice
48:20 71:19 80:19
81:19 82:17 90:7
chose
80:9 81:7
chosen
96:1
Chris
35:12 52:8 55:14
59:24 63:3 65:24
67:16 73:23 79:19
80:23 81:13 86:3
93:10 100:4
Christian
4:5,14 95:14
Christina
145:11,12,16
Christine
145:9
CI
20:7
Ciprofloxic
106:14
circumstance
115:18 116:15
circumstances
12:10 105:19 107:12
CIT
19:12,13,15,18,23,
24 20:7,12,14,17,23
22:11,16,19 23:16
24:1,8 27:12 120:22
City
5:20 58:15
class
20:2,5,6,7,16 21:12

clearer
129:8
Clements
4:12 5:22 9:4,23
10:8,13,24 12:2 18:8
22:12,21 24:4,12
25:5,22 27:9,16
28:19 29:16 30:1,8,
33:22 33:10,24
34:7 35:22 36:4,11
37:3 48:22 49:19
51:24 61:19 63:1
64:19 65:2,20 66:17
68:2,5 70:9 71:8,14,
21 72:9 74:9 76:22
77:2 79:14 80:13,17
82:7 85:20 86:17,23
89:5 90:11,17 91:4
92:18 93:5 96:2
101:3 105:20 117:10
119:3 120:17 121:20
122:6 124:21 128:20
134:12 139:5,19
140:5 143:19 144:24
Clements'
11:22 12:17 32:16
69:2 108:16
climb
99:16
climbed
77:9
Clonazepam
106:14
close
27:2 78:23 79:5 81:6
89:16 101:22
closed
66:11,16 90:1
closer
101:18 102:2,12
closest
6:17
Collin
49:16
combination
28:24 34:5
comfort
7:3
command
35:2 36:1,15 123:8
132:7 139:22
commander
49:16 51:16 129:7
commands
34:23 35:7,15,20
36:21 37:2 107:23
108:2 132:4,12,13,
19 133:1,10,15
commit
31:23 32:5,7,9,13,
18,23 33:3,7 44:7
committed
30:10,11
communicate
99:19,20,21 139:3
communicated
99:5,7
company
61:1
compiled
111:23
complete
129:23
Completely
105:21
completing
94:20
compliance
70:3
computer
25:19

concerned
69:1,5 70:19
conclude
34:2
conclusion
32:3
concrete
73:11 127:1 134:8
condition
50:13 126:11
conduct
112:16
conducted
113:18
conference
4:22
confirm
43:7
confirmed
115:23
confronted
53:24 54:2
confused
134:20
conscious
10:10 71:19 78:11
consciously
9:19 48:22 82:13
considered
52:5 79:13 95:24
constant
76:20
construed
31:7
contact
23:3,6 25:8,22,24
48:6 70:11 120:4
138:21 139:2 144:1
contacted
25:18 29:18
contained
119:10
contending
103:1
continue
78:8
continuously
47:8
continuum
112:19
control
104:9,10
controlling
111:18
conversation
22:21 23:14 49:5,11
50:21
conversations
58:3 60:2
conveyance
128:17
convicted
8:3
cooperate
5:4 139:11
corner
105:13 132:11
cornered
92:14
correct
8:15,22 9:9,13,15,
21,24 10:5,8,15
11:2,6 12:3 13:8
16:1 17:24 18:1
20:13 22:17 24:2,19
28:10,14 29:7 33:14
36:24 37:5,6 40:14,
18 42:2,3,23 44:23
45:6 46:9 48:4 57:8
60:18 65:15 66:18



70:23 71:5 72:15,16,
18,19 73:18,20 74:4,
13,16,19,21,24 75:3,
19 76:2,23 78:9,16
80:7,10 81:11 82:10
83:4 84:18 85:12,22
86:8,20,24 87:4,7,
10,14 89:14,23 90:2
91:21 93:16,23
94:18,19 96:17
100:2 103:23 104:3
110:13 112:12,20
113:9 114:4,7,18
115:1,12,21 116:3,7,
15 119:12 120:11
121:8 122:6 123:11,
17,20 124:18 125:1,
2,6,7 126:16,23
127:7,22 128:4,9
129:15,18,19,21,22,
24 130:13 131:5
132:16,20 133:2,12
135:19 136:9
137:18,23 138:9
140:23,24 141:2,7,8,
14,15,23 143:1
144:14 145:10,24

**couch**
105:14

**counsel**
56:9 57:24 61:4
142:15,19

**counselor**
22:3 63:15

**counselor's**
29:19

**County**
19:20

**court**
6:2 50:7,10 82:2
125:12

**courtroom**
54:14 55:16

**cover**
9:11 74:23 75:9
100:20 110:10

**covering**
72:20

**Covid**
5:1

**Creek**
104:20

**crime**
30:10,11 31:24 32:5,
8,9,14,18,23 33:3,8
39:2,8,10,11,19
40:6,21 41:10,15,24
42:22 43:1,4,10,21
44:20 112:9

**crimes**
13:20,21 14:5,14
44:7,18 45:5

**crisis**
23:24 27:13 130:23
131:22,24 132:18
133:2

**critical**
128:7

**cross**
134:19

**cry**
87:18 88:7

**current**
7:16

**custody**
128:19

**Cynthia**
5:21

---

### D

**dangerous**
121:17

**dash**
49:8,10

**date**
37:23 38:3,5

**dated**
118:11 127:20

**dates**
14:22

**day**
13:1 20:19,21

**daylight**
124:16

**days**
20:4,20

**de-escalate**
133:15

**de-escalation**
131:14,16

**dead**
79:15,16 80:17 81:5,
11,16

**deadly**
90:7 104:2 109:22
114:21 116:13,16
137:5,18,22 138:4
140:20

**deal**
64:1 130:20

**dealing**
17:13 18:23 19:10
119:20

**dealings**
18:7

**Deano**
12:4,7,15 18:10 32:2
35:10 52:6 55:12
56:11 57:7 58:20
59:2,20 63:2 65:23
67:12 73:21 79:18
80:21 81:12,23
85:23 93:8 94:1
98:11 100:3 104:5,7
110:19 125:8,10,14
143:1,7 148:8,14,17

**death**
5:21 68:13

**debate**
77:15

**debating**
51:8

**debris**
68:20

**decide**
51:6

**decision**
10:10 51:13,18 78:7,
11 109:11 123:2
137:14

**decisionmaking**
112:15

**decisions**
111:18

**decline**
45:22

**Decynthia**
4:12 5:22 9:4,23
10:8,13,24 11:22
12:2,17 18:8 22:12,
21 23:17 24:4,12,15,
19 25:1 26:2,19
27:9,16 28:19 29:16
30:1,8,23 32:16,22
33:10,18,24 34:7
35:22 36:4,11 37:3
48:22 49:19 51:24
61:19 63:1 64:19

**Decynthia's**
78:2 107:1 125:20
126:11,19 135:1
143:18

**Defendant**
95:24

**defense**
111:6 114:17 143:1

**define**
119:11 121:11 124:3
131:14

**defined**
107:14,18 128:20

**defines**
28:20 121:20

**definition**
28:19 29:6 85:17
128:11,21 131:3,4

**definitions**
119:6,7,10,14

**delineate**
97:20

**delirium**
123:14

**demographic**
15:6,7

**department**
7:14,17,24 8:7 9:16
11:10,14,18 13:5
14:21 17:12,19 18:6
19:1,13 20:15 21:2
28:20 42:21 43:9,18
62:6,18 63:14,19
64:10 68:1 84:24
85:2 103:6,20
112:11 127:20
130:19

**Department's**
44:2

**depend**
32:10

**depended**
140:14

**depending**
74:5 91:13 103:13
116:22

**depends**
35:18 103:15 138:21

**depicted**
125:18

**depicts**
124:20

**deployed**
70:12,21 71:5 72:10
108:23 114:4 141:7

**deployment**
109:2

**DEPONENT**
148:19

**deposition**
4:21 5:13 7:13 37:9
56:1,8 57:21 58:8
64:7 95:9 105:3

**disciplined**
8:6

**disclosed**
102:18

**disconnect**
20:12

**discretion**
113:4

**discretionary**
123:9

**discuss**
59:16

**discussed**
58:21 60:12

**discusses**
102:16

**discussion**
12:13 51:15 60:5
136:7 142:16 147:9

**discussions**
24:11 60:9

**dispatch**
25:19 29:18

**displaying**
68:7

**disposal**
131:19

**disproportionately**
44:6

**disputing**
147:3

**disqualify**
44:17

**distance**
6:15 79:9 80:6,12,18
86:17 87:3 91:13,16
92:11 137:21 140:16
141:1

**distress**
94:15

**disturbance**
18:13 34:24 94:16

**disturbances**
17:15 122:2

**disturbed**
17:23 18:20 19:11
28:21,22 29:7,12
30:2 34:1,3,21 35:3,
9,21 36:19 83:14
107:15,19

**division**
14:14 54:6,7

**divisions**
54:12,19

**divulged**
61:21

**document**
94:21 130:15
147:13,21

**documents**
58:6,13 59:7

**door**
16:17,18 66:8,10,16
75:18 88:11 90:11,
15,18,23 91:4,9
101:21,24 102:1,11
103:1 108:16,22
117:12,17,20 134:15
135:1,7,8,10,18
136:4 141:14,18,19
142:1

