**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CHEVELLE and HOLLY CLEMENTS, as CO- ADMINISTRATORS) of the ESTATE of DECYNTHIA CLEMENTS, DECEASED,** | |
| **Plaintiffs,** | |
| **v.** | **No. 18-CV-3935** |
| **CITY OF ELGIN, a municipal corporation, and ELGIN POLICE OFFICER CHRISTOPHER JENSEN, individually and an agent of the CITY OF ELGIN,** | **Judge Jeffrey I. Cummings** |
| **Defendants.** | |

**MEMORANDUM OPINION AND ORDER**

This case arises from a March 12, 2018 incident during which Elgin police officer

Lieutenant Christopher Jensen shot and killed DeCynthia Clements in the early morning of

March 12, 2018. (*See* Dckt. #1). Plaintiffs, the co-administrators of the Estate of DeCynthia

Clements, bring claims under 42 U.S.C. §1983 for excessive force, failure to intervene, and

failure to train against defendants Lt. Jensen, Doe Officers, and the City of Elgin, respectively.

(Dckt. #48). The Estate also brings state law claims of willful & wanton conduct, wrongful

death, battery and survival against Lt. Jensen and the City. (*Id.*).[1] Lt. Jensen and the City have

moved for summary judgment. For the reasons stated below, defendants' motion (Dckt. #69)[2] is

---

[1] The Court has jurisdiction over the Estate's §1983 claims under 28 U.S.C. §1331, and supplemental jurisdiction applies to the state-law claims under 28 U.S.C. §1367.

[2] The filings related to the summary judgment motion include: the motion (Dckt. #69) and the memorandum in support thereof (Dckt. #70); defendants' Rule 56.1(a)(3) statement of material facts

granted on the Estate's federal claims and the Court relinquishes jurisdiction of the Estate's state law claims.

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), *quoting* Fed.R.Civ.P. 56(c); *see* Fed.R.Civ.P. 56(a); *see also Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment *unless* it is a genuine dispute as to a material fact); *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (issues of material fact are material if they are outcome determinative).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not

---

("DSOF") (Dckt. #71); plaintiffs' response opposition to summary judgment (Dckt. #77) and its memorandum (Dckt. #80); plaintiffs' Rule 56.1(a)(3) statement in opposition to DSOF ("DSOF Resp.") (Dckt. #78), and plaintiffs' Rule 56(b)(3)(B) statement of additional facts ("PSOF") (also Dckt. #78); defendants' reply brief (Dckt. #88); and defendants' response to PSOF ("PSOF Resp.") (Dckt. #89).

suffice; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020); *NES Rental Holdings, Inc. v. Steine Cold Storage, Inc.*, 714 F.3d 449, 452 (7th Cir. 2013). However, "when video footage clearly contradicts the nonmovant's claims, [courts] may consider that video footage without favoring the nonmovant." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 272, 378-81 (2007)). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (quotations and citation omitted).

## II. FACTS

The pertinent facts, construed in the light most favorable to the Estate,[3] are as follows:

On March 11, 2018, at approximately 11:50 pm, Elgin Police Officer Matthew Joniak was on a routine patrol in a marked squad car when he noticed a vehicle (a dark colored SUV) legally parked with its running lights near a bike trail that was closed at that hour. DSOF ¶¶1, 10; PSOF ¶1. A half hour later, Joniak saw that the SUV was still there and he approached it and spoke with the driver, who identified herself as DeCynthia Clements. DSOF ¶¶2-3. During this

---

[3] In their response to defendants' statement of material facts, plaintiffs often dispute paragraphs of defendants' statement without citing to specific parts of the record to contest each factual assertion within the paragraphs they dispute as a whole. *See* Local Rule 56.1(b)(3)(B) (the nonmovant shall provide "a concise response to the movant's statement that shall contain . . . a response to each numbered paragraph in the moving party's statement, including, *in the case of any disagreement*, specific references to the affidavits, parts of the record, and other supporting materials relied upon") (emphasis added). Because the portions of the paragraphs of defendants' statement of material facts to which plaintiffs dispute overall but do not specifically contest with reference to the record are deemed admitted (Local Rule 56.1(a)), the Court will frequently cite to plaintiffs' response to defendants' statement of material facts because that document makes clear what facts are actually in dispute for purposes of this motion.

encounter, Joniak saw a knife on the front passenger seat.  DSOF ¶4.  He also observed that Ms.

Clements exhibited dilated pupils and clenched teeth, which are both possible symptoms of

mental health episodes and the influence of narcotic stimulants to the central nervous system.

DSOF ¶4.  When Joniak returned to his squad car to run a check on Ms. Clements, Ms. Clements

drove away.  DSOF Resp. ¶5.  Joniak, who believed that Ms. Clements was driving while

impaired, followed her and activated his overhead lights to initiate a traffic stop after she

disregarded a stop sign.  DSOF Resp. ¶6.  Instead of pulling over, Ms. Clements accelerated and

drove to Interstate 90.  DSOF Resp. ¶6.  As he drove onto the Interstate 90 ramp in pursuit of

Ms. Clements, Joniak received and obeyed an order to terminate his pursuit because the pursuit

was being conducted solely for a traffic violation.  DSOF Resp. ¶¶7, 8.