**draft**
138:24

**drag**
75:16

**drawn**
110:2

**drink**
7:8

**depth**
18:3

**deputy**
53:20 62:13

**derogatory**
49:20 50:2 51:21,23
52:1,2,5

**describe**
55:5,10 96:2

**deserved**
12:2

**design**
79:14

**designated**
74:23

**designed**
10:14,20 11:2 69:22
70:6 78:15 81:19

**desired**
35:4

**desk**
54:3

**destructive**
121:17

**detailed**
98:15 99:10

**details**
38:18

**determination**
32:19,21 139:17

**determine**
21:16

**determined**
77:16 92:5

**device**
70:5

**diagnose**
29:1

**diagnosis**
120:9 121:6

**difference**
19:16 69:15

**difficult**
121:11

**diminished**
32:13,16 33:7
139:11

**direct**
24:16 58:16

**direction**
10:7 23:5 68:21
94:11,17 137:3,8

**directive**
11:8,17 48:9

**directives**
48:12,14

**directs**
11:10

**Disabilities**
120:14

**disability**
120:18,21

**disadvantage**
134:23

**disagree**
139:21

**disarray**
103:3

**discharge**
11:5 97:15,17 110:7,
12

**discharged**
63:8 98:4

**discharging**
104:11

**drive**
51:11 104:20 136:24
137:7,11

**driver**
67:9

**driver's**
27:4 77:17 101:24

**driving**
30:12 137:1

**drop**
36:2,4,6,11,14

**dropped**
77:8

**drove**
30:15 137:8

**drug**
14:10,12 29:6 94:16
105:16 106:6,8,10
107:16,20

**drugs**
28:23 29:10 34:4
106:21,23 107:1,3
139:10

**Duffy**
129:13

**duly**
4:3,6

**duties**
14:17

**duty**
8:7,10 9:6,8,12,13,
15 10:19 11:1 16:4,
9,11 63:8

---

### E

**earlier**
18:11 40:12 85:24
98:12 99:7 101:17
114:12 132:4 135:16
146:2

**early**
7:21 14:7 117:21

**easily**
139:11

**east**
77:6 108:15,21
125:5 126:1,16,19

**eastbound**
23:1 74:2 77:3,10
84:16 100:20,23
125:22 127:6 134:1
135:3,12,13,18

**Ecker**
22:1

**edged**
73:5

**EDPS**
18:23 35:17

**effect**
70:6 81:14 86:19
106:22,24 107:3
118:12,23 128:11
130:12

**effective**
114:7 118:20,21
120:10 130:11

**effectively**
130:20

**eight-hour**
20:16 21:12

**electrical**
70:7 113:18

**electronic**
58:7 70:5

**Elgin**
5:20 7:14,17,24 8:3,
7,12,15 9:16 11:10,
14,18 13:5,11 14:21
15:6,12 17:11,19
18:5 19:1,13 20:14



21:1,24 28:20 29:18
30:21 33:23 34:10
37:23 39:18 40:13,
16 42:21 43:9,18
44:1,22 45:9,24
58:15 62:6,18 63:15,
18 64:10 65:21
66:12,15,21 67:24
84:24 85:2 102:20
103:5,19 112:11,16
113:8 122:9 127:20
130:18 136:13
143:24

**emotional**
17:14 18:12 34:23
94:15 122:1

**emotionally**
17:23 18:20 19:11
28:21,22 29:7,12
30:2 34:1,3,21 35:3,
9,21 36:19 83:14
107:15,19

**employ**
137:20

**employed**
7:23 13:4 114:13,20
136:19

**employees**
119:24 122:8

**employment**
8:2 13:3

**empty**
104:9

**en**
24:22

**encounter**
34:11 138:4 140:4

**encountering**
123:14

**end**
34:12 40:7 91:5,12
93:15 94:24 95:1
140:8

**ended**
116:17

**ends**
93:21

**enforcement**
128:18

**engage**
23:14,15

**engaged**
24:11 47:3

**engulfed**
66:2 74:7 91:22 99:8
145:8

**Enjoy**
148:14

**ensure**
137:21

**entire**
76:13 83:9

**EPD**
65:1

**episode**
53:12 123:15

**equal**
112:9

**equals**
89:22

**equipment**
16:11 46:7

**error**
109:1

**esc**
133:14

**escalate**
133:2,16

**establish**
119:24 128:4

**Estate**
4:12

**estimate**
6:17,18 89:19 148:3

**ethnically**
52:14,15

**evaluate**
96:3

**evaluation**
22:4

**even-steven**
107:11

**evening**
49:15

**event**
22:12 60:10 61:19
62:11 63:13

**eventually**
115:20

**evolution**
100:6

**exact**
7:22 15:8,9 18:2
45:18,23 46:2 47:7
62:19 103:7

**EXAMINATION**
4:8

**examined**
4:7

**examples**
17:19

**exceed**
128:7

**excited**
123:14

**exclamation**
42:16,19

**exercise**
97:6

**exercising**
96:11

**exhaust**
6:11

**exhibit**
37:8,10 56:2 95:7,10
104:24 105:4 110:24
111:6 118:3,6,16,19
124:11,15 125:8
126:4,6,10 127:15,
18 130:6,9 131:8
147:15,16,18

**exhibited**
33:17

**exhibiting**
34:8

**exhibits**
34:11

**exigent**
116:14

**exists**
43:3,10,20

**exit**
64:11 65:3 67:9
96:19 100:16,17
128:18

**exited**
30:6,8,24 36:5,12,24
37:4 79:15,21 89:6
92:4 97:11,20 98:20
100:9,18 101:4
124:21 126:12

**exiting**
29:17 92:12 98:24
134:14

**expect**
100:14

**expectation**
100:11

**experience**
112:24

**explain**
55:16 104:7

**explained**
55:15

**explaining**
13:24 43:16

**explanation**
34:17 69:18

**Exposure**
39:8,10

**expound**
102:7 104:22

**extent**
50:21

**extra**
7:6 16:14

**extract**
102:4 141:22

**extraction**
139:19 141:10,13,24

**extreme**
122:22

**extricate**
75:11 128:24 139:24

---

**F**

**faces**
39:9,11,15

**facilitated**
39:9,15

**facing**
125:22

**fact**
6:1 40:5 41:23 62:24

**factors**
12:24

**facts**
81:24

**faded**
148:9

**fail**
36:13

**failed**
36:10

**failure**
30:12

**fair**
37:15 38:16 39:21
148:13

**falls**
29:6,11

**false**
67:10 68:14 82:21
87:21 98:13

**familiar**
5:15 120:13 130:15
131:11

**familiarity**
11:13

**family**
143:18

**fast**
69:21

**fear**
122:14,17

**feet**
71:13 78:18,22 79:1,
4,6,11,12 86:23
89:17,20,22 90:2
91:18 101:19 102:2,
12,14,15 127:4
134:13 137:12
138:3,8

**fellow**
139:6

**felony**
8:4

**felt**
144:13

**female**
57:11 67:9 104:19

**field**
13:14,16

**figure**
62:3 65:9

**figured**
57:3

**file**
58:11 95:5

**filed**
5:20

**fill**
78:8

**filled**
70:2

**filling**
78:5

**final**
139:17 143:13

**fine**
34:19 110:19

**finger**
9:20 145:1,3 146:3,
6,11,14,23 147:1

**finish**
5:11

**fire**
27:17 28:9 65:12
70:13 77:7,17 90:12,
15,19 92:3 116:9
146:16,19

**firearm**
81:7 116:18

**five-day**
19:19 20:5

**flames**
66:2 74:7 76:5 77:1
91:23 92:7 99:8
127:11 145:8

**flashlight**
16:19

**flee**
30:14

**fleeing**
30:11 117:14

**Floyd**
44:12

**Flurry**
49:16 50:22 51:16
62:13

**fly**
68:21

**follow**
34:17,22 43:2

**foot**
15:19 89:9,17,18
92:18 133:20 139:6

**force**
18:22 31:9 68:23
72:10 78:16 80:7,15
86:19 87:4 90:8
103:5,13,14,15,17,
19 104:1,2 105:1
111:8,19 112:8,15,
19,22 113:6 116:21
117:4 137:10,18,22
138:4 140:20 144:13