Minutes later, Elgin police officer Christopher Hall saw the taillights of a vehicle 200

yards ahead of him jump four to six feet in the air and come down abruptly, which caused him to

conclude that the vehicle had collided with the guardrail.  DSOF Resp. ¶9.  Hall pursued the

vehicle until it stopped close to the median barrier outside of a traffic lane on the shoulder of

westbound Interstate 90.  DSOF Resp. ¶10.  Hall radioed Joniak, who confirmed that the vehicle

was the same SUV he had been pursuing and soon came to the scene.  DSOF ¶¶10-11.  Upon

arrival, Joniak approached the vehicle and asked Ms. Clements to roll down her window or step

out of her car.  DSOF ¶12.  Hall then approached the passenger side of the SUV and informed

Joniak that Ms. Clements had a steak knife with a sharp serrated edge under her right hip.  DSOF

Resp. ¶¶12, 13.  The SUV had two flat tires and body damage to its driver's side.  DSOF ¶12.

Lt. Jensen arrived on the scene as the officer in charge at 12:30 a.m. on March 12.  DSOF

¶19.  Multiple other Elgin police officers and two Illinois state troopers arrived on the scene as

well.[4]  Lt. Jensen tried to communicate with Ms. Clements by calling her name but she would not acknowledge him or look in his direction.  DSOF Resp. ¶20.  Lt. Jensen directed Sgt. Hartman to make announcements to Ms. Clements that she was under arrest and to exit the vehicle immediately.  DSOF Resp. ¶20.  Sgt. Hartman announced over his squad car's PA system that the Elgin Police Department was present on the scene and they were not going to go anywhere, and that Ms. Clements should exit her vehicle immediately and just talk to them.  DSOF Resp. ¶21.  Lt. Jensen told the officers that "we'll be here for a while," and that they were going to wait until Ms. Clements got out of her vehicle.  DSOF Resp. ¶39.  Lt. Jensen's plan was to continue to talk to Ms. Clements and see if the circumstances changed for her to come out of the car.  DSOF Resp. ¶39.

However, Ms. Clements did not exit her SUV; instead, she drove her SUV forward and backward multiple times for a distance of between 15 to 50 feet while the officers were on foot behind her.  DSOF Resp. ¶¶29-30, 32.  As she drove back and forth, the friction of her SUV's metal rims on the pavement caused sparks to fly as the wheels turned.  DSOF Resp. ¶29.  Lt. Jensen told Sgt. Harman that they would have to stop Ms. Clement's vehicle from moving and he ordered Sgt. Hartman to park his squad car immediately behind the SUV and he parked his own squad car immediately in front of the SUV.  DSOF Resp. ¶33.  Lt. Jensen took this action to pin in Clement's SUV for the safety of Ms. Clements and the officers by preventing her vehicle from going back and forth and keeping her from exiting Interstate 90 and getting on to Dundee Road.  DSOF Resp. ¶33.

---

[4] In addition to Lt. Jensen and Officers Joniak and Hall, Sergeant Hartman, Officers Garcia, Williamson, Schuttrow, and Duffy from the Elgin Police Department along with Illinois State Troopers Master Sergeant Surz and Trooper Nelson were present on the scene.  DSOF ¶¶15, 18, 19, 25, 30, 31, 40.

After Ms. Clements' SUV was pinned in, Sgt. Hartman announced over the PA system that no one would hurt Ms. Clements if she exited the vehicle. DSOF Resp. ¶24. Once more, Ms. Clements did not exit the SUV; instead, she stepped on the gas pedal and placed the SUV in forward and reverse causing the engine to smoke, the rims and metal axles to grind into the concrete surface of the road, and a piece of debris to fly across the highway. DSOF Resp. ¶34. At the time, Ms. Clement's SUV was in physical contact with the squad cars of Lt. Jensen and Sgt. Harman. DSOF Resp. ¶34. The officers observed Ms. Clements holding a knife to her throat and making a stabbing motion with the knife towards her chest. DSOF Resp. ¶35. Lt. Jensen – who had been informed at an early stage of the incident that Ms. Clements had a prior suicide attempt and previous mental health crises – concluded that Ms. Clements was exhibiting suicidal actions, and that she was either emotionally disturbed, mentally ill, under the influence of alcohol or drugs, or a combination of all of the above. DSOF Resp. ¶35; PSOF Resp. ¶4.

At 2:03 a.m. on March 12, the dashboard camera in Lt. Jensen's squad car recorded Ms. Clements lighting a piece of paper on fire and tossing it into the back seat of her SUV. DSOF Resp. ¶44; (Dckt. #80 at 8) (acknowledging that "DeCynthia may have unintentionally started a fire in her car"). A fire started in the middle of her SUV and it spread to the point where the vehicle was nearly fully engulfed in flames. DSOF Resp. ¶46. After the fire started, the police officers called out to Ms. Clements and yelled at her to get out of the SUV. DSOF Resp. ¶¶45, 47. After Ms. Clements did not exit, Lt. Jensen told the officers that they would have to approach the burning vehicle to extract Ms. Clements from it because there was not enough time to wait due to the fire. DSOF Resp. ¶¶46-48.