**forget**
7:21 56:16 135:24

**forgot**
53:10,14

**form**
12:4 35:8,11,16 52:6
55:12 63:2 73:21
79:18 80:21 81:23
85:23 93:8 94:1
98:11

**forms**
94:21

**forward**
93:6

**found**
78:21

**foundation**
65:23 67:13 142:16,
20 143:2,9

**four-foot**
134:8,11

**fourth**
14:7

**frame**
39:22 47:7 74:6
135:5,6

**friends**
61:18,21 62:1,14,15

**front**
28:15 125:21

**full**
4:13 50:21 51:10

**function**
47:4

**functions**
48:4

---

**G**

**gang**
13:20,21 14:5,13
45:5,24 46:1 50:7,9

**gangs**
45:9,11,13,19,21

**gap**
89:16 90:1

**garage**
103:1

**Garcia**
100:19,22 145:16

**Garcia's**
145:9

**Garner**
112:3

**gauge**
43:15

**gave**
60:16,17,21 61:2,10
64:2 72:14 100:7
115:3 145:2 146:3,
10,14 147:1 148:3

**George**
44:12

**gesture**
137:9

**give**
5:5,19 6:14,16,17,20
14:22 15:10 17:19
19:3 33:24 35:3,24
36:15 37:3 43:13,23
47:21 50:17 59:6
60:24 61:6 62:8
63:22 72:12 98:15
119:20 132:19
145:19

**giving**
7:12 146:5

**glance**
43:23

**glass**
16:15

**goal**
74:8 86:12

**good**
57:20 55:20
110:16,18 142:5

**govern**
112:14

**grab**
103:14

**grabbed**
71:12

**graph**
38:21

**greater**
91:17

**ground**
89:9 92:19 101:6
133:20 134:13 139:7

**group**
130:19

**guess**
6:19 31:7 32:10
38:11 67:2

**guessing**
19:6

**guidance**
119:20

**guidelines**
119:24

**gum**
68:6

**gun**
9:20,23 10:2 72:1,4,
8 74:21 75:7 78:19
79:16 80:9,14 91:17
93:1 97:13,15 98:2,4
101:4 115:15,21
116:21

**guns**
101:2,3

**gunshots**
70:23,24

---

**H**

**hair**
70:17

**hairs**
29:13

**half**
5:7 14:15 57:19
76:10,13,22 99:23
124:5

**Hall**
22:15 24:3,9 75:9
88:23 114:1

**Hall's**
88:22

**halt**
72:14

**hand**
74:18 75:8 77:12
79:9 81:6,10 85:21
87:3 92:22 93:1 97:8
98:17 99:11 100:17
101:2 104:9,10
109:13 116:14
133:21 145:21

**handcuff**
103:15

**handcuffs**
16:16

**handed**
16:4,5

**handle**
100:9

**handling**
120:1 124:9

**hands**
36:15,17 72:18
75:10,23 80:3 81:21
85:4 109:23 132:6,7

**happen**
132:17

**happened**
146:8,18

**happy**
63:4 148:15

**hard**
28:24 41:5 69:18
104:9



Christian Jensen 11/24/2020

harm
31:1,4 33:11,18
68:16,22 117:3
Hartman
22:13 23:20 24:9,10,
14,24 25:4,22 26:1,
6,11 32:20,24 49:18
100:19,24 131:2
Hartman's
126:3
head
62:4 68:6 76:4 77:19
138:12
health
22:1,7 119:21 120:3,
8
hear
12:13 14:18 28:4
83:23 123:7
heard
25:3 30:18 33:19
85:6 144:15
height
15:18
Heintze
58:10 60:17 78:21,
24 147:16 148:4
held
65:7 74:18
hid
53:15
hide
53:17,19 54:22
high
69:20 127:3 133:5
highest
11:16
highlight
97:3
highlighted
101:13
highly
114:7
Hillard
58:10 60:17 78:21,
24 147:16 148:4
hip
144:17,20
hired
13:11,12,13
Hispanic
15:15 45:22
Hispanics
40:22
history
13:3 144:18
hit
46:21 69:22 77:19
89:9
hold
11:16 28:14,17
33:13 64:16 84:1
100:12 103:14 108:8
holding
34:9 77:12 82:15
116:13
holiday
148:14
Holly
143:20 144:6
holstered
75:15
hook
16:17
hop
98:23 134:7,18
137:16
hoping
100:16

hopped
77:13 91:23 136:6
hopping
99:2
hospital
21:22,23 22:3
hospitals
21:24
hostage
115:20 116:15
130:21
hostages
130:21
hour
7:5 51:9 55:19 57:19
84:9 99:22
hours
7:1 20:18 47:14 51:8
76:10,13,22
house
103:2
human
10:15,20 11:2,19,21
hundreds
63:21
hurdles
5:2
hurtful
146:22

## I

I-90
8:18 23:1 26:8 51:12
140:19
idea
109:6
identification
26:23 37:11 39:9,11
56:3 95:11 105:5
111:1 118:4,17
124:12 126:7 127:16
130:7 131:9 147:19
identify
118:9,21 147:13
identifying
50:13
identity
54:22
ill
31:22 32:4 34:1,3,22
35:9,17,21 36:20
83:13 107:15,19
120:2,7 122:10
Illinois
60:22 64:2,9 65:11
67:7,19 76:8 85:1
90:4 111:23 123:24
124:8 144:21
illness
17:15,24 18:13,20,
23 29:16 30:3 31:20
34:24 35:5 94:16
118:20 119:4,16
121:4,7,11,24
immediately
46:19,22 127:9
impact
17:1 69:12,13,16,17,
18 77:12,14,20
78:12,15 79:8,13,16
80:5,14 81:9,15
86:18 87:2,3 97:13,
17 104:2 109:3
114:10 116:6
impaired
29:2
impairment
119:16 120:19,21
impartial
37:16 38:16 39:21

important
5:23 11:19,21,23
12:18 13:1
in-between
79:6
in-car
50:23
in-service
19:14,21,23 20:15
37:23 38:10,15 41:1,
4,14
inappropriate
122:19
incapable
92:19 134:11
incapacitate
69:23 70:6
incapacitated
70:24
incapacitating
77:20
incident
8:17 59:14,16
104:14,17 105:1
115:10 124:17
138:17,18,19
incidents
8:8 128:7 144:18
include
21:21
including
40:6 41:24
income
42:8 44:5
incorrect
10:17 29:8 74:5
78:20 100:5 116:16
135:20
index
9:20
indication
33:17,24
individual
21:14 22:2 117:3
121:12 136:22
individually
142:23
individuals
49:14 52:12 62:23
114:14 119:21 120:5
ineffective
70:15,18,22 73:14
98:6
inferring
43:5
inflexibility
122:23
inflexible
123:2
influence
28:23 29:3,9,10 34:4
139:10
information
6:10,13 63:23
inhalation
87:20
inhibited
39:11
initial
4:16 101:20
injury
68:12,16
ink
15:22
inside
7:14 28:4 31:12,16
49:18 65:15,17,22
66:6,10,22,24 68:16
77:1,20 87:13,19,22
88:2,11,14,18 92:7
133:8 136:23 138:22

instance
140:21
instruct
48:10
instructed
39:23
instruction
145:19
instructions
100:7
instructor
19:22,23
insurance
56:14 57:8 60:24
interesting
116:24 117:5
internet
148:9
Interrogatories
95:14
interrogatory
94:22
Interrogs
95:6
interruption
84:7
interruptions
76:18
intervention
27:13
interview
147:16
Investigations
54:6,7
investigative
128:9
involve
104:1
involved
41:18 59:3 63:24
91:13 135:5 138:17
irrational
68:7
irritate
70:3
issue
6:16 43:8
issued
9:16 17:7 35:20
111:13
issues
29:19 119:21