Lt. Jensen and three officers (Joniak, Hall, and Schuttrow) gathered near Ms. Clements' SUV to prepare to rescue her while protecting themselves from any harm that she might attempt

to inflict.  DSOF Resp. ¶49.  Lt. Jensen assigned two officers (Joniak and Schuttrow) to the "hands" team while Hall – who was trained and certified on the use of Tasers – was assigned to carry the Taser.[5]  DSOF Resp. ¶¶48, 50-51.  The two officers assigned to the "hands team" were tasked with physically removing Ms. Clements from the burning vehicle once it was appropriate to do so.  DSOF Resp. ¶51.  Lt. Jensen – who carried a ballistic shield[6] – positioned himself closest to Ms. Clements, followed by Hall and then the other two officers.  DSOF Resp. ¶¶66, 67.  The officers discussed amongst themselves about what they would do if Ms. Clements voluntarily exited the vehicle.  DSOF Resp. ¶41.  Lt. Jensen was aware that Ms. Clements could come out of the SUV with a knife or knives in her hands  and the decision as to whether to use lethal force depended on how Ms. Clements exited the vehicle.[7]  DSOF Resp. ¶53.  If Ms. Clements came out of the car armed with a knife, the plan was to use the Taser if she was not charging at the officers and for the officers to back up and hopefully hop over the concrete median.  DSOF Resp. ¶¶41, 53.  If she came out and ran away from the officers, lethal force would not have been an option.  DSOF Resp. ¶53.

The officers approached the driver's side door, which appeared to be the most practical route for Ms. Clements's exit from the SUV.  PSOF Resp. ¶19.  As the officers approached from behind to extricate Ms. Clements and the SUV was becoming fully engulfed in flames, the

---

[5] The officers had several non-lethal and less-lethal weapons on the scene including at least five Tasers, a 40-millimeter impact weapon, and a Pepper Ball launcher.  PSOF Resp. ¶26.  Lt. Jensen decided not to use the 40-millimeter impact weapon – which can be lethal in a range of closer than five feet – because he was concerned that using it to break the SUV's window could oxygenate the interior of the vehicle and accelerate the fire.  DSOF Resp. ¶45.  Lt. Jensen was also concerned that a 40-millimeter round could incapacitate Ms. Clements inside the vehicle if it struck her in the head.  DSOF Resp. ¶45.

[6] The ballistic shield was not an effective defense against an attacker wielding a knife.  DSOF Resp. ¶52.

[7] It is undisputed that Ms. Clements had at least one knife, though at times defendants suggest she had two knives.  *See* DSOF ¶60.

driver's door opened. DSOF Resp. ¶52. The officers yelled at Ms. Clements to show them her hands, drop the knife, and get out of the car. DSOF Resp. ¶52. Ms. Clements – who could be heard screaming in pain – remained in the SUV for at least ten seconds after she opened the driver's door. DSOF Resp. ¶59; PSOF Resp. ¶20.

After Lt. Jensen had closed to within six to eight feet of the SUV, Ms. Clements – who was 5'3" and 103 pounds – exited the SUV and moved swiftly toward him with a knife in her hand when he fired his weapon. DSOF Resp. ¶59; PSOF ¶6. Hall fired his Taser at Ms. Clements after he saw her moving rapidly toward the officers with a knife in her hand and the Taser discharged almost simultaneously with the discharge of Lt. Jensen's firearm. DSOF Resp. ¶60. Joniak unholstered his firearm after he saw Ms. Clements exit the SUV with a knife in her hand because he perceived her to be a threat who intended to inflict harm. DSOF Resp. ¶55.[8] Schuttrow likewise believed that Ms. Clements was coming to attack the officers after she made a "harsh step" toward them while leaning in their direction. DSOF Resp. ¶54. The Estate does not dispute that the video from Schuttrow's body camera shows that Ms. Clements exited her vehicle and moved swiftly towards Lt. Jensen and the other officers with a knife in her left hand. DSOF Resp. ¶57.[9]

Ms. Clements died on the scene a few feet from the burning SUV as a consequence of a lethal gunshot wound to her head. DSOF Resp. ¶¶62, 64. The autopsy report showed that she had indicators of smoke inhalation, including soot buildup near her nose and in her

---

[8] Lt. Jensen fired before Joniak could discharge his weapon. DSOF ¶55.

[9] The record contains evidence from the body worn camera video recordings of Lt. Jensen, Sgt. Hartman, and Officers Joniak, Schuttrow, Hall, Garcia, and Duffy as well as the video recordings from the dashboard cameras of Lt. Jensen and Sgt. Hartman. The parties have stipulated to the proper foundation for these video recordings. DSOF Resp. ¶56.

tracheobronchial tree, and that her blood tested positive for cocaine and Benzoylecgonine (a metabolite of cocaine).  PSOF ¶20; DSOF ¶14.