## J

J-E-N-S-E-N
4:15
James
56:11 57:7
January
130:11
Jensen
4:5,10,14,20 12:12,
21 37:8,9,13 42:7,9
56:1 59:9 76:9 80:1
84:13 94:20 95:9,24
99:9 105:3 110:23
111:5,17 118:2,15
124:10,15 126:5
127:14 130:5 131:7
143:13 147:17
Jensen's
95:5,14 107:23
Jim
49:17 104:6 125:11
139:16
job
34:10
jog
38:14 104:22 106:12

Joniak
26:22 27:12,21
30:15,16 33:19
64:23 65:17 67:8,18,
22 88:22,23 129:12
judge
50:15,16
judging
38:3
jump
77:6 85:10,11,14,17,
21 87:7 99:12
135:11
jumped
84:16 94:7 100:12
135:2
jumping
86:11 134:1,11
135:17,21 136:3
jumps
84:20 85:7
June
13:13
jury
50:15,16

## K

Kane
19:20
Kevlar
72:24 73:1
kill
81:19
killed
9:4 10:13,24 44:12
48:23 63:1,9 93:5
kind
10:16 24:7 85:15
106:11
knew
66:24 74:3 86:22
87:6
knife
26:21 28:14,18
33:14 34:9 64:20
65:8,14,17,21 66:12,
15,18 67:10 73:2
74:4 75:22 84:21
85:7,12,21 86:12
91:10 92:22 93:15,
22 96:16 97:7,21
108:5,8 109:18,21
133:21 138:2,9
144:17,19
knives
36:7 64:12,17 65:3,4
75:22 79:22 80:3
81:20 82:15 88:3
98:16 99:11 100:1,9,
12,14,17,18 107:6
109:13,20,22 110:3
140:13 145:21
knowing
10:10,14 11:1 82:15
100:1
knowingly
9:19 11:4 31:14
knowledge
29:24 30:5 101:5

## L

labeled
95:5
lag
46:20
Lalley
49:17 51:16 62:12
129:4 139:16

Lalley's
58:11
landed
70:20
lane
127:7
lanes
77:10
language
51:22,23 52:1 120:6
143:8
late
7:21 136:20,21
launcher
69:14,16
law
111:23 112:7 128:18
lawsuit
5:20
lead
13:10
leaguer
69:22
learned
18:19
leave
71:19 117:23 141:1
left
16:4,6 89:10 92:20
94:8 103:2 132:10
142:4
legal
32:3
length
148:1
lethal
79:13 80:7,15 86:19
87:4 114:10 116:6
117:3 138:4
letter
52:23 53:2,16 54:12,
15
lie
19:4
lieutenant
7:18,19 8:21 14:16
76:9 129:17
life
10:15,21 11:2,11,15,
19,20,21,23 12:17
34:12,14 47:9 52:9
69:6,11 75:6,7,14
86:13,16 90:24 98:9
Linda
145:14,15,17
list
69:8 113:9 125:12
144:10
listen
66:9
live
12:2
loaded
9:16
located
7:12
location
15:21
locked
132:13
lodged
70:17
long
7:20 19:24 51:2
57:18 101:3
lot
38:10 62:5
loud
40:3 42:10 119:18
128:14



**lower**
42:8 44:5 69:23
**Lucy**
143:20
**lunch**
7:5

## M

**made**
25:13,22 26:2 27:2
51:18,19 66:20
72:23,24 76:2 78:7,
11 85:7 87:19 88:5
120:16,21 138:11
**magazines**
16:14
**maintaining**
60:8
**major**
54:6 69:21,22
**make**
5:8 6:2 7:2 15:16
21:14 23:6 25:8
26:3,23 32:19,21
69:10 70:11 71:19
90:10,14 101:17
102:2,3,11 129:8
136:24 137:14
139:17
**makeup**
15:5,11 45:8
**making**
5:3 123:2
**male**
39:9,10,15 57:10,12
**man's**
57:13
**Mandy**
104:15 106:3,8
107:6,14,22 108:4,
12 109:12,19,21,23
110:2,10,13
**Mandy's**
107:3
**manner**
50:2
**March**
5:22 8:11 9:18 11:23
12:3 15:2 16:8 18:8
29:23 35:22 44:16
46:6 47:17 48:13
64:3 104:18 113:13
118:12,22 119:3
120:17 128:1 130:13
132:1 142:18
**mark**
40:7 95:4 104:24
**marked**
37:10 56:2 95:10
105:4 110:24 111:6
118:3,16 124:11,14
126:6,10 127:15
130:6 131:8 147:18
**marking**
37:7
**marks**
15:22
**married**
59:9,11,13
**material**
72:24 73:1
**matter**
60:12 106:19 116:19
**mattered**
12:18
**matters**
12:24 106:20
**meaning**
5:4 94:14 120:9
122:9 132:15,18

**means**
39:14 64:16 82:17
85:15 131:15 132:22
140:10 141:13
**meant**
67:14 74:1
**mechanism**
10:20 136:19
**media**
58:7
**median**
71:10,16 73:10,11,
18 74:2,15 77:3,9,13
87:10 90:6 91:23
92:15 94:6,8 97:22
98:10,18,23 99:2,13,
17 100:8 108:15,21
109:4 126:22 127:1,
6 133:19 134:1,11,
18 135:2,12,18,22
133:3 137:16
**medical**
29:11
**meet**
56:21 57:16
**member**
14:20 15:1 45:5
54:21
**members**
62:16 143:17
**membership**
46:1
**memory**
6:11,12 36:16 38:14
45:4 104:22 105:8
106:12 144:22
**mental**
17:15,23 18:13,19,
23 21:21,23 22:1,7
29:16 30:3 31:19,23
32:8,10,11,13,16
34:24 35:5 50:2
94:16 118:20 119:4,
16,21 120:3,8 121:3,
7,10,24 122:24
123:15 139:11
**mentally**
19:11 29:2 31:22
32:4 34:1,3,22 35:9,
17,21 36:20 83:13
107:15,19 120:2,7
122:10
**messy**
145:6 146:7,13,17,
24
**met**
28:19 56:7,9,13
57:5,6,20 143:19,21
**MID**
54:4
**middle**
4:16 101:9 114:12
145:1,3 146:3,6,11,
14
**midnight**
13:17 14:16
**mile**
124:5,6
**mind**
33:1
**mindset**
67:3
**minutes**
7:6 47:10,12 49:2
50:19 55:19 80:1
84:9 143:15
**misdemeanor**
8:4
**missed**
148:10

**misstates**
18:11 85:24 98:12
**misunderstood**
51:17
**mitigated**
12:19
**mobilize**
129:20
**mode**
51:10
**module**
41:1 131:12
**moment**
60:4 80:17 92:17
**morning**
4:10 8:11 9:18 11:23
14:9
**motivated**
122:2
**motorcycle**
45:24
**move**
101:18 114:9
**moving**
85:16 92:19 137:13
**munition**
116:6
**munitions**
114:10
**muscle**
69:23
**music**
28:4
**mute**
60:4 84:1 147:6

## N

**names**
52:10 62:1,19
**narcotics**
122:1
**Nazi**
52:18 53:5,6,12,13
54:13,20 55:1
**neck**
66:18
**needed**
51:5,6 105:17
**negotiate**
24:14,18 26:3,8,12
**negotiating**
23:24 35:8 76:21
**negotiation**
76:10,14,16,17
**negotiations**
24:4,11 25:1,4 32:22
130:10
**negotiator**
22:8 90:14 120:23
130:24
**negotiators**
120:23
**Nerf**
69:19
**night**
8:11 14:9 16:8
22:17,20 34:7 46:6,
11 48:22 49:13
51:14 69:9 70:9
105:10 113:13 114:2
117:11 119:12
120:17 122:15
124:17 129:21
131:1,24 136:7
141:4 142:18 143:4
144:12
**non-appreciation**
52:24

**non-attorney**
56:17
**non-lethal**
69:8 72:10 78:16
**non-police**
62:23
**non-response**
132:20
**nonetheless**
81:10 147:1
**normal**
36:20
**northeast**
105:13
**Nos**
95:10
**nose**
89:2
**note**
16:19
**noted**
12:7
**notes**
14:1,3
**notice**
29:24
**noticed**
26:19
**nourishment**
7:7
**number**
13:7 25:17,20 103:7
111:22
**numbers**
15:5,8 45:18
**nutshell**
112:10