### III. ANALYSIS

Defendants move for summary judgment on all federal claims on the grounds that the Estate cannot establish that Lt. Jensen subjected Ms. Clements to excessive force, a showing required to prevail on each federal claim the Estate has brought in this case.  *See King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020) (relaying the requirements for showing excessive force against an individual officer under §1983); *Doxtator v. O'Brien*, 39 F.4th 852, 864-65 (7th Cir. 2022) (proof of a failure to intervene under §1983 requires a showing that excessive force was being used); *Tesch v. Cnty. of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998) ("A failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim.").  The Court will review these claims in this respective sequence, first addressing whether excessive force can be established.

### A. Lt. Jensen Is Entitled to Qualified Immunity from Liability.

Defendants argue that Lt. Jensen is entitled to qualified immunity from liability on the excessive force claim that the Estate has asserted against him.  The doctrine of qualified immunity protects government officials from liability for civil damages in situations in which their conduct does not violate a clearly established statutory or constitutional right.  *Gupta v. Melloh*, 19 F.4th 990, 1000 (7th Cir. 2021) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014).  "There are two inquiries in determining whether qualified immunity applies: [1] whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a constitutional

right; and [2] whether the right at issue was 'clearly established' at the time of the officer's alleged misconduct." *Tousis v. Billiot*, 84 F.4th 692, 698 (7th Cir. 2023) (cleaned up). Accordingly, the first step is to determine whether the Estate has produced sufficient evidence to show that Lt. Jensen violated Clements' constitutional rights by using excessive force.

1. **The Constitutional Claim at Issue for Purposes of Qualified Immunity is Excessive Force.**

Section 1983 authorizes private suits to redress deprivations of constitutional rights by state actors. *King*, 954 F.3d at 984. "The Fourth Amendment assures the right to be free from unreasonable 'seizures,' a category that includes a law enforcement officer's use of deadly force against a free citizen." *Id.* Since "[a] police officer's use of deadly force on a suspect is a seizure within the meaning of the Fourth Amendment," an unreasonable seizure is a violation of the Fourth Amendment cognizable under §1983. *Doxtator*, 39 F.4th at 860 (citing *Ybarra v. City of Chicago*, 946 F.3d 975, 978 (7th Cir. 2020)).

"All claims that law enforcement officers have used excessive force should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id*. (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). This reasonableness standard is an objective one, in the sense that it is the facts and circumstances presented to the officer at the time of the conduct at issue, rather than the officer's subjective intent, that matter. *Id.* The analysis of the officers' actions must be "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, [and the Court must] allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Weinmann v. McClone*, 787 F.3d 444, 448–49 (7th Cir. 2015) (cleaned up); *Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009) ("the police are entitled to err on the side of caution when faced with an uncertain or threatening

situation."). "This is true even when, judged with the benefit of hindsight, the officers may have made some mistakes." *King*, 954 F.3d at 984 (cleaned up).

When evaluating the reasonableness of the use of deadly force, the Seventh Circuit has held that:

> we focus on the danger posed by the person to whom the force was applied. This requires asking whether a reasonable officer in the circumstances would have probable cause to believe that the suspect poses an immediate threat to the safety of the officers or others. As a general matter, if the suspect threatens the officer with a weapon, deadly force may be used. And police officers may resort to deadly force even if a less deadly alternative is available to the officers.

*Estate of Biegert by Biegert v. Molitor*, 968 F.3d 693, 699–700 (7th Cir. 2020) (cleaned up); *see Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018) (where a suspect threatens the officer with a weapon, deadly force may be used because the risk of serious physical harm to the officer has been shown).

Crucially, "the totality of the circumstances to justify a seizure includes the period just before and during the shooting." *Smith v. Finkley*, 10 F.4th 725, 739 (7th Cir. 2021). The Seventh Circuit's "historical emphasis on the shortness of the legally relevant time period is not accidental [because] [t]he time-frame is a crucial aspect of excessive forces cases." *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994).[10] As the *Plakas* court explained: "[o]ther than random attacks, all [excessive force] cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force

---

[10] Accordingly, the Court rejects the Estate's argument that it should find Lt. Jensen's use of lethal force unreasonable based on the behavior of the officers during early portions of the incident, which started on March 11. (*See, e.g.*, Dckt. #80 at 10) ("When evaluating the reasonableness of deadly force, we focus on the danger posed by the person to whom the force was applied. . . . DeCynthia posed no danger to Elgin Police officers or others while she was in her vehicle, nor after her vehicle was pinned by Defendant Lt. Jensen and Sergeant Hartman, as she did not verbally or physically threaten anyone with the steak knife in her vehicle.") (citation and internal quotation marks omitted). The "seizure" claimed by the Estate is the lethal shot that Lt. Jensen fired at Ms. Clements. Thus, what transpired shortly before and during the shooting plays the predominant role in determining the reasonableness of Lt. Jensen's actions.

would have been used." *Id.* at 1150. Moreover, "officers who make errors that lead to a dangerous situation retain the ability to defend themselves." *Gysan v. Francisko*, 965 F.3d 567, 570 (7th Cir. 2020) (citing *Los Angeles v. Mendez*, 581 U.S. 420 (2017)).