## O

**object**
12:4 18:10 32:2
35:10 52:6 55:12
59:20 63:2 65:23
67:12 73:21 79:18
80:21 81:12,23
85:23 93:8 94:1
98:11
**objection**
12:7,15 100:3 104:5
**objective**
96:19
**objects**
12:9 26:19 27:22
28:12 39:10,12 73:4
**observation**
27:3
**observations**
68:4
**observe**
24:5 26:9 67:20
**observed**
26:24
**observing**
24:6
**obstinance**
146:20
**obtain**
20:22 23:2
**obtained**
25:16,19
**OC**
94:8
**occasionally**
138:20
**occurred**
24:21 44:16 61:16
124:17
**occurrence**
62:18

**October**
13:14 14:6
**off-the-record**
142:16
**offended**
146:10
**offensive**
146:21
**offered**
19:19
**office**
7:15 19:20 29:20
**officer**
4:10,20 7:24 8:12,15
9:1,3 12:12,21 13:11
19:14 22:13,15,20
24:1,10 26:1,6,22
27:12,21 30:15 31:3
32:20,24 33:6,16,19,
23 34:10 37:13 42:7
48:18 59:9 64:18,19,
23 65:4,15,17,21
66:12,16,21 67:18,
22 71:11,17 75:9,10
80:1 83:18 84:13,23
94:20 95:24 99:9
107:23 110:10
111:5,17,18 112:16
114:1 116:11,19
124:15 129:12,13,17
136:22,24 137:13
139:1,2 141:5,15
143:13,23 145:15
**officer-to-officer**
48:5
**officers**
11:15 22:17 23:16
24:2,9 27:20 44:23
62:7 64:10 65:2,10
68:1,21 72:17 76:19
85:3 92:16 97:9
113:7,8,15 114:17
115:24 120:22
121:15 122:9 129:9,
10 130:20 131:21
137:3,8 139:6
142:17
**Olson**
53:13 55:2
**one-day**
21:12
**Online**
58:14 59:8 61:23
**open**
16:17,18 75:19
88:11 90:10,15,18,
23 101:21 102:2,11
108:17 135:1,7,8,10,
19 136:4 141:18
**opened**
66:8 91:4 108:23
117:11,17,20 134:15
141:19 142:1
**opening**
91:9 141:13
**operating**
4:24 11:9 72:3
118:10 119:18
120:10 127:19
130:10
**operational**
113:21 114:1
**operations**
129:23
**operative**
120:6
**opinion**
44:22 92:7
**opposite**
133:11 140:10,18

**option**
11:1 73:8,10,13,14,
18 74:2 95:24 96:4
97:6,19 109:8
140:20,21
**options**
9:11 69:8 112:22
113:7
**order**
11:8 24:14,16 54:4
69:10 72:12,14
92:20 93:2 99:3,16
123:10,11 137:21
**ordered**
85:9
**Ordering**
36:2
**orders**
100:7 145:19
**orientation**
124:24
**outcome**
35:4
**outcomes**
76:5
**Outlaws**
45:24
**outlining**
112:7
**overdose**
105:17 106:6,8,11,
14 107:16,20
**oxygenate**
77:16

## P

**p.m.**
55:22 56:5 110:20
111:3 142:10
**PA**
25:6,9,10,11 117:21
**pad**
16:20
**pads**
68:20
**pages**
147:24
**pain**
70:3
**paint**
70:2
**pairs**
16:16
**pandemic**
4:23
**paragraph**
97:1,2
**Pardon**
26:16 53:18
**part**
10:11 50:8 64:21
65:9 97:4 146:16
**participating**
6:6
**particulars**
60:15
**parts**
45:2
**pass**
51:9
**passenger**
101:23,24 139:23
**past**
29:21 102:17
**patrol**
13:17,19
**patrolmen**
17:9



Christian Jensen 11/24/2020

**peaceful**
130:23 131:19
140:10
**peacefully**
140:4,8
**pen**
16:19
**pending**
6:23
**people**
17:23 19:10 31:22
32:12 34:22 35:17
36:20 41:9,16 42:8
44:6,7,17,19 50:6
52:10 54:23 55:10
60:14 61:20,22 62:4,
5 63:21,22 75:10
139:9 144:1 146:22
**pepper**
16:15 69:14,15 70:1,
2 71:24 72:1,4,8
97:10,13,15 139:23
145:17
**perceived**
93:2
**percent**
15:14,15 40:14,17
**percentage**
15:17
**perception**
38:23 39:7
**periodic**
6:24
**permission**
90:18,22
**person**
16:12 28:21,23 29:7,
12 30:2 32:5 34:1
35:3,9,21 50:13
52:22 54:9 56:21,24
61:15 62:9 63:20
69:24 70:3,7 73:15
77:23 83:14 113:16
122:11 123:14
128:15 131:21
132:18 134:8
**person's**
32:11 56:15 103:14
**personally**
28:11 31:1 61:14
113:12 115:11
**persons**
17:14 18:20 118:19
120:1,7 121:3
**perspective**
37:17 38:17
**pertain**
122:23
**phone**
7:3 25:14,16,20,23
**phonetic**
49:16 53:21 106:14
**photograph**
124:20 125:17
126:9,15
**physical**
66:20 104:1 122:24
**physically**
77:12 135:14 136:1,
2,5
**picked**
77:14
**picture**
115:8 124:15
**pie**
102:6,10
**pieces**
46:7
**pin**
31:10

**pinned**
31:6 87:9 125:19,24
**pinning**
28:16 77:4 145:4
**pistol**
116:17,20 117:2
**pitch**
69:21
**place**
91:16 92:10 135:3
**Plaintiff's**
95:6
**plan**
91:10 98:8,15,16
99:1,5,7,9,10,19,20,
21,24 129:23 139:18
140:3,7,11 141:10
**planned**
97:20
**plans**
51:2 139:4
**play**
18:7 24:3 83:20,24
84:3,8 88:21
**played**
84:10
**playing**
28:4
**point**
13:18 27:5 28:17
31:9 32:17 33:21
67:3 68:23 72:5 73:9
75:15 77:11 78:4,23
81:18 91:3,11 92:6
97:23 117:11 127:5
144:24 145:7
**pointed**
65:8 91:17 101:3
**pointing**
104:10
**points**
42:16,19 111:22
**police**
7:14,17,24 8:7,12,15
9:16 11:10,14,18
13:5,11 14:21 17:11,
19 18:5 19:1,13
20:14 21:1 28:20
33:23 34:10 42:23
43:9,18 44:1 46:3
47:3 48:4 58:9 60:22
62:6,18 63:13,18
64:3,10,18 65:1,21
66:12,15,21 67:8,19,
20 68:1 76:8 84:24
85:1,2 90:5 103:5,20
111:7 112:11,16
113:8 116:19 122:9
123:24 124:8 126:18
127:20 130:18
136:22 138:17,18,19
143:23 144:21,22
**policies**
30:21
**policing**
37:16 38:17 39:21
**policy**
48:12 119:23 128:3,
6 130:17,18 138:24
**poor**
35:8,16 109:10,11
135:15,23
**Poplar**
104:19
**population**
15:5,11 40:13,16,18
**portable**
25:10
**pose**
68:12,15

**position**
31:15 82:13 93:18
133:18 135:4 145:20
**positioned**
108:15
**possessed**
96:16
**possibilities**
76:1
**possibility**
75:20 86:4,5,7,10
**possibly**
30:12 87:7 106:5
115:8
**potential**
107:20 121:23
**potentially**
105:16 106:1,2
121:16
**Powerpoint**
37:21 38:2 41:2,8,13
43:14,19 44:9 45:1,3
111:13 115:4,11
131:11
**practical**
123:16
**predominantly**
45:20
**prep**
56:20
**preparation**
56:8 57:6,21 58:8
**prerecords**
46:23
**present**
56:24 58:4 61:7,9
148:4
**presentation**
37:21 38:7,8 40:20
41:14 43:3,5,15,19
44:14 111:7 115:4
**preserve**
34:12,14 69:10
86:12,15 90:24 98:8
**preserving**
69:5
**pressing**
84:8
**pretty**
69:20 138:19
**prevented**
108:20 133:24
135:17 136:3
**preventing**
136:5
**previously**
23:23
**primary**
75:2,4,6,13,14
**prior**
4:23 8:2 27:17 29:17
35:22 91:9 123:19
134:12,14 144:11
147:22
**private**
60:2
**privilege**
59:21,23,24 60:8
**problem**
125:15
**procedure**
4:24 11:9 118:10
119:19 120:10
127:20 130:10
**procedures**
120:3 128:4
**proceed**
4:2
**process**
51:3