To prevail on its claim of excessive force and related claims that require this showing, the Estate must ultimately show that the force was unreasonable as a matter of law. *See Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003) (explaining that the Court "treat[s] the reasonableness of force as a legal issue, rather than an analog of civil negligence"). Although the Seventh Circuit has "recognized that summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations," *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010), when the undisputed facts establish reasonableness as a matter of law, the Court must grant summary judgment in favor of the law enforcement party. *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) ("we may consider reasonableness as a matter of law when there are sufficient undisputed material facts to draw a conclusion."); *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (where there are "sufficient undisputed material facts to establish the officer acted reasonably under the circumstances, the court must resolve the issue as a matter of law, rather than allow a jury to 'second-guess' the officer's action") (citation omitted).

## 2. The Estate Has Failed to Produce Sufficient Evidence That Would Permit a Reasonable Jury to Find that Lt. Jensen Used Excessive Force Against Ms. Clements.

The Court must examine the record to determine whether the Estate has proffered sufficient evidence to permit a rational factfinder to find in its favor. *See Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). In recognition that "the person most likely to rebut the officers' version of events—the one killed—can't testify," the Court will "scrutinize[] the

evidence carefully" to ensure fairness to Ms. Clements, whose Estate alleges that Lt. Jensen impermissibly used deadly force. *King*, 954 F.3d at 985 (citing *Maravilla v. United States*, 60 F.3d 1230, 1233–34 (7th Cir. 1995)).

Once more, the Court's focus is on the events just before and during the time that Lt. Jensen fired his weapon at Clements. *Smith*, 10 F.4th at 739; *Plakas*, 19 F.3d at 1150. The parties offer two competing and inconsistent narratives of what occurred during the relevant time. According to defendants, Ms. Clements exited her SUV and moved swiftly towards Lt. Jensen and the other officers with a knife in her left hand. DSOF Resp. ¶57. According to the Estate, however, Ms. Clements did not exit the vehicle "aggressively." Instead, she "stumbled out of the vehicle, crouched to get below the smoke, and was shot within one second of her first foot hitting the ground as she fled her vehicle, complying with Elgin Police Officer demands that she exit the vehicle." DSOF Resp. ¶¶53, 55; (*see also* Dckt. #80 at 5) ("As her foot touched the ground, Defendant Lt. Jensen used excessively deadly force to shoot her in the head."), at 7 (Because Ms. Clements "did not pose an immediate, or any, threat to the safety of the officers and others, and was at most passively resisting arrest, the use of deadly force by Officer Jensen was unreasonable.").

If the Court accepts defendants' version of the crucial events, then Lt. Jensen's use of deadly force was constitutionally reasonable. *See, e.g.*, *King*, 954 F.3d at 985 ("If we accept the defendants' account of the critical events—that is, Bradley pointed a large knife at them, disregarded their repeated commands to drop the knife, and then charged at Hays—then Hays's use of deadly force was constitutionally reasonable."). If a reasonable jury could find that the Estate's version is what occurred, then it is extremely doubtful that Lt. Jensen would have been justified in using lethal force. Indeed, Lt. Jensen testified that he would have authorized only the

13

use of the Taser to subdue Ms. Clements if she came out of the SUV and was not charging at the officers *even if she had a knife in her hands*.  DSOF Resp. ¶41.

Although what occurred at the relevant time is certainly material to the disposition of this motion (and the case), the parties' dispute is not "genuine" because no reasonable juror could credit the Estate's version of what happened immediately prior to and during Lt. Jensen's use of lethal force.  This is so because the Estate's version is clearly contradicted by the footage from the officers' body worn cameras.  Paragraph 57 of the defendants' statement of material facts and the Estate's response thereto are illustrative:

> 57.  Officer Schuttrow had his body camera activated and recording throughout the event.  Exhibit P p. 56-57.  Lieutenant Jensen reviewed the video recording of Officer Schuttrow's body camera and concluded that *the video truly and accurately depicts the events of March 12, 2018*, as they unfolded, in particular*, the manner in which Ms. Clements exited her vehicle in possession of a knife in her left hand and moving swiftly toward Lieutenant Jensen and the other officers.*  Exhibit E par. 9.  The still shots below, taken from Officer Schuttrow's body camera, depict Ms. Clements as she exited her car.  Ex. E.

> **Response**:  *Plaintiffs admit that the factual statements in Paragraph 57 are undisputed*, but add that the still shots below, taken from Officer Schuttrow's body camera, *also depict Ms. Clements as she ran from her vehicle*.

DSOP Resp. ¶57 (emphasis added).