**program**
13:15,16
**progress**
8:18
**project**
69:19
**projectile**
69:19
**promoted**
13:22
**properly**
70:6
**proportions**
45:17
**protect**
73:7 74:3
**protection**
23:2
**protocol**
138:16
**provide**
57:14 120:3 130:19
**provided**
58:13
**proximity**
81:6
**psychologist**
63:17
**public**
138:21
**pull**
30:13 82:22
**pulled**
10:2,4 11:4
**pulling**
104:23
**purpose**
119:18,22,23 128:3
**pursuant**
128:21
**pursue**
30:22
**pursuing**
30:19
**push**
46:16
**put**
23:22 29:23 31:14
38:20 67:19 72:3,7
111:17 134:6,22
135:23 137:1,3,11
**putting**
54:2 108:21 118:6

**Q**

**quarter**
5:7
**question**
5:5,8,12 6:20,23
10:23 12:4,6,14
18:15 23:7 35:11
40:7 41:23 42:10
43:17 44:2 52:7
55:13 63:2 66:9
73:17,22 79:18
80:22 81:23 85:24
91:7 93:9,20 94:1
95:20,21 97:19
98:11 99:18 102:8,
16 117:15 119:9
135:16
**questioning**
143:14
**questions**
5:18 12:11 144:8
148:8
**quick**
89:12

**quickly**
85:16,20 92:4

**R**

**race**
144:4,6
**racially**
49:20,23 52:11
**radio**
16:15 33:19
**raised**
33:5
**ram**
31:15
**ramming**
31:6,10,11,18
**ran**
140:18
**range**
81:15 113:21 114:1
**rank**
7:16 13:23
**rapidly**
115:17
**rapport**
21:16
**rate**
40:21 41:15
**rated**
73:3
**RAVEENDRAN**
83:16,22 84:1,8 95:4
104:24 125:11,15
126:4 147:15
**reactions**
121:24 122:10
**read**
40:3 42:10,13 43:14,
22 45:2 81:1,3 95:21
97:2 106:12 119:17,
22 128:14 130:17
148:12
**reading**
38:9 64:24 96:22,24
**ready**
72:15 84:21
**real**
98:8 116:18,20
**rear**
101:23
**reask**
10:23
**reason**
17:5 30:19,21
**recall**
17:16 18:12,16,17
20:24 21:11 22:16
23:11 24:6 26:5,6,
10,14,17 27:7,19
28:5 33:9 37:20 38:5
40:23 41:8,11,13,19,
21 42:1 50:19 53:8
54:1 55:7,9 61:4
62:5,21 63:20 64:4,
9,13 65:16,18 72:2
76:11 94:20 101:1
102:14 105:10,12
106:10 111:7,12,14
115:3 118:1 124:8
143:22 144:3,19
146:5,9 147:2
**receive**
21:18,21
**received**
19:9,12,14
**receiving**
19:17

**recognition**
120:1 121:2
**recognizing**
121:16
**recollection**
17:21 18:9 24:10
38:8 40:22 47:24
55:3 61:14
**reconvene**
110:16 142:7
**record**
4:1 6:2 47:6 49:10
55:21 56:5 60:4,6
81:3 83:16,19
110:20 111:3 142:9,
14 147:6,10 148:18
**recorded**
6:1 50:23 67:14
**recording**
46:19 47:8 138:24
**records**
21:1 58:6
**refer**
49:19,23 50:1
**reference**
50:6 53:11
**referring**
50:13
**refers**
39:24 113:8
**refresh**
36:16 45:4 144:22
**refreshes**
105:8
**refused**
64:11 65:2 67:9
**refuses**
128:18
**regard**
11:16 19:10 62:10
96:2 127:21
**regulations**
63:16
**related**
62:23
**relevance**
52:7
**relevant**
39:10,12
**remained**
9:3
**remember**
18:2 36:17 38:1,12,
18 41:5,17 63:12
104:14,17 108:6,11
111:10 115:10 132:3
133:22 144:2 146:4
**remote**
15:20
**remove**
78:1 101:11 102:3
**render**
79:12
**rendered**
70:18,22 98:5
**repeat**
80:24
**repetitive**
35:7,15,20,24 132:3,
7,11,13,19 133:1,10,
15
**rephrase**
57:5 91:8
**report**
58:9,10,11 67:8,19
76:8 78:21 79:3
106:13 144:21,23
**reporter**
6:2 81:1,4 82:3,4
125:12



reports
59:3 115:14
representative
56:13 57:8,10
represented
44:6
representing
4:12 44:22
request
123:16,19,22
requested
81:4 124:1 139:15
required
6:3
rescue
73:15
resembled
26:20
reserve
148:9,11
resistance
118:11
resisting
114:13
resolution
116:12 130:23
131:19
resolve
21:17 131:16 140:4
resolving
128:7
resources
51:4,6
respect
11:11,13,15 16:3
18:19 25:4 35:16
40:21 50:12 132:11
respond
129:14 130:20
139:16
responded
37:4 104:18 129:17
responders
128:8
responding
107:22 108:1 118:19
129:5,7
response
36:21 39:3,8,20,24
41:15 42:20 51:11
118:11 132:14,15,22
137:10 142:21
rest
15:16 38:6
result
5:19 35:4 50:2 80:18
87:20 90:6 94:15
107:19
retreat
82:9 90:6 92:10,20
93:11 98:22 99:16
retreated
99:15
retreating
99:2
return
116:21
reveal
58:20
reverse
137:1,4,7,13
review
21:1 46:5 58:18,24
59:1,7 64:6
reviewed
58:7,11 147:21
reviewing
58:17
rifle
145:17

rights
96:8,11
rigid
123:1 132:14,22
rigidity
122:22
Rob
49:18
role
18:7 22:19 24:3
roll
23:3
rolled
27:10 28:2,3
Romanucci
4:9,11 12:8,20 18:14
32:6 35:14 37:12
42:4,6 52:13 55:18
56:6 59:5 60:3,7
63:6 66:3 67:23
73:24 79:24 81:1,8,
17 82:1,5,6 83:20,23
84:3,11 86:6 93:13
94:3 95:12,17,19
98:14 100:10 104:13
105:6 110:15 111:4
118:5,18 124:13
125:9,16 126:8
127:17 130:8 131:10
142:2,6,15 143:6,10,
12 147:5,11,20
148:7,13,15
room
56:24
root
40:5 41:24
round
69:18 143:13
route
24:22
rule
121:23
rules
5:15 63:15
running
93:15,22 140:18
rush
51:9

S

safe
123:15 124:4,5
safely
134:19
safer
135:3
safety
69:2
SAITH
148:19
salute
145:2,3,4 146:4
sanctity
11:11,15,20 86:12,
16 90:24
save
74:9 75:7
saver
75:14
saving
75:6
scenario
115:3
scenarios
76:2,4 99:23 139:4
scene
8:17,24 22:11,17
23:16 24:9,21,23,24
27:8,18 29:23 31:4
33:6 47:18 48:1

61:17 68:1 69:10
83:10,12 96:1 101:7
105:10 113:12
115:24 117:24
123:22 124:2,3,4
128:24 129:5,9,10,
13,21 131:1 136:14,
17 139:2,14
Schuttrow
83:18 84:23 85:3
88:23 141:5
Schuttrow's
83:18 88:22
science-based
37:16 38:17
scream
87:19
screaming
87:12
screen
37:13
search
102:22 103:3
seconds
84:9,17 92:3
section
114:12 121:2
Seinfeld
53:12
Seitz
104:15
send
125:12
sentence
53:4 96:15 101:10
separately
56:21
sergeant
13:23 14:6,8,11
22:13 23:20 49:17,
18 51:16 53:13 55:2
126:3 129:4 131:2
139:15
serve
133:2
service
103:23
set
94:21 125:3 133:20
settled
102:19
sharp
27:22 28:11 73:4
shelter
128:16
shield
72:21,23 73:6 74:18
75:8 134:7
shift
13:17,18 14:8,16
shock
70:7
shoot
77:15,17
short
55:18,24 84:7
110:22 142:12
shot
10:7,13,24 63:1
69:20 70:5,20 71:4,
7,14 78:19 80:13
83:3,7 84:18 86:23
89:14 91:14,15 93:5
108:17 123:20,23
124:22 127:12 129:9
138:11,12 139:7
141:23
show
37:7 38:6 42:4 132:6
144:24 147:12