The Court's independent review of the footage from the body worn cameras of Officer Schuttrow and the other officers is fully consistent with the above description of Ms. Clements' actions after she exited the SUV.  This is the archetypal example of the scenario discussed by the Supreme Court in *Graham v. Connor* where a police officer (here, Lt. Jensen) was "forced to make [a] split-second judgment[]—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that [wa]s necessary in a particular situation."  *Graham*, 490 U.S. at 397; *King*, 954 F.3d at 984; *Plakas*, 19 F.3d at 1149.  Courts "give considerable leeway to law enforcement officers' assessments about the appropriate use of force in [such]

dangerous situations." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724–25 (7th Cir. 2013) (internal quotation marks omitted).

In sum: the video footage establishes that Ms. Clements did not crouch down in place after exiting the SUV but instead rapidly moved towards Lt. Jensen and the other officers. Moreover, she did not comply with the officers' command to drop her knife and she did not exit the SUV in a non-aggressive manner. Because the video footage "firmly settles" the factual issue of what occurred in the moment immediately before and during Lt. Jensen's use of force, "there is no genuine dispute about it" and the Court will not indulge the Estate's version of events. *Horton*, 883 F.3d at 944.

Thus, the question is whether defendants' version of events as captured by the video footage establishes that Lt. Jensen acted reasonably as a matter of law. Indeed, it does. As the Seventh Circuit has repeatedly held: "[i]f the person of interest threatens the officer with a weapon, deadly force may be used, because the risk of serious physical harm to the officer has been shown." *King*, 954 F.3d at 985; *Siler*, 957 F.3d at 759 (cleaned up) ("there can be no question that deadly force may be used if the officer has probable cause to believe that the armed suspect . . . poses a threat of serious physical harm, either to the officer or to others . . . ."); *Horton*, 883 F.3d at 949. By rapidly moving towards Lt. Jensen (who was six to eight feet away) and the other officers with a knife (a deadly weapon) in her hand, Ms. Clements posed a serious threat of death or great bodily harm to Lt. Jensen at the time he fired his weapon[11] and the Court finds he acted reasonably as a matter of law.

---

[11] The undisputed fact that Hall fired his Taser at Ms. Clements at the same moment that Lt. Jensen fired while Joniak was simultaneously preparing to shoot provides further evidence in support of the conclusion that Lt. Jensen reasonably perceived a threat of serious physical harm from Ms. Clements at the moment he fired.

The facts here are analogous to those in *King*. *See* 954 F.3d 981. In that case, two deputies went to the home of a man who suffered from paranoid schizophrenia to perform a "welfare check." *Id.* at 983. The man emerged from his house, advanced toward the deputies with a knife in his left hand, ignored their warnings to stop and drop his knife, and began running at one of the deputies. *Id.* When the man was approximately eight feet away from one of the deputies, the deputy fired one shot and killed the man. *Id.* The Seventh Circuit held that the deputy's use of deadly force under these circumstances was reasonable as a matter of law and found that he did not violate the man's Fourth Amendment rights. *Id.* at 985–87; *see also Logan v. City of South Bend*, 564 F.Supp.3d 719, 729, 737 (N.D.Ind. 2021), *aff'd sub nom. Est. of Logan v. City of South Bend,* 50 F.4th 614 (7th Cir. 2022) (citing *King* and holding that an officer acted reasonably as a matter of law when he shot a man who was advancing with a raised knife and came within seven or eight feet of the officer at the time the officer fired).

Finally, because Lt. Jensen's use of lethal force was reasonable as a matter of law, he was not required – as the Estate asserts – to resort first to any less deadly alternatives that may have been available to the officers. *See, e.g.*, *Est. of Biegert*, 968 F.3d at 699–700; *King*, 954 F.3d at 985; *Plakas*, 19 F.3d at 1149 ("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable."). In any event, it is unclear what less deadly alternatives the officers possessed at the moment that Lt. Jensen fired his weapon. The 40-millimeter impact weapon was lethal at a range of five feet, DSOF Resp. ¶45, and Hall discharged his Taser at Ms. Clements. Moreover, Lt. Jensen – who was advancing towards the burning SUV with the other officers to rescue Ms. Clements – was not required to keep some sort of distance or barrier (such as the concrete median) between himself and Ms. Clements to avoid liability to the Estate. *Plakas*, 19 F.3d at 1149.

In sum: because the Estate cannot show that Lt. Jensen's use of lethal force was unreasonable as a matter of law, *Bell*, 321 F.3d 640, Lt. Jensen is entitled to summary judgment on the excessive force claim alleged against him.

**3. The Estate has Failed to Establish that Lt. Jensen's Use of Force Violated A Clearly Established Right.**

Even if the Estate had presented sufficient evidence to show that Lt. Jensen's use of force was unreasonable as a matter of law (and it has failed to do so), Lt. Jensen would be entitled to qualified immunity on the excessive force claim asserted against him if the Estate cannot show that his conduct violated a clearly established constitutional right such that he was on notice that his conduct would be clearly unlawful. *Siler*, 957 F.3d at 758 (citing *Saucier v. Katz*, 457 U.S. 194, 201-02 (2001)); *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (The plaintiff bears the burden to show that a right is clearly established). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Tousis*, 84 F.4th at 698 (cleaned up). A plaintiff can show that a right is "clearly established" by statute or constitution in at least two ways: (1) pointing to an analogous case establishing the right to be free from the conduct at issue; or (2) showing that the conduct was "so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007).