showed
33:11 101:16
122:14,17
showing
43:18 64:17 111:5
124:14 126:9
shown
41:6 125:13 143:3
shows
126:20 147:24
SID
54:4
side
16:6 23:1 27:4 74:2,
15 77:6,7,9,17
84:16,17 93:18 94:5,
7 97:9,22 98:10,17
99:13 100:8,21,23,
24 101:24 108:15,21
109:4 127:6 134:1,2
135:3,12,13,18
sidearm
16:14 71:21 72:21
74:12 82:18 86:18
92:24 104:2 110:2,7,
13
sidearms
101:2
signature
95:1,2,7
significant
46:1
Similar
105:19
simultaneous
70:14
simultaneously
70:21 98:4
single
30:9
sir
6:8 8:5,9,13,15,16,
22,23 9:10,14,17,21,
22 10:1,5,6,9,15,17
11:6,7,12 12:3 13:9,
24 15:3,24 16:7,22,
24 17:2,4,17 19:7
20:6,21 21:10 22:18
24:20 25:15 26:5,15
27:14,24 29:13 30:7
31:2,13,17 32:19
33:9 34:5 35:6,13
37:14,19 38:5 39:1
40:9,23 41:3,21
42:24 43:22 44:8,20
45:7 46:4,10,13
47:11,13,15 48:16,
24 49:7,9,12,22 50:4
54:10 55:11,15
56:16,23 57:2,9,22
60:1 61:6 63:10
65:10 66:19 67:6
70:14 71:6,15,18,23
72:11,16,19 73:19
74:6,14,17,20,22
75:1,24 76:3,12
77:24 78:6,17 79:2
80:11,24 81:7 84:14,
19 85:13,18 86:9,21
87:1,5,8,11,15
88:13,15,19 89:4,12,
23 90:16,21 91:1,7,
24 92:13 94:9,13,19,
23 95:16 96:10,13,
18,24 97:16,18 98:1,
3,7,13 100:5 101:5,
8,15 103:7 105:9,11,
15,18 106:18 107:5,
13 110:14,18 111:9,
12,15,16 112:5,13,
21 113:2,5,16,23
114:3,5,19 115:2,6

showed …
117:1,7,18 118:1,8,
14 119:5 120:12,15
121:5,9,14,19 122:4
123:3 124:19,23
125:2,7,21,23
126:17,20 127:23
128:2,5,10 129:16
130:1,16 131:6,23
132:2 133:23
134:15,19,23 135:5
136:6 137:19,24
138:10,14 139:13
140:2,9,24 141:3,8,
15,21 142:5 143:22
144:15,23 145:13,18
146:8 147:23 148:2,
6
sit
17:21 18:20 21:8,11
22:10 28:10 41:7
62:21
site
141:4
sitting
88:18
situation
21:17 35:18 116:22
130:23 131:16,17
133:5,6 138:22
situationally
122:2
situations
130:21
sizeable
45:19
skills
94:11
slang
145:3
slashing
88:3,12,17
sleeves
15:21
slicing
102:5,9
slide
38:22 39:6,22 40:1,
20 41:8,11,17,22
42:5 43:19 111:17
114:10
slides
38:14 41:5
slowly
109:19
small
45:21
smart
109:5,7
smoke
77:18 78:5,8 87:20
89:2
smoking
99:11
sneak
54:3
snipers
101:6
SOP
112:12 118:12,21
119:2 141:9
SOPS
112:14
sound
83:24 84:4 103:20
148:1
Sounds
7:9 55:20 142:5
Soup
53:12
south
126:22

space
19:3 137:23
speak
5:24 21:13 22:22,23
23:7,8,10 25:6 57:23
63:16 68:19 76:18,
19
Special
54:7 127:21
specific
19:9 41:11
specifically
17:12 29:1 41:8,13
59:6 130:19
speculate
15:9 17:18 19:2
31:21 32:24 67:2,13,
18 81:14 89:4
speculation
80:22 81:12
speed
6:15 68:19
spelled
4:14
spend
12:22
spent
76:13,14
spit
89:21
split
14:8 29:13
spoke
23:12 49:17 56:19
57:24 58:1 60:1
63:15,21 105:24
spoken
50:18 60:14 61:3,11,
12,15 62:2,9,12,13,
15
spouse
59:21
spray
16:15 104:8 139:23
spread
20:19
Spreadsheet
105:1
squad
25:12 48:6 49:4
50:24 92:2 138:23
139:14
squat
137:15
stab
108:4,9
stabbing
33:20 73:2,4
stage
124:4
staged
124:7
stalled
8:18
stand
84:21 85:8 124:1
standard
4:24 118:10 119:18
127:19 130:10
standing
11:9 80:12 86:22
125:5 138:3
start
51:9 96:7 98:22
104:22
started
51:8 77:14 90:12,15,
19 146:19
starter
116:17,20 117:1



Christian Jensen 11/24/2020

**starting**
27:17 77:18 146:16, 17

**starts**
38:23 46:18 101:11

**state**
4:13 30:9 58:9 60:22 64:2,9 65:1 67:7,20 76:8 85:1 87:18 90:5 94:10 95:23 100:19 111:23 123:24 124:8 144:21

**State's**
19:20

**stated**
144:16

**statement**
18:4 28:11 60:16,17, 21,24 61:3,6,16 64:2,6 65:1 67:11 85:6 138:12

**statements**
61:10 88:4,6

**states**
95:23 96:15

**station**
24:22

**statistical**
15:5

**stats**
41:18

**statutes**
111:23

**stay**
100:8

**steak**
26:21 107:6

**step**
89:22 92:9 96:3

**stepped**
80:18 81:20 101:18 102:12 139:6 141:23

**steps**
41:6 89:5,14 90:1 123:6,13

**stereotype**
43:4,11,21 44:17

**stereotypes**
40:6 41:24 46:3

**stereotyping**
39:16

**stick**
147:7

**stipulate**
143:2

**stipulated**
143:8

**stipulation**
142:20,22

**stomach**
69:23 109:21

**stood**
98:21 99:14 100:20 140:15

**stop**
10:17 14:4 82:18 83:21 93:2 135:21

**street**
18:22 19:11 44:7 144:1

**stress**
133:5

**strike**
49:24 71:2 91:2 119:8

**strong**
16:6

**structure**
128:17

**stuck**
77:20

**study**
38:23 39:7

**subdued**
116:5

**subject**
33:5 68:2 115:15,20 116:5 117:6 128:12, 15,21 129:1 131:4

**subjected**
17:14

**subjects**
130:22

**submit**
128:19

**successful**
116:12

**sued**
102:17,18

**suffered**
29:16

**suffering**
30:2 31:19 121:3,8

**suggestion**
70:20

**suicidal**
29:21 34:7,8,11 67:1,5 68:2 104:18 105:17,22 106:1,3 144:18

**supervise**
14:13

**supervisor**
14:11

**supervisors**
76:19

**supposed**
21:13,15 48:18 72:18

**suspected**
120:2,7 121:3,7 123:14

**suspects**
19:10 114:20

**suspicious**
30:20

**SWAT**
14:21 15:1 51:10,13 62:16 116:2 127:22 128:4,23 129:3,4,6, 7,9,10,12,14,20,23 131:4 136:13

**swear**
7:22

**swiftly**
85:16,20

**sworn**
4:4,7 7:24 8:14 50:15,16

**T**

**tactic**
137:21,22

**tactical**
93:18 97:12 109:1 130:9,24 134:23 145:20

**tactics**
109:10 127:21 131:19 135:15,23,24 136:1

**takers**
130:21

**takes**
70:5

**taking**
4:20

**talk**
19:3 22:19 23:16 46:7 99:1,4 112:23 132:11

**talked**
36:8 41:9,14 49:14 61:18,20 62:17 63:12 112:23 113:14 114:11 132:3 133:18

**talking**
25:10 48:17 49:13 51:2 63:19 68:6 76:15,20 102:1 103:16,17 135:24 136:1

**talks**
11:10,18 39:2 95:13 113:19,20 114:10,12 122:22 123:5

**taser**
16:21 17:3,6,7 69:14 70:4,10,12,15,19,21, 22 71:2,4 72:15 75:10 97:14,23 98:5, 20 104:2 108:11,16, 22 109:1 113:19,20 114:2 140:17