The Estate's burden on this point is rigorous. As the Seventh Circuit has explained:

[A] right is clearly established for qualified immunity purposes if its contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question beyond debate. And in order to answer the question beyond debate, the Supreme Court has repeatedly emphasized that the clearly established law must share specific details with the facts of the case at hand. Though to defeat a defendant's assertion of qualified immunity plaintiffs

> need not produce a case directly on point, defining the applicable law at a high level of generality simply will not do. Only in the rare obvious case will the unlawfulness of the officer's conduct be sufficiently clear without existing precedent . . . addressing similar circumstances. This sounds like a high bar because it is—qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Doxtator*, 39 F.4th at 863 (cleaned up).

The Estate offers four theories to establish how Jensen violated a "clearly established" right belonging to Ms. Clements: (1) officers cannot create circumstances that give rise to deadly force; (2) passive resistance does not permit lethal force; (3) mere possession of a weapon does not warrant deadly force; and (4) officers must consider mental health when considering the deployment of deadly force. These propositions of law are unassailable. However, the cases that the Estate cites in support of these theories are distinguishable. None of them are sufficiently "particularized to the facts of this case," and, therefore, none satisfies the "high bar," required to jettison the officers' assertion of qualified immunity. *Doxtator*, 39 F.4th at 863 (citation omitted).

First, the Estate cites *Estate of Starks v. Enyart* for the principal that an officer who unreasonably creates the physical circumstances such that the "decedent would have been unable to react in order to avoid presenting a deadly threat" cannot be "immuni[zed] for the use of deadly force." 5 F.3d 230, 234 (7th Cir.1993). However, *Starks* is inapposite. As the Seventh Circuit has explained:

> In *Starks v. Enyart*, . . . we held that an officer acted unreasonably when he jumped in front of a speeding cab, after which companion officers shot the driver to prevent the officer from being struck. The officer acted unreasonably, we explained, because he created a situation in which it was impossible for a person to react in a way that would 'avoid presenting a deadly threat.'

*Estate of Biegert*, 968 F.3d at 698(internal citation omitted); *Reynoldsv. Shelton*, No. 122CV01345RLYMKK, 2024 WL 1055634, at *6 (S.D.Ind. Feb. 6, 2024). It was not

18

"impossible" for Ms. Clements to react to the approaching officers in a way that would avoid presenting a deadly threat.  To the contrary, as pointed out above, there is no basis to believe that Lt. Jensen would have used lethal force against Ms. Clements if she had exited her SUV without her knife, or done so while holding the knife but had stood still and not moved rapidly towards the officers.

Furthermore, unlike in *Starks*, where "the officers acted so far outside the bounds of reasonable behavior that the deadly force was almost entirely a result of the officers' actions," it was Ms. Clements' action in setting her SUV ablaze that was the precipitating event (or intervening cause) which led Lt. Jensen and the officers to approach to rescue her from the burning vehicle.  *Estate of Biegert*, 968 F.3d at 698 (distinguishing *Starks* on the ground that "Biegert's actions were an intervening cause of the deadly force.").  Prior to the fire, Lt. Jensen and the other officers were content to wait at a distance until Ms. Clements decided to get out of the SUV.  DSOF Resp. ¶39.  Once Ms. Clements set her SUV ablaze, the officers had two choices:  they could remain at a distance to see whether she would voluntarily exit the flaming vehicle and risk the possibility that she was unable or unwilling to do so, or they could move forward to rescue her while taking steps to make sure they were protected from any harm that she might inflict with her knife.  They chose the latter course of action, and their hand was essentially forced by Ms. Clements' threatening actions once she emerged from the SUV.

Second, the Estate asserts that Ms. Clements was only "passively resisting" arrest and it cites *Becker v. Elfreich*, 821 F.3d 920, 928-29 (7th Cir. 2016), for the proposition that "only minimal force is warranted where the accused is passively resisting."  (Dckt. #80 at 7, 9 ("Even after her vehicle was on fire, DeCynthia's decision to exit the vehicle was passive resistance"), 10, 17, 18 ("Until she stepped foot out of the vehicle, DeCynthia was passively resisting Elgin

Police's attempts to arrest her by not exiting the vehicle.")).  While the Court agrees that it is unreasonable for an officer to use deadly force on a passively resisting person, Ms. Clements was not engaged in "passive resistance" at the moment that Lt. Jensen fired his weapon.  Instead, as established above, Ms. Clements was rapidly moving towards Lt. Jensen (who was six to eight feet way) with a knife in her hand when he fired his weapon.  *Cf. Becker*, 821 F.3d at 927 (the arrestee displayed no conduct suggesting to the officers that he was armed and he "did not exhibit any sort of aggressive behavior toward [the arresting officer] or anyone else.").