**tasers**
17:8 108:13 110:12

**tasked**
128:6

**tattoos**
15:22

**taught**
19:2,22

**teach**
131:20

**team**
14:21,23 23:24 51:10 62:16 116:2 127:22 129:6,20 130:10,22 136:13

**technique**
102:5

**techniques**
19:15 131:17

**telling**
43:3,9,20 64:9

**tells**
12:10 122:8

**temporary**
29:5 122:1

**ten**
13:22 84:9 103:10

**ten-minute**
110:15

**tendencies**
34:12

**Tennessee**
112:3

**term**
50:8 138:19

**terminate**
30:17

**terms**
15:6 75:6

**tested**
73:5

**testified**
4:7 33:13 50:9

**testify**
58:22

**testifying**
50:14

**testimony**
18:11 50:11,15,16 55:6,7,16 63:11 65:7 85:24 88:10 89:13 98:12 134:10 138:7

**Thanksgiving**
148:16

**thereof**
28:24

**thing**
6:9 31:5

**things**
6:11 19:2 44:10 54:23 55:17 104:12 109:8 148:10

**thinking**
5:9

**thought**
39:18

**threat**
10:18 66:21 68:12, 15,22 88:2,5,6,7 93:2

**threaten**
68:9 87:22

**threatened**
30:24 31:3 144:12, 14

**threatening**
137:9

**throat**
28:15,18 33:14 34:9 108:9

**tie**
24:7

**time**
4:2 6:15,21,22 8:3, 14,21 9:12,18 12:16, 22 13:18 17:7,20 26:10,20 27:7,24 28:1,7,8,13 30:6,23 33:1 38:4 39:22 46:23,24 47:6,7,19 48:13,17 49:15 50:11,14 53:20 55:4, 21 56:5 57:1,21 59:13 63:7 64:21,22 65:6,12,19 71:4,7,11 72:2 74:5 75:15 76:15,17,20 77:5,23 83:9,12 84:15 86:13 90:18 92:6,17 93:12 94:2 97:11 99:21 101:1 111:3,10 118:24 131:18,22 133:19 134:5 135:5, 6 137:10 138:24 140:16 142:9,14 143:20,24 144:11 146:9

**timelines**
47:21

**times**
10:4,7 40:17 55:8,9, 13 65:11 100:7 102:18 103:4,19 148:10

**today**
5:3 12:23 13:4 18:21 21:9 22:10 28:10 41:8 56:8 96:12 138:7,15

**today's**
64:7 147:22

**told**
5:23 7:10 13:3 16:9 20:12 30:16 33:4 36:3,13 40:12 53:19, 20,21 54:2 59:19 60:10 80:1,6 90:4 103:18 117:19,23 121:15

**Tony**
4:11

**tool**
10:20 16:16 109:11

**tools**
131:18

**top**
62:4 132:10 147:24

**town**
50:8

**traffic**
30:20 127:7 135:13

**train**
39:19

**trained**
20:13,14 22:8,20 35:15 44:15 108:16, 22 111:7,11 114:24 120:22 130:20

**training**
13:15,16 17:11,13, 18,22 18:2,5,9,12, 16,24 19:9,12,14,17, 22,24 20:1,7,15,17, 18,23 21:1 33:22 38:10,15 41:1,14 42:22 43:9 131:12

**trainings**
41:4

**trains**
11:14 44:23

**transcribed**
60:20

**transcript**
61:5

**transferred**
13:18

**transient**
29:6

**transport**
22:7

**trapped**
135:8

**Travelers**
56:14 61:1,3,6,10, 11,13,15

**Trazodone**
106:15

**treatment**
120:3,8

**trial**
56:20

**tricky**
143:7

**trigger**
9:20 10:2,4 11:4

**tripod**
125:3,5

**true**
8:19 9:1,2,4,5,6,7 10:2,3,11,12 13:5,6 24:12,13 30:3,4,6,7 31:16,17 34:13 43:21 48:1,2,23,24 49:6 53:24 54:9 60:22 66:11,22,23 67:1,5,24 68:4,10, 11,13 70:16 72:12, 13,21,22 74:10,11 75:23 76:6,7 77:3 78:13,14,19 79:10 80:15,20 82:7,20 83:14,15 86:13,14 87:20 92:15,22,23 93:3,4,7 98:6,10 112:17,18 126:19 127:1,2 132:1,23 133:16

**turn**
48:10,21 123:4 134:18 138:16,20,22 139:1

**turned**
48:18 49:1,5 50:20

**type**
16:18 23:2 52:1

**typically**
6:24 89:22

**U**

**unable**
25:8

**unarmed**
100:18

**unclear**
106:11

**understand**
13:24 1 75:4,14 91:7 94:14,17

**understanding**
15:11 40:13 43:8 47:1 67:4

**understood**
6:7 143:10

**underwent**
20:9

**uniform**
9:6

**unit**
13:21 14:10,12 15:1 45:6 129:14

**units**
128:9

**unsure**
73:3 113:14

**usage**
48:15

**utilize**
97:13 140:17

**utilized**
70:10 98:20

**V**

**vague**
73:22 86:1 94:2 138:19

**vagueness**
12:15

**validate**
109:11

**vehicle**
8:18 22:24 25:11 26:3,12,20 27:17 28:6,9,12,16 29:17 30:6,9,20,24 31:10, 11,15,18 36:5,12,24 37:4 48:8 49:18 64:11,12,19 65:2,3, 5,11,12,15,18,22 66:10,22,24 67:10 68:17,18,20 71:22 73:16 74:6 75:11,16 77:2,5,7,19,21 78:2, 13 79:15,21 80:3 81:20 82:8,19 87:7, 13,19,23 88:2,11,14, 18 89:6 92:5,8,12 96:20 97:7 98:20,24 100:13 101:4,20 102:6 124:22 125:4, 19,20,24 126:12,19, 22 133:8 134:14 135:9 136:8,12,14, 20 139:20 140:12 145:8 146:16

**vehicles**
31:6 125:18 126:18 136:23

**velocity**
69:21

**verbal**
23:2 66:20 88:4,6,7

**verbally**
144:12,15



Christian Jensen 11/24/2020

**versus**
102:20 112:3
**vest**
16:12
**video**
4:21 36:17 46:19
61:23 82:22 83:1
84:10,12 88:17
89:11 101:16 138:23
143:3,4 147:7
148:11
**video-wise**
6:1
**videos**
58:12 142:17,21
143:3,8
**view**
102:6
**violence**
31:1,4
**violent**
31:7
**violently**
114:13
**visual**
38:23 39:7
**voice**
84:20
**volition**
96:20

---

**W**

**wait**
5:6,11 92:6
**waiting**
83:1
**waive**
59:23,24
**waiving**
96:8
**walk**
19:8 109:12
**walking**
76:14 109:19 110:3
**wall**
90:6
**wanted**
33:11
**war**
87:18 88:7
**warn**
142:17
**warrant**
102:22 103:3
**watch**
14:7 89:11
**watched**
61:23
**watching**
76:15
**wave**
89:2
**weak**
16:6
**weapon**
9:13,15 10:19 11:1,5
16:4 36:2,4,5 63:8
69:13 70:13 71:9,20,
21 73:5 77:12,14
78:12,15,16 79:8,13,
17 80:5,14 81:9,15
86:18 87:2,3 97:13,
17 104:10,11 109:3,
22 113:19 116:9,13,
17 137:6
**weapons**
17:1 36:11,14 80:20
81:6,19 114:21
127:21

**wearing**
9:6,8 16:9 46:8,11
**week-long**
20:1
**weeks**
57:17
**weight**
15:18
**west**
77:7,9 125:6 126:1,
15
**westbound**
8:18 26:7 74:15 77:4
84:17 97:21 98:10,
17 99:13 100:21,23,
24 125:1 134:2
**white**
15:6 39:10 41:15,16
45:9 104:19 117:6,7
144:7
**wife**
59:17 60:1,9 62:10
**Williamson**
22:13 24:3,9 145:15
**window**
23:4 27:1,4,6 28:2
77:22 78:2,9 139:23
141:14,20
**windows**
27:10 77:15
**wise**
109:1
**withstand**
73:1
**woman**
105:12 146:13
**word**
50:5,12 52:15,22
53:5,13 55:5,10,11
64:15 85:14 86:1
**words**
22:22 23:8,10,12
49:20 50:17 52:10,
11,14 54:14,15,16
131:15 146:22
**wore**
142:22
**work**
18:22 46:2 98:23
**working**
7:4 48:7,9
**world**
4:24
**worn**
145:5
**Wow**
116:23
**write**
6:3 54:12
**writing**
14:1,3
**wrote**
53:20,21,22 54:8
67:20

---

**Y**

**year**
14:14 20:22 21:8
41:4 44:13 103:22,
23
**years**
7:23 8:1 13:5,8,22
14:12,24 18:2,17
38:2,10 44:11
104:19 143:24
**yelling**
36:17

**Z**

**zoom**
57:2,6