Third, the Estate asserts – with citation to *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015) – that the mere possession of a weapon does not justify deadly force.  While this is correct, Ms. Clements did not merely possess a knife at the time Lt. Jensen fired his weapon.  Instead, Ms. Clements was holding a knife as she rapidly towards Lt. Jensen, making the facts in *Weinmann* (where the evidence established only that officer knew that the man had *access* to a gun, not that he was in possession of it or threatened to use it) distinguishable.  To reiterate: "[i]f the person of interest threatens the officer with a weapon, deadly force may be used, because the risk of serious physical harm to the officer has been shown."  *King*, 954 F.3d at 985.

Finally, the Estate argues that Lt. Jensen should have taken Ms. Clements' mental health into consideration before using deadly force.  In particular, the Estate asserts that "DeCynthia had a knife in her hand, but a reasonable officer would have known, based on the totality of the circumstances, that DeCynthia was not attacking the officers; rather she was panicked, during a mental health crisis, and trying to flee her blazing vehicle using the only path available to her after her vehicle was pinned between police cruisers."  (Dckt. #80 at 15-16).  It is true that Lt. Jensen believed that it was possible that Ms. Clements was emotionally disturbed or mentally ill and the Seventh Circuit has "held that mental illness may also be relevant to the reasonableness

inquiry." *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) ("If the suspect is mentally ill, the officer's awareness of his mental illness is also a factor in the analysis.").

Nonetheless, it is equally clear that deadly force may be used if the person of interest threatens the officer with a weapon "[a]nd this is so whether or not the targeted person suffers from a mental illness—the critical consideration is whether he or she poses an immediate threat to the officers or others." *King*, 954 F.3d 985. Thus, the fact that Ms. Clements may have suffered from a mental health crisis at the time of the incident did not render Lt. Jensen's use of force unreasonable given that the video footage establishes that she posed an immediate threat to the physical safety of the officers at the time he fired his weapon. *Id.*, at 985–87 (holding that the officers reasonably applied deadly force against a mentally ill man who pointed a knife at them and then charged); *City & Cnty. Of San Francisco v. Sheehan*, 575 U.S. 600, 602–06, 612–13 (2015) (officers' use of deadly force by firing multiple shots at a mentally-ill group home resident was reasonable where the resident was wielding a knife, advancing on officers, and threatening to kill them).

In sum: the Estate has not met its burden of establishing that Lt. Jensen violated any "clearly established" right of Ms. Clements at the time he fired his weapon. Therefore, Lt. Jensen is entitled to qualified immunity from the excessive force claim asserted against him.

## B. The Federal Claims Against the Doe Officers and the City Fail in the Absence of a Constitutional Violation by Lt. Jensen.

Despite the fact that the identify of all Elgin police officers who were involved the incident underlying the Estate's claims has been disclosed, the Estate has not amended its complaint to specifically name the "Doe Officers" listed in its complaint. Nonetheless, because the failure to intervene claims pled against the Doe Officers rise or fall with the merits of the

excessive force claim against Lt. Jensen, and the excessive force claim against Lt. Jensen has fallen, no separate analysis of the failure to intervene claim is necessary. *See, e.g.*, *Doxtator*, 39 F.4th at 864-65 (proof of a failure to intervene under §1983 requires a showing that excessive force was being used and that defendant officers had a realistic opportunity to intervene to prevent the harm from occurring); *Sanchez v. City of Chicago*, 700 F.3d 919, 926 n.3 (7th Cir. 2012) (if the plaintiff establishes that an officer subjected him to excessive force, he may seek to hold liable other officers who were present, observed the use of excessive force, and had a reasonable opportunity to stop it). The Estate's failure to train claim against the City likewise fails without a showing that Lt. Jensen used excessive force against Ms. Clements. *Doxtator*, 39 F.4th at 865; *Tesch*, 157 F.3d at 477 ("A failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim."); *Plakas*, 19 F.3d at 1150.

## C. The Court Relinquishes Jurisdiction of the Pendent State Claims.

With the federal claims dismissed, the Estate's state law claims against the defendants remain. The Seventh Circuit has described a "sensible presumption that if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). Pursuant to 28 U.S.C. §1367(c)(3), the Court follows this presumption and declines to exercise supplemental jurisdiction over the Estate's pendent state law claims. *See Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). Accordingly, the Estate's state law claims against the defendants are dismissed without prejudice so that they may be pursued in a state forum. *See Doxtator*, 39 F.4th at 867

("Without any federal claims over which it had original jurisdiction, the district court's decision not to exercise supplemental jurisdiction over the pendent state law claims was not an abuse of discretion.").

## IV. CONCLUSION

The death of Ms. Clements was tragic, and the Court expresses its condolences to her Estate and her family. Nonetheless, based upon the undisputed facts and the principles of law described above, the Court concludes that Lt. Jensen's conduct did not amount to a violation of Ms. Clements's constitutional rights. Consequently, the Court grants defendants' motion for summary judgment (Dckt. #69) as to the Estate's §1983 claims and the Court exercises its discretion to relinquish jurisdiction as to the Estate's state law claims. IT IS SO ORDERED.


**Date: March 27, 2024**

**Jeffrey I. Cummings**
**United States District Court Judge**